**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 16-cv-00671

ISABEL VALVERDE; and those similarly situated

       Plaintiffs,

v.

XCLUSIVE STAFFING, INC.;
XCLUSIVE MANAGEMENT, LLC D.B.A. XCLUSIVE STAFFING;
XCLUSIVE STAFFING OF COLORADO, LLC;
DIANE ASTLEY;
OMNI INTERLOCKEN COMPANY, L.L.C.;
OMNI HOTELS MANAGEMENT CORPORATION;
SELECT HOTELS GROUP, L.L.C. D.B.A. HYATT HOUSE DENVER TECH CENTER
D.B.A. HYATT PLACE DENVER TECH CENTER; and
MARRIOTT INTERNATIONAL, INC.

       Defendants.

---

## CLASS AND COLLECTIVE ACTION COMPLAINT

---

### INTRODUCTORY STATEMENT

Xclusive Staffing is a Colorado-based staffing agency composed of a conglomerate of

entities in at least 10 states. In large part, Xclusive provides low paid hourly employees to hotels,

including many in the Denver Metro area, like Defendants Omni, Hyatt, and Marriott. The entire

operation is 100% owned and operated by Defendant Diane Astley from Xclusive's

Westminster, Colorado corporate office.

Xclusive is a serial violator of federal and state wage and hour laws. Since 2011, the

United States Department of Labor has found Xclusive in violation of federal minimum wage

and overtime laws on at least five occasions. After these investigations, Xclusive promised to conform. But its blatant violations continue.

Most egregiously, Xclusive forces its employees to pay to get paid: deducting $3.00 from each pay check for the cost of issuing the check. Xclusive also systematically fails to appropriately track its employees' time, automatically deducting 30 minutes each day for lunches while often not permitting a lunch break and failing to provide the 10 minute breaks required by Colorado law. Xclusive does all of this while advertising on its website that it "exceed[s] industry standards" in complying with "federal, state and local laws."

Meanwhile, clients of Xclusive (including Defendants Omni, Hyatt, and Marriott) are hoping to relieve themselves of their legal obligations to their employees by hiring Xclusive to act as an intermediary between them and their workers. Luckily, the law will not permit such a sleight of hand and these clients should be held to account.

Xclusive accepts the incidental cost of occasional wage and hour compliance actions by government agencies as a cost of doing business, while persisting with wage and hour violations in its sprawling operation. Here, Plaintiff Valverde, a victim of these policies, seeks to hold Xclusive, Defendant Astley, and Xclusive's clients accountable to him and his fellow workers.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's related claim under state law.

2.      Venue is proper pursuant to 28 U.S.C. § 1391 because all of the defendants reside, or are registered to do business in, Colorado.

## PARTIES

3.      At all times material to the allegations of the complaint, the Plaintiff was domiciled in the District of Colorado.

4.      The Plaintiff signed a written consent to be a named Plaintiff in a Fair Labor Standards Act collective action and the signed consent is attached to this Complaint as Exhibit 1.

5.      At all times material to the allegations of the complaint, Defendant XCLUSIVE STAFFING, INC. (hereinafter "Xclusive") was a Colorado corporation with its principal place of business in the District of Colorado.

6.      At all times material to the allegations of the complaint, Defendant XCLUSIVE MANAGEMENT, LLC D.B.A. XCLUSIVE STAFFING (hereinafter "Xclusive Management") was a Colorado limited liability company with its principal place of business in the District of Colorado.

7.      At all times material to the allegations of the complaint, Defendant XCLUSIVE STAFFING OF COLORADO, LLC (hereinafter "Xclusive Colorado") was a Colorado limited liability company with its principal place of business in the District of Colorado.

8.      At all times material to the allegations of the complaint, Defendant OMNI INTERLOCKEN COMPANY, L.L.C was a Delaware limited liability company registered to do business in Colorado.

9.      At all times material to the allegations of the complaint, Defendant OMNI HOTELS MANAGEMENT CORPORATION was a Delaware corporation registered to do business in Colorado.

10.     Defendants OMNI INTERLOCKEN COMPANY, L.L.C and OMNI HOTELS MANAGEMENT CORPORATION shall hereinafter collectively be referred to as the "Omni Defendants."

11.     Upon information and belief, based on the hotel's website and a search of the Colorado Secretary of State's records, the Omni Defendants own and operate the Omni hotel located at 7 500 Interlocken Blvd, Broomfield, CO 80021 (hereinafter, the "Omni Interlocken").

12.     At all times material to the allegations of the complaint, Defendant SELECT HOTELS GROUP, L.L.C. D.B.A. HYATT HOUSE DENVER TECH CENTER D.B.A. HYATT PLACE DENVER TECH CENTER (hereinafter "Hyatt") was a Delaware limited liability company registered to do business in Colorado.

13.     Upon information and belief, based on the hotel's website and a search of the Colorado Secretary of State's records, Defendant Hyatt owns and operates the Hyatt hotel located at 7800 E Tufts Ave, Denver, CO 80237 (hereinafter, the "Hyatt Denver Tech Center").

