**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 16-cv-00671-MSK-MJW

ISABEL VALVERDE; and those similarly situated

      Plaintiff,

v.

XCLUSIVE STAFFING, INC.;
XCLUSIVE MANAGEMENT, LLC D.B.A. XCLUSIVE STAFFING;
XCLUSIVE STAFFING OF COLORADO, LLC;
DIANE ASTLEY;
OMNI INTERLOCKEN COMPANY, L.L.C.;
OMNI HOTELS MANAGEMENT CORPORATION; and
MARRIOTT INTERNATIONAL, INC.

      Defendants.

**MOTION FOR PROTECTIVE ORDER, TO PROVIDE CORRECTIVE NOTICE, TO STRIKE ARBITRATION REQUIREMENT TRANSMITTED TO PUTATIVE CLASS MEMBERS, AND FOR ATTORNEY'S FEES AND COSTS**

**CERTIFICATE OF CONFERAL PURSUANT TO D.C.COLO.LCIV.R. 7.1(A)**

Plaintiff's counsel conferred with Defendants' counsel prior to filing this Motion. Defendants oppose this Motion.

**I.  INTRODUCTION**

This case is about Defendants' ongoing efforts to extract labor and money from their low-wage workers. Plaintiff filed his Complaint in this case on March 22, 2016. Dkt. No. 1. He asserts claims on behalf of a putative class of Xclusive employees under state and federal wage-and-hour laws and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962, *et*

1

*seq.* ("RICO").

After Plaintiff filed his complaint, Xclusive attempted to force putative class members to enter into arbitration requirements that would have waived their right to participate in this litigation. *See* Exhibit A: "Mutual Arbitration Agreement." This motion concerns Xclusive's improper interactions with putative class members after Plaintiff filed claims on their behalf. As a consequence of Xclusive's communications, Plaintiff moves for (1) a protective order; (2) corrective notice; (3) an order finding the attempted arbitration requirements unenforceable; and (4) attorney's fees and costs related to this motion.

## II.   FACTS KNOWN TO PLAINTIFF

Maria Sonia M. Simon works for Xclusive staffing and is a member of the putative class. Ex. A at ¶¶ 1-5. During the week of May 9, 2016, she went to Xclusive's offices to pick up her paycheck. *Id.* at ¶ 6. When she arrived at the office, an Xclusive employee told her that she could not pick up her paycheck until she signed a form. *Id.* at ¶ 7. That form was a single-spaced, two-page document titled "Mutual Arbitration Agreement." *Id.*; Exhibit A: "Mutual Arbitration Agreement." Ms. Simon stated that she did not understand the document, to which the Xclusive supervisor replied that it meant that if "there was an accident on the job," Ms. Simon "would have to speak to [her] boss." *Id.* at ¶`9. The Xclusive supervisor did not inform Ms. Simon that the document purported to waive her right to participate in this class action or any future class action. Nor did Xclusive inform Ms. Simon of the existence of this class action.

Ms. Simon explained to the Xclusive supervisor that she would not sign the "Mutual Arbitration Agreement" because she did not understand it. *Id.* at ¶¶ 8-10. Nonetheless, based on her experiences with Xclusive, Ms. Simon believes that many other workers likely did sign the

2

document. Xclusive employs many low-wage immigrant workers. *Id.* at ¶ 12. Many of these workers fear that they will face employment or immigration consequences if they refuse to cooperate or otherwise speak out for themselves. *Id.* at ¶ 13. And many live paycheck to paycheck. *Id.* at ¶ 12. Therefore, it is likely that Xclusive's misleading communications with putative class members resulted in at least some putative class members signing the arbitration requirement.

### III. THE IMPROPRIETY AND ILLEGALITY OF THE ARBITRATION REQUIREMENTS

**A. The Transmission of the Arbitration Agreements Violated *Gulf Oil* & Its Progeny**

Immediately after the filing of a class action, and even before the class is certified, a district court has "broad authority to exercise control over [the case] and to enter appropriate orders governing the conduct of counsel and parties." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). In general, communications with absent class members are permitted. However, particularly where a defendant has made coercive or misleading statements to putative class members, courts may take broad remedial action to preserve "the proper functioning of the litigation." *Randolph v. PowerComm Const., Inc.*, 41 F. Supp. 3d 461, 465 (D. Md. 2014); *Zamboni v. Pepe W. 48th St. LLC*, No. 12-cv-3157 AJN JCF, 2013 WL 978935, at *3 (S.D.N.Y. Mar. 12, 2013) ("Courts have a responsibility to restrict communications that are potentially coercive or misleading."). This same analysis applies to opt-in classes asserting claims under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq. See, e.g., Stransky v. HealthONE of Denver, Inc.*, 929 F. Supp. 2d 1100, 1109 (D. Colo. 2013).