14.     At all times material to the allegations of the complaint, Defendant MARRIOTT INTERNATIONAL, INC. (hereinafter "Marriott") was a Delaware corporation registered to do business in Colorado.

15.     Upon information and belief, based on the hotel's website and a search of the Colorado Secretary of State's records, Defendant Marriott owns and operates the Marriott hotel located at 4900 S. Syracuse Street  Denver  Colorado  80237 (hereinafter, the "Marriott Denver Tech Center").

16.     At all times material to the allegations of the complaint, Defendant Astley was a natural person domiciled in the District of Colorado.

## STATEMENT OF FACTS

**I.**   **Xclusive**

17.      Xclusive is a staffing agency based in Colorado that is 100% owned by Defendant

Astley.

18.      Xclusive's corporate headquarters is in Westminster, Colorado.

19.      Xclusive operates in at least 10 other states using subsidiary entities in each state.

20.      Xclusive operates subsidiaries in Colorado, New Mexico, Texas, Kansas, Louisiana,

Indiana, Tennessee, Kentucky, Ohio, and Florida.

21.      Xclusive uses Xclusive Management to manage these state subsidiaries and their

employees.

22.      Xclusive Colorado is a Colorado subsidiary of Xclusive.

23.      All of these entities are under common control because they are all 100 percent owned

and operated by Defendant Astley.

24.      All of these entities are also a unified operation because they are all are advertised as a

single operation at www.xclusivestaffing.com and they all do business as Xclusive Staffing.

25.      All of the entities provide the same service to clients: providing low wage hourly

personnel. Most of Xclusive's clients are hotels, like Defendants Omni, Hyatt and Marriott. But

Xclusive also provides its services to convention centers, timeshares, warehouses, stadiums,

hospitals, office buildings, catering companies, amusement parks, and schools.

26.      Xclusive Describes itself as follows on its website:

> In 2002, Xclusive Staffing began as a small Denver-based firm
> specializing in housekeeping services for local hotels. Xclusive
> Staffing was born out of our experience as "the user" of temporary
> staffing agencies. With many years of hotel experience among us,

our executives and managers understood the challenges of working with outside staffing firsthand. Based on our past struggles we collectively created a unique model of providing quality employees centered on the client's needs.

The past 13 years have proved that our vision of creating a new model of staffing was sorely needed. Xclusive Staffing has expanded from one location to 25 regional offices in 11 states largely on our reputation of doing things differently than the "typical staffing agency." We are a 100% female-owned company and remain committed to the highest levels of integrity in our business. We treat our employees with respect and in turn they deliver top-notch customer service.

We are trailblazers in our industry because we share the same values as our clients when it comes to staffing. Our focus on quality, consistency, and reliability has allowed us to build long-term partnerships. We understand the pressure that hoteliers face every day and we want to be that partner you can count on. We speak and understand the same "language" that hoteliers speak regarding standards, guest expectations, and competition.

Now, Xclusive Staffing is the industry leader and trusted partner of hundreds of clients across the country. As the preferred partner of multiple national hotel brands, facilities management companies and hotel management companies, we are excited to share our passion with you. We care about your challenges like they are our own because we have been in your shoes.

27.   Xclusive's operations throughout the country are controlled centrally out of its Westminster, Colorado headquarters. The branch offices fax and email timesheets and employee paperwork to the corporate office, and the corporate office sends payroll checks by FedEx to the branch offices weekly.

28.   In an enforcement action ending in January of 2014, the United States Department of Labor's Wage and Hour Division found that Ms. Astley creates policies affecting all of the branches.

29.     All pay stubs issued to every employee out of every branch are issued by "XCLUSIVE STAFFING."

30.     Xclusive's clients also rely on and help control the work of the workers provided by Xclusive. The USDOL has found that Xclusive employees are an integral part of the clients' business activities, providing large numbers of housekeeping, cooking, room attendant, and other operational staff. Moreover, client supervisors take part in training, controlling, and inspecting the work of Xclusive's employees.

31.     While Xclusive is responsible for compensating its employees, its employees' work directly benefits Xclusive's clients, and Xclusive's clients compensate Xclusive for providing the employees.

**II.     <u>Mr. Valverde was Employed by Xclusive</u>**

32.     Mr. Valverde entered into a service contract or contracts with Xclusive.

33.     Mr. Valverde first worked for Xclusive from in or about the Fall of 2010 to in or about the late Winter or Spring of 2011. During that time, Mr. Valverde worked at the following hotels that were clients of Xclusive or one of its subsidiaries:

> i.     Ameristar Blackhawk
>
> ii.     Crowne Plaza Denver Airport Convention Center
>
> iii.     Hyatt Regency Denver at Denver Convention Center
>
> iv.     Hyatt Denver Tech Center
>
> v.     Omni Interlocken
>
> vi.     The Denver Convention Center

34.     Mr. Valverde then worked again for Xclusive from the Fall of 2014 to the Winter of

2015.  During that time, Mr. Valverde worked at the following hotels that were clients of

Xclusive or one of its subsidiaries:

      i.      Ritz Carelton, Denver

      ii.     Marriott Denver Tech Center

      iii.    Omni Interlocken

      iv.    Hyatt Denver Tech Center

35.     At every hotel, Mr. Valverde worked as a cook or prep cook. Sometimes, when things

were busy, he would also help serve. At the Colorado Convention Center, he also sometimes

worked as a cleaner.