For a number of reasons, Xclusive's transmission of arbitration requirements to putative class members and communications with those putative class members about the arbitration

requirements were particularly coercive and misleading. First, coercion and intimidation are likely because the putative class members are Xclusive's employees, and Xclusive told putative class members that they had to sign the arbitration requirements as a condition of receiving their pay. *Id.* at 1109 ("The context here is of particular concern, as an employment relationship exists between the parties, which itself may increase the risk that communications will have a coercive effect.") (internal quotation marks omitted). Because many of the putative class members are low-wage, immigrant employees with limited English skills, the possibility of coercion was particularly acute here.

Second, Xclusive did not inform the putative class members about the existence of this litigation or the rights that they would purportedly waive by signing the arbitration requirement. *See, e.g., Kleiner v. First Nat'l Bank*, 751 F.2d. 1193, 1202-03 (11th Cir. 1985) (upholding district court's invalidation of opt-out forms obtained through ex parte phone calls to defendant bank's customers); *Freidman v. Intervet Inc.*, 730 F. Supp. 2d 758, 764 (N.D. Ohio 2010) (invalidating settlement releases obtained from putative class members that failed to clearly advise them that they were giving up the right to participate in putative class action); *County of Santa Clara v. Asta USA, Inc.*, 2010 WL 2724512, at *4 -*6 (N.D. Cal. 2010) (refusing to enforce releases of putative class members in a consumer class action through an "accord and satisfaction" which did not contain an explanation of plaintiffs' theory of the case or contact information for plaintiffs' counsel). In other words, Xclusive's communications with putative class members were not motivated by a desire to maintain the employment relationship or even an interest in investigating the facts underlying Plaintiff's lawsuit. They were part of a bald effort to decrease the size of the putative class after the class action had been filed.

Third, at least in the case of Ms. Simon, the communications involved explicit lies about the import of the arbitration requirement. Ms. Simon was not told that by signing the document, she was agreeing to resolve all of her disputes in a private forum, nor that she was waiving her right to participate in this class action or any other. Instead, Defendant Xclusive merely told her that the form meant that she would speak to her boss if she were injured on the job. Blatant deception of this sort is precisely the kind of communication that supports judicial intervention under Rule 23(d). Fed. R. Civ. P. 23(d); *Longcrier v. HL-A Co.*, 595 F. Supp. 2d 1218, 1228 (S.D. Ala. 2008).

Finally, it makes no difference that the coercive communication at issue here is styled as a "Mutual Arbitration Agreement" that purports to require that its "interpretation [and] enforcement" be governed by the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.* Over the past few years, a number of courts have addressed situations involving arbitration requirements transmitted to putative class members and have struck down those requirements, even in less coercive and misleading contexts as that at issue here. *See, e.g.*, *Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 919 (11th Cir. 2014) (refusing to enforce agreements distributed after filing of a collective action under the FLSA); *Espinoza v. Galardi S. Enterprises, Inc.*, 2015 WL 9592535, at *3 (S.D. Fla. Dec. 31, 2015) (refusing to enforce arbitration agreements distributed during the pendency of an FLSA collective action); *Jimenez v. Menzies Aviation Inc*, 2015 WL 4914727, at *6 (N.D. Cal. Aug. 17, 2015) (refusing to compel arbitration of putative class members where new arbitration policy was disseminated during the pendency of the class action and noting that "[a]t best, . . . [the] new arbitration policy raises the specter of interference with the rights of . . . putative class members; at worst, it was a deliberate effort to undermine pending

class litigation"); *Piekarski v. Amedisys Illinois*, LLC, 4 F. Supp. 3d 952, 956 (N.D. Ill. 2013) (refusing to enforce arbitration agreements distributed during the pendency of case); *Balasanyan v. Nordstrom*, 2012 WL 760566 (S.D. Cal. Mar. 8, 2012) (invalidating new arbitration agreement with a class waiver, distributed during pendency of a class action); *Williams v. Securitas Sec. Serv. USA, Inc.*, 2011 WL 2713741, at *2 (E.D. Pa. July 13, 2011) (same); *In re Currency Conversion Fee Antitrust Litigation*, 361 F.Supp.2d 237 (S.D.N.Y. 2005) (holding that an arbitration clause that a company tried to implement after a lawsuit was filed was not enforceable, since the affected individuals were not informed of the case and how the arbitration provision would affect their rights in the case); *Carnegie v. H&R Block, Inc.*, 180 Misc. 2d 67, 70 (N.Y.S.C. Jan. 7, 1999) (refusing to enforce arbitration agreements signed by potential class members after the lawsuit was filed); *cf. Russell v. Citigroup, Inc.*, 748 F.3d 677, 680 (6th Cir. 2014) (refusing to enforce an arbitration agreement signed by a plaintiff in an ongoing lawsuit where the plaintiff understandably "expected the contract to apply only to future lawsuits" and the agreement was presented directly to the represented litigant and not through his counsel).