36.     During his second stint with Xclusive – from the Fall of 2014 to the Winter of 2015 – Mr.

Valverde frequently worked overtime. In particular, he remembers working a lot of overtime

during November and December of 2014 because he helped to cater many holiday parties.

37.     Attached as Exhibit 2 is one weekly paystub from this period where Mr. Valverde

worked overtime during a week that he worked at the Omni Interlocken, the Marriott Denver

Tech Center, and the Hyatt Denver Tech Center.

**III.     Xclusive's Pay Practices**

38.     Xclusive's website advertises compliance "federal, state and local laws" and ensures its

customer that it takes these laws "extremely seriously" and that "[w]e exceed the industry

standards to ensure your protection."

39.     In addition, the website claims that Xclusive has "[f]ull compliance with overtime laws."

40.     Despite these promises, Xclusive maintains policies that violate state and federal wage and hour laws.

**A.  The $3.00 Weekly Deduction and Other Deductions Primarily for the Benefit of the Employer**

41.     $3.00 was deducted from every paycheck Mr. Valverde received from Xclusive as an administrative charge to cover the cost of issuing the paycheck.

42.     Mr. Valverde complained about the deduction, and an agent of Xclusive told him that it was necessary because Xclusive had to recoup the $3.00 cost of issuing his paychecks.

43.     Xclusive also deducts other expenses from wages that are primarily for the benefit of the employer, including clothing, name tags, criminal background checks, and tools or other equipment necessary for the employee's work.

44.     Mr. Valverde talked to various other Xclusive employees at the various hotels where he worked and they complained of the same deductions.

45.     A 2011 enforcement action against Xclusive by the USDOL Wage & Hour Division in Texas found that Xclusive "deducted $3.00 per paycheck as a processing fee and made other deductions for things such as uniforms, name badges and background checks."

46.     The paystub attached as Exhibit 2 reflects the $3.00 deduction (labeled "FEE") during the work week described by the paystub. The paystub also reflects deductions for a criminal background check, a name tag, a kitchen uniform, and kitchen tools during the year to date.

**B.  Automatic 30 Minute Meal Deductions**

47.     At every hotel where Mr. Valverde worked, Xclusive automatically deducted 30 minutes from his time each day for lunch.

48.     Sometimes Mr. Valverde would get a 30 minute break.

9

49.     But most days he would not get a 30 minute break, and would instead be doing his normal work during the unpaid 30 minutes.

50.     On some occasions, Mr. Valverde was ordered to indicate the 30 minute break on his time sheet and then ordered to get back to work.

51.     On some occasions, Mr. Valverde saw an agent of Xclusive indicate the 30 minute break on his timesheet even though he did not take it.

52.     Mr. Valverde talked to his coworkers about this policy and they also complained about the same thing happening to them.

53.     Mr. Valverde had 30 minutes deducted on the days he worked in the paystub attached as Exhibit 2 and worked doing his normal duties during at least some of the time that was deducted.

54.     A 2012 enforcement action against Xclusive by the USDOL Wage & Hour Division at the Grand Hyatt in Denver Colorado found that Xclusive "did not count missed lunch breaks."

55.     A 2014 enforcement action against Xclusive by the USDOL Wage & Hour Division at the Hampton Inn & Suites in Denver Colorado found that lunches were "auto-deducted even when the employee worked."

### C.  Failure to Provide 10 Minute Breaks

56.     The Colorado Wage Order provides that "[a] compensated ten (10) minute rest period for each four (4) hours or major fractions thereof shall be permitted for all employees."

57.     During his time working for Xclusive, Mr. Valverde did not receive *any* 10 minute rest breaks, except at the Hyatt Regency Denver  and at the Denver Convention Center.

58.     At those two hotels, managers that worked for the hotel and convention center, rather than the Xclusive supervisor, required the breaks.

59.     No other person who managed Mr. Valverde during his time at Xclusive permitted the 10

minute breaks.

60.     Mr. Valverde did not receive 10 minute breaks during the week represented by the

paystub attached as Exhibit 2.

### IV.     The USDOL Wage & Hour Division Investigations

61.     Xclusive has been investigated several times by the USDOL Wage & Hour Division for

minimum wage and overtime violations.