**B. Even if the Arbitration Agreements Were Neither Misleading Nor Coercive, They Are Nonetheless Improper under Rule 23**

The arbitration requirements and the manner in which they were disseminated were coercive and misleading. Even if they were neither of these things, however, they would still be improper under Rule 23. Rule 23 precisely sets out the procedure for individual class members to decide whether they want to be bound by the outcome of a class action. For Rule 23(b)(3) classes, the court must direct notice to the class members explaining, among other things, "that the court will exclude from the class any member who requests exclusion." Fed. R. Civ. P. 23(c)(2)(B)(v). Consistent with the opt-out scheme prescribed by Rule 23, the law recognizes

that the mere filing of a Rule 23(b)(3) class claim must necessarily absolve putative class members of the responsibility to take affirmative conduct to preserve their rights. *See, e.g.*, *American Pipe & Const. Co. v. Utah*, 414 U.S. 538, 550 (1974). This procedure—notice and an opportunity to opt out—is fundamental to the Rule 23 scheme and is triggered by the filing of a class action.

Transmission of the arbitration requirements here, however, placed putative class members in the position of having to affirmatively reject the arbitration requirement—which would not have seemed possible to many of the low-wage workers who make up the putative class—in order to retain their class member status. Put simply, the unilateral transmission of the arbitration requirement to putative class members transformed the Rule 23 opt-out class into an opt-in class. That conduct is antithetical to the Rule 23 scheme and therefore improper.

### IV.     THE REQUESTED RELIEF

Based on Xclusive's conduct here, Plaintiff requests the following relief:

**(1) A protective order prohibiting Xclusive from communicating with putative class members about this case and from transmitting arbitration requirements or class waivers to them.** Evidence of Xclusive's communications with putative class members provide the basis for "specific findings" that justify limiting communications with putative class members. *Stransky*, 929 F. Supp. 2d at 1105 (*quoting Gulf Oil*, 452 U.S. at 101); *see also Randolph*, 41 F. Supp. 3d at 465 n.1 (ordering similar relief and noting that it is more properly framed as a "protective order" than an "injunction"). Meanwhile, the requested protective order is "narrowly tailored" to allow Xclusive to communicate with its employees while preserving the integrity of this litigation. *Stransky*, 929 F. Supp. 2d at 1105.

**(2) Corrective notice.** Based on the likelihood that members of the proposed class may believe that they cannot participate in this litigation, the Court should issue notice to putative class members describing this case and clarifying that Xclusive cannot force its employees to waive their right to participate in this litigation notwithstanding any forms that Xclusive forced putative class members to sign. *See, e.g., Mevorah v. Wells Fargo Home Mortgage, Inc.*, No. C 05-1175 MHP, 2005 WL 4813532, at *6 (N.D. Cal. Nov. 17, 2005) (ordering notice to members of putative Rule 23 class to "correct[ ] any inaccurate impression left by defendant's misleading and improper pre-certification communications with potential class members."). Defendants should bear the costs of issuing these notices. *Stransky*, 929 F. Supp. 2d at 1109

**(3) Striking coerced arbitration requirement as unenforceable.** As explained above, numerous courts have deemed arbitration requirements and class waivers transmitted to putative class members to be unenforceable. This Court should do the same with respect to Xclusive's arbitration requirement here.

**(4) Costs and attorney's fees.** The Court should award Plaintiff reasonable fees and costs incurred as a result of Xclusive's misconduct. *Stransky*, 929 F. Supp. 2d at 1110; *see also Pacheco v. Aldeeb*, No. 5:14-CV-121-DAE, 2015 WL 5125830, at *4 (W.D. Tex. Sept. 1, 2015) ("Defendants shall bear the cost of sending the corrective notice, and must further pay Plaintiffs' reasonable attorneys' fees incurred in bringing this Motion.").

## CONCLUSION

Plaintiff requests that the Court:

(1) Issue the protective order described above;

(2) Order corrective notice;

(3) Deem the arbitration requirements submitted to putative class members

unenforceable; and

(4) Award Plaintiff his costs and attorney's fees.


Dated: 9/24/2016

                    Respectfully Submitted,
s/Alexander Hood
Alexander Hood
David Seligman
Towards Justice
1535 High Street, Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org
       david@towardsjustice.org

Attorneys for Plaintiff

**Certificate of Service**

      I hereby certify that on 5/24/2016, I served a true and correct copy of the forgoing on all parties that have appeared pursuant to F.R.C.P. 5.

                                                       s/ Alexander Hood
                                                       Alexander Hood