62.     Below is a table summarizing USDOL Wage & Hour Division's recent history with

Xclusive:

| Year | Location | Finding |
|------|----------|---------|
| 2011 | Albuquerque, NM | Minimum Wage and Overtime Violations |
| 2011 | Grapevine, TX | Minimum Wage, Overtime, and Recordkeeping Violations |
| 2012 | Tampa, FL | Minimum Wage Violation |
| 2012 | Denver, CO | Minimum Wage, Overtime, and Recordkeeping Violations |
| 2014 | Denver, CO | Overtime and Recordkeeping Violations |

### V.     Xclusive's Pattern of Racketeering

#### A.  The Astley Enterprise

63.     As the Owner of Xclusive, Defendant Astley formed an association-in-fact with Xclusive

and all of its associated entities and subsidiaries, which shall be referred to as the "Astley

Enterprise."

64.     The USDOL Wage and Hour Division found that Ms. Astley is "involved in the daily

operations of [Xclusive]."

11

65.     Ms. Astley owns and operates 100 percent of Xclusive and all of its associated entities and subsidiaries.

66.     In conducting their illegal racketeering scheme, the enterprise acted with the common purpose of violating state and federal wage and hour laws, and thus paying its employees less than legally required in order to capture more revenue and profit from the contracts with Xclusive's clients and more market share from its competitors in the temporary labor market.

67.     Because of her sole ownership of Xclusive, Defendant Astley has personally profited from the fraudulent scheme through Xclusive's increased profits resulting from the racketeering.

**B.  Wire And Mail Fraud Schemes And Their Resulting Harm To Plaintiff And The Class**

68.     The Astley Enterprise engaged in three interrelated wire fraud schemes: (1) the USDOL scheme, (2) the website scheme, and (3) the electronic timekeeping scheme.

69.     Both on their own and together, these schemes comprise patterns of racketeering activity.

**i.     The USDOL Scheme**

70.     In a 2012 investigation by the USDOL Wage and Hour Divisions Denver District Office of Xclusive's operations at the Grand Hyatt, Denver, the USDOL found an illegal policy of automatic 30 minute deductions for lunch. As part of that investigation, Ms. Astley met with the USDOL Investigator on June 27, 2012 and was told that "the employer failed to count missed lunched breaks." According to the USDOL, at this meeting, Ms. Astley "agreed to comply by making sure that all employees are paid at time and one-half the employee's regular-rate of pay after 40 hours in a workweek and by making sure that the Grand Hyatt and Xclusive compensate employees for all their hours worked." Ms. Astley blamed Xclusive's client – Grand Hyatt – for the practice.

71.     Despite Ms. Astley's attempt to blame Grand Hyatt, the investigator damningly found that Xclusive "employees have missed lunch breaks that Grand Hyatt employees did not have." That is, Grand Hyatt was only deducting time for lunch breaks for its non-Xclusive employees when the breaks actually taken, while Xclusive was deducting time for lunch breaks regardless of whether the breaks were taken.

72.     In 2014, the USDOL found Xclusive automatically deducting lunch breaks at another hotel. At the close of the investigation there was a 2/24/2014 meeting at the Denver District Office of the USDOL Wage and Hour Division with Ms. Astley. According to the USDOL, "Ms. Astley stated that Xclusive never automatically deducted lunches." After the investigator showed Ms. Astley records showing that every employee was off the clock from exactly 12:00pm to 12:30pm, Ms. Astley again blamed Xclusive's client – this time Hampton Inn & Suites – for the practice.

73.     The automatic lunch break deductions, and their result of illegally paying employees, were the result of an intentional pay practice of the Astley Enterprise and Ms. Astley's statements to the contrary to the USDOL were fraudulent because she knew or should have known about these practices.

74.     Moreover, despite Ms. Astley's promises to the USDOL, these practices continued after the USDOL investigations. Mr. Valverde experienced automatic lunch deductions at each hotel where he worked for Xclusive, including the workweek encompassed by the paystub attached as Exhibit 2.

75.     The USDOL relied on Ms. Astley's fraudulent promises regarding the meal deductions in deciding its dispositions and the Plaintiff and those similarly situated were harmed because, as a result of the fraud, Xclusive was able to continue its illegal pay policies.

76.     The Astley Enterprise used the mail and wires in furtherance of the fraudulent scheme by using them to transmit the fraudulent pay records and checks. The Astley Enterprise uses the mail and wires each week, including the week encompassed by the paystub attached as Exhibit 2, to send time records to its corporate office in Westminster, Colorado and to send the resulting pay checks back to its branch offices.

77.     In the 2012 USDOL investigation of Xclusive in Denver, the USDOL found that Xclusive "routinely faxes/emails timesheets and new-hire paperwork from branch offices (located in other states) to the corporate office and the corporate office sends payroll checks by FedEx to the branch offices weekly."

78.     The Astley Enterprise communicated with the USDOL Wage and Hour Division by wire and or mail during the course of investigations by the USDOL into Xclusive's wage-payment practices. Ms. Astley is listed as a contact by the USDOL for Xclusive in the documents related to these investigations, along with her phone number, cell phone number, fax number, and email address.

79.     Specifically, the Astley Enterprise continually and repeatedly made material and false representations to the USDOL Wage and Hour Division after investigations by that agency found violations of wage and hour laws.

80.     The Enterprise also continually and repeatedly defrauded its clients by promising full compliance with federal and state wage and hour law, while repeatedly being found in violation

of these laws. Moreover, many of these repeated violations stemmed from the implementation of identical illegal policies.

81.     The Asltey Enterprise made these fraudulent statements despite knowingly and intentionally implementing policies that violated state and federal wage and hour laws.

### ii.     The Website Scheme

82.     As detailed *supra,* the Astley Enterprise uses the internet to fraudulently advertise its compliance with state and federal minimum wage laws.

83.     Specifically, Xclusive's website currently advertises that Xclusive "exceed[s] industry standards" in complying with "federal, state and local laws."

84.     From at least 8/2/2010 to 3/6/2015, Xclusive's website claimed "[c]ompliance with all federal, state and local labor laws" in advertising "Why Xclusive Staffing?" to potential clients.

85.     Not only does this knowingly and intentionally false assurance allow Xclusive to recruit employees, it also serves to reassure current and potential clients who confront the risk of being held jointly and severally liable for Xclusive's wage-and-hour violations.

86.     Because of the false assurances made by the Astley Enterprise over Xclusive's website, clients are more likely to contract with Xclusive, allowing Xclusive to maintain its illegal pay policies.

### iii.     The Electronic Timekeeping Scheme

87.     Xclusive maintains records of employee work hours for its various clients on online electronic time keeping systems, including its proprietary platform, StaffTraxs.com, and a third party platform, WorkRecords.com.

88.     Xclusive is currently advertising for Property Managers on its website that will manage their employees at client locations. The Property Managers must be able to "[m]anage all timekeeping systems including but not limited to manual timesheets, StafftraXS and WorkRecords."

89.     On its online "Client Center," Xclusive provides a link to its StaffTraxs.com system where a client can go if it is "[l]ooking to view [its] employees [sic] hours." StraffTraxs.com provides Justin Astley's name and phone number as a technical support contact. Justin Astley is a vice president at Xclusive.

90.     Until at least March 2, 2015, the Xclusive website advertised StaffTraXS to its clients as follows: "Xclusive Staffing is pleased to offer our clients the easiest and most user-friendly timekeeping solution in the industry.  Designed in house, StafftraXS is built specifically for the needs of the hospitality industry making it far superior to other options available. StafftraXS is indicative of Xclusive's commitment to leading the industry and making our client's jobs easier everyday."

91.     In a different wage and hour action against Xclusive in the District of Colorado different Plaintiffs, who were former Xclusive employees, filed an amended complaint with WorkRecords.com time sheets for Xclusive Workers at the Omni Interlocken attached as Exhibits. *See Cota Martinez et al v. Xclusive Management LLC et al.*, 15-cv-00047 (D. Colo.), ECF Docs. 39-6, 39-8, & 39-10. The WorkRecords time sheets reflect the automatic 30 minute deduction policy and are incorporated here by reference.

92.     Both Xclusive and its clients have access to, and use, these platforms and therefore the Astley Enterprise uses these online platforms to make repeated, intentionally-false statements over the wires regarding employee work hours.

93.     In particular, as alleged elsewhere, Xclusive's records for employee work hours consistently report 30-minute breaks that employees rarely take, notwithstanding that Xclusive and Defendant Astley know that this practice violates wage-and-hour laws.

94.     By underreporting employee work hours to clients over the wires, the Astley Enterprise engages in repeated acts of wire fraud that harm class members by enabling Xclusive to charge clients less than it would if it truthfully recorded and reported work hours or by enabling Xclusive to retain the profits that would otherwise flow to employees if it truthfully recorded and reported work hours.

95.     An example of repeated wire fraud injuring Mr. Valverde is the use of WorkRecords.com to fraudulently report Mr. Valverde's time while he worked at the Omni Interlocken, including during workweek described by Exhibit 2.

## RULE 23 CLASS ALLEGATIONS

96.     The Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-written herein.

97.     The Plaintiff asserts their Counts I, III, and IV as Fed R. Civ P. 23 class action on his own behalf and on behalf of classes for which he seeks certification.

98.     Pending any modifications necessitated by discovery, the Plaintiff preliminarily defines a the "Rule 23 RICO Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT A CLIENT LOCATION

99.     Pending any modifications necessitated by discovery, the Plaintiff preliminarily defines

the "Rule 23 Wage Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES
> THAT WORKED AT A CLIENT LOCATION AND WORKED
> IN EXCESS OF 40 HOURS IN A WEEK

100.    Pending any modifications necessitated by discovery, the Plaintiff preliminarily defines a

sub-class to the Rule 23 Wage Class (the "Omni Sub-Class") as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE OMNI INTERLOCKEN HOTEL (500
> INTERLOCKEN BLVD, BROOMFIELD, CO 80021) AND
> WORKED IN EXCESS OF 40 HOURS IN A WEEK

101.    Pending any modifications necessitated by discovery, the Plaintiff preliminarily defines a

sub-class to the Rule 23 Wage Class (the "Hyatt Sub-Class") as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE HYATT DENVER TECH CENTER
> HOTEL (7800 E TUFTS AVE, DENVER, CO 80237) AND
> WORKED IN EXCESS OF 40 HOURS IN A WEEK

102.    Pending any modifications necessitated by discovery, the Plaintiff preliminarily defines a

sub-class to the Rule 23 Wage Class (the "Marriott Sub-Class") as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE MARRIOTT DENVER TECH
> CENTER HOTEL (4900 S. SYRACUSE STREET DENVER,
> COLORADO 80237) AND WORKED IN EXCESS OF 40
> HOURS IN A WEEK

103. The classes are so numerous that joinder of all potential class members is impracticable. The Plaintiff does not know the exact size of the classes since that information is within the control of Defendants. However the Plaintiff estimates that, based on the size of Xclusive's operations, the classes are composed of well over 1000 persons and each sub-class is composed of over 50 persons. The exact size of the classes will be easily ascertainable from Defendants' records.

104. There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions of law and fact include: the Defendants' pay practices; the Defendants' failure to pay employees all they are legally owed; the nature and extent of Defendant Astley's fraud.

105. The class claims asserted by the Plaintiff are typical of the claims of all of the potential Class Members because they experienced the same or similar working conditions and pay practices as the Defendants' other employees. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy. This is especially true in the case of low-wage, hourly, temporary workers, like the class members here, who are un-sophisticated, are unlikely to seek legal representation, cannot realistically navigate the legal system pro se, and whose small claims make it difficult to retain legal representation if they do seek it.

106. The Plaintiff will fairly and adequately protect and represent the interests of the class. He was Defendants' employee and was the victim of the same violations of law as the other class members, including numerous violations of federal and state wage and hour laws.

107.     The Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in wage and hour class actions.

108.     The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct for Defendants.

109.     Each class member's claim is relatively small. Thus, the interest of potential class members in individually controlling the prosecution or defense of separate actions is slight. In addition, public policy supports the broad remedial purposes of class actions in general and that the pertinent federal and state laws are appropriate vehicles to vindicate the rights of those employees with small claims as part of the larger class.

110.     The Plaintiff is unaware of any members of the putative classes who are interested in presenting their claims in a separate action.

111.     The Plaintiff is unaware of any pending litigation commenced by members of the classes concerning the instant controversy.

112.     It is desirable to concentrate this litigation in this forum because all parties are domiciled in this jurisdiction, or are registered to do business in this jurisdiction.

113.     This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of wage claims to both class litigation and the use of representative testimony and representative documentary evidence.

114.     The contours of the class will be easily defined by reference to the payroll documents Defendants were legally required to create and maintain. *See* 29 C.F.R. § 516 *et seq.*

## 29 U.S.C. § 216(B) COLLECTIVE ACTION ALLEGATIONS

115.    The Plaintiff brings his FLSA claim as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of himself and on behalf of all other similarly situated current and former employees of the Defendants.

116.    Pending any modifications necessitated by discovery, the Plaintiff preliminarily defines the "216(b) National Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT ONE OF ITS CLIENTS' LOCATIONS
> AND WORKED IN EXCESS OF 40 HOURS IN A WEEK

117.    Pending any modifications necessitated by discovery, the Plaintiff preliminarily defines the "216(b) Omni Sub-Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE OMNI INTERLOCKEN HOTEL (500
> INTERLOCKEN BLVD, BROOMFIELD, CO 80021) AND
> WORKED IN EXCESS OF 40 HOURS IN A WEEK

118.    Pending any modifications necessitated by discovery, the Plaintiff preliminarily defines the "216(b) Hyatt Sub-Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE HYATT DENVER TECH CENTER
> HOTEL (7800 E TUFTS AVE, DENVER, CO 80237) AND
> WORKED IN EXCESS OF 40 HOURS IN A WEEK

119.    Pending any modifications necessitated by discovery, the Plaintiff preliminarily defines the "216(b) Marriott Sub-Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE MARRIOTT DENVER TECH

CENTER HOTEL (4900 S. SYRACUSE STREET DENVER, COLORADO  80237) AND WORKED IN EXCESS OF 40 HOURS IN A WEEK

120.    All potential FLSA class members are similarly situated because, among other things, they were all hourly employees of Defendants and the members of the sub-classes were additionally all employed by Defendants. Moreover, all members of the class and sub-classes suffered from the same policies of Defendants, including:

 a.    Deductions for costs that are primarily for the benefit of the employer (including the $3.00 weekly deduction for the cost of issuing a pay check); and

 b.    The automatic 30 minute meal break deduction, regardless of whether the employee worked during the 30 minutes.

**<u>COUNT I</u>: CIVIL RICO, 18 U.S.C. 1964(C)**

- **The Named Plaintiff and the Rule 23 RICO Class vs. Defendant Astley**

121.    The Plaintiff incorporates by reference all previous paragraphs of this Complaint.

122.    As set forth above, Plaintiff asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

123.    Defendant Astley violated RICO by violating 18 U.S.C. §§ 1962(c) and 1964(c).

124.    Defendant Astley and the Astley Enterprise engaged in the fraudulent schemes, acts, and misrepresentations described above, which violate 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), and which constitute patterns of racketeering.

125.    By conducting the Astley Enterprise through a pattern of racketeering, Defendant Astley injured the Plaintiff and those similarly situated.

126.    Among other things, each of these RICO violations caused the Plaintiff and those

similarly situated to suffer loss of past, current, and prospective wages.

127.    As a result, the Plaintiff and those similarly situated suffered injuries and are entitled to

treble damages, fees, and costs as set forth by law.

### <u>COUNT II</u>: THE FAIR LABOR STANDARDS ACT, 29 U.S.C. §§ 201 *ET SEQ.*

- **The Named Plaintiff and the 216(b) National Class against Xclusive, Xclusive management, and Astley**
- **The Named Plaintiff and the 216(b) Omni Subclass against Defendants Omni Defendants, Xclusive, Xclusive management, Xclusive Colorado, and Astley**
- **The Named Plaintiff and the 216(b) Marriott Subclass against Defendants Marriott, Xclusive, Xclusive management, Xclusive Colorado, and Astley**
- **The Named Plaintiff and the 216(b) Hyatt Subclass against Defendants Hyatt, Xclusive, Xclusive management, Xclusive Colorado, and Astley**

128.    The Plaintiff incorporates by reference all previous paragraphs of this Complaint.

129.    The Plaintiff brings his FLSA claim as a collective action, pursuant to 29 U.S.C. §

216(b), on behalf of himself and on behalf of all other similarly situated current and former

employees of the Defendants.

130.    Defendants Employed the Plaintiff and those similarly situated pursuant to the Fair Labor

Standards Act.

131.    Each of the Defendants are, or were members of, of an enterprise that had annual

revenues in excess of $500,000 during the Plaintiff's employment and had two or more

employees that handled goods or materials that had been moved in or produced for interstate

commerce. The Defendants were therefore an enterprise and/or enterprises engaged in commerce

pursuant to 29 U.S.C. § 203(s)(1).

132.    As employers of the Plaintiff and those similarly situated, the Defendants named in this

claim were required to pay the Plaintiff and those similarly overtime pursuant to 29 U.S.C. § 207

and failed to do so.

133.    The failure to pay overtime was willful pursuant to 29 U.S.C. § 255(a).

134.    The Plaintiff and those similarly situated are therefore entitled to the following pursuant

to 29 U.S.C. § 216:

       i.      unpaid overtime;

      ii.     gap time for any work week in which overtime is owed;

    iii.     their regular rate for unpaid breaks;

    iv.     statutory liquidated damages;

     v.     reasonable attorney's fees and costs.

135.    As joint employers, Defendants are joint and severally liable to the Plaintiff and the

216(b) class.

## COUNT III: FAILURE TO PAY STATUTORILY REQUIRED WAGES, INCLUDING OVERTIME UNDER, THE LAWS OF THE SEVERAL STATES

- **The Named Plaintiff and the Rule 23 Wage Class vs. Defendant Xclusive**
- **The Named Plaintiff and the Rule Omni Subclass against Defendants Omni Defendants, Xclusive and Xclusive Colorado**
- **The Named Plaintiff and the Rule 23 Marriott Subclass against Defendants Marriott, Xclusive and Xclusive Colorado.**
- **The Named Plaintiff and the Rule 23 Hyatt Subclass against Defendants Hyatt, Xclusive, and Xclusive Colorado**

136.    The Plaintiff incorporates by reference all previous paragraphs of his complaint.

137.    The Plaintiff brings this claim for himself and on behalf of the Rule 23 Class and Sub-

Classes.

138.    The Defendants employed the Plaintiff and those similarly situated.

24

139.     The Plaintiff and those similarly situated worked for the Defendants under an

employment contract and the Defendants failed to pay them overtime pursuant to the relevant

state statutes and regulations, including Colo. Rev. Stat. § 8-6-118 (Colorado),  N.M. Stat. § 50-

4-22, -26 (New Mexico), Kan. Stat. Ann. § 44-1204 (Kansas), Ind. Code § 22-2-2-4, (Indiana),

Ky. Rev. Stat. Ann. § 337.285 (Kentucky), and Ohio Rev. Code § 4111.03. (Ohio).

140.     By failing to pay for all hours worked, the Defendants also failed to pay all wages due

under the hourly employment contracts and therefore violated the state wage payment statutes,

including Colo. Rev. Stat. § 8-6-101 *et seq.*

141.     The Plaintiff and those similarly situated are entitled to damages and, if applicable,

attorneys' fees.

## <u>COUNT IV</u>: CONTRACT AND, ALTERNATIVELY, EQUITY UNDER THE LAWS OF THE SEVERAL STATES

- **The Named Plaintiff and the Rule 23 Wage Class vs. Defendant Xclusive**
- **The Named Plaintiff and the Rule Omni Subclass against Defendants Omni Defendants, Xclusive and Xclusive Colorado**
- **The Named Plaintiff and the Rule 23 Marriott Subclass against Defendants Marriott, Xclusive and Xclusive Colorado.**
- **The Named Plaintiff and the Rule 23 Hyatt Subclass against Defendants Hyatt, Xclusive, and Xclusive Colorado**

142.     Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully re-

written herein.

143.     As set forth above, the Plaintiff asserts this count on his own behalf and on behalf of all

those similarly situated pursuant to Fed. R. Civ. P. 23.

144.     Plaintiff and those similarly situated entered into hourly employment contracts with the

Defendants.

145.     The contracts promised payment of a fixed amount per hour worked.

146.    The contracts also incorporated state and federal wage and hour laws.

147.    The Defendants breached the contracts by, among other things, not compensating employees for all hours worked.

148.    Plaintiff and those similarly situated suffered damages.

149.    In the alternative, if the contracts fail, the Defendants are liable to Plaintiff and those similarly situated in quasi-contract, including promissory estoppel and unjust enrichment.

## DEMAND FOR JURY TRIAL

150.    Plaintiff demands a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

151.    The Plaintiff respectfully requests an Order from this Court:

    c.    Certifying an opt-in class and sub-class pursuant to the FLSA, 29 U.S.C. §§ 201 *et seq.*;

    d.    Certifying the Rule 23 class and sub-classes, naming the named Plaintiff class representative, and naming Plaintiff's counsel class counsel;

    e.    granting judgment in favor of Plaintiff and against all Defendants;

    f.    awarding the Plaintiff and the Rule 23 classes their actual damages and any applicable statutory damages;

    g.    awarding the Plaintiff and those similarly situated damages and liquidated damages under the FLSA;

    h.    awarding the Plaintiff and those similarly situated their costs;

    i.    awarding the Plaintiff and those similarly situated their attorneys' fees;

j.      awarding the Plaintiff and those similarly situated prejudgment and post-

judgment interest, when allowable by law; and

k.      granting such other relief as this Court deems just and proper.

Respectfully Submitted,

s/Alexander Hood
Alexander Hood
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

Attorney for the Plaintiff

# EXHIBIT 1

## CONSENTIMIENTO PARA ACCIÓN FLSA

Por este medio doy mi consentimiento para que se haga una demanda por salarios que puede

que me deben bajo la Ley de Normas Justas de Trabajo. Yo les autorizo a mis abogados a que me

representen ante cualquier tribunal o agencia sobre estas reclamaciones, incluyendo la presentación de

un caso el cual yo soy la parte Demandante en una acción colectiva de conformidad con 29 U.S.C. §

216.

NOMBRE    _Isabel Valverde_

FIRMA     _(signature)_

FECHA     _11-30-15_

## FLSA CONSENT FORM

I hereby give my consent to sue for wages that may be owed to me under the Fair Labor

Standards Act. I hereby authorize my attorneys to represent me before any court or agency on these

claims, including filing a case where I am the party Plaintiff in a collective action pursuant to 29 U.S.C.

§ 216.

NAME        _____

SIGNATURE _____

DATE        _____

8

# EXHIBIT 2

**XCLUSIVE STAFFING**
PAYROLL ACCOUNT

373642

| Check # | 373642 | | | XXX-XX-4367 | | Gross | 604.29 |
|---|---|---|---|---|---|---|---|
| Date | 12/07/14 | | Sr. Isabel Valverde | | | YTD | 1,460.30 |
| Amount | | 534.57 | | | | | |

| | Earnings | | | | Taxes | | Year-T-D |
|---|---|---|---|---|---|---|---|
| MARRIOTT DENVER TE | 11.08 | 34.17 | 378.60 | RegFWT | FED W/H | 13.79 | 36.12 |
| HYATT DTC | 9.00 | 8.33 | 74.97 | RegSOC | SOC | 37.47 | 90.54 |
| OMNI INTERLOCKEN | 10.00 | 9.00 | 90.00 | RegMED | MED | 8.76 | 21.18 |
| overtime diff | 5.28 | 11.50 | 60.72 | APTCOT | CO TAX | 6.70 | 17.35 |

| | | | Deductions | | Year-T-D |
|---|---|---|---|---|---|
| | | FEE | | 3.00 | |
| Gross Amount | 604.29 | CRM | Crimina | .00 | 7.60 |
| | | NAME | Name Ta | .00 | 5.00 |
| | | CHEF | Chef | .00 | 25.00 |
| | | KIT | KIT | .00 | 20.00 |
| | | BLUE | Blue | .00 | 16.00 |
| | | MEAL | Meals | .00 | 3.00 |

**XCLUSIVE STAFFING**
PAYROLL ACCOUNT

373642

ADVANCED 3632 1429