**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 16-cv-00671-MSK-MJW

ISABEL VALVERDE; and those similarly situated,

Plaintiffs,

v.

XCLUSIVE STAFFING, INC; *ET AL.*,

Defendants.

---

**DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER, TO PROVIDE CORRECTIVE NOTICE, TO STRIKE ARBITRATION REQUIREMENT TRANSMITTED TO PUTATIVE CLASS MEMBERS, AND FOR ATTORNEY'S FEES AND COSTS**

---

Defendants Xclusive Staffing, Inc., Xclusive Management, LLC d/b/a Xclusive Staffing, Xclusive Staffing of Colorado, LLC, (collectively, "Xclusive") Diane Astley, Omni Interlocken Company, LLC, Omni Hotels Management Corporation, and Marriott International, Inc., (collectively "Defendants") submit the following Response to Plaintiff's Motion for Protective Order, to Provide Corrective Notice, to Strike Arbitration Requirement Transmitted to Putative Class Members, and for Attorney's Fees and Costs ("Response"), and state as follows:

**PROCEDURAL HISTORY**

On March 22, 2016, Plaintiff Isabel Valverde, filed a Class and Collective Action Complaint ("Complaint") alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Fair Labor Standards Act ("FLSA"), various state wage laws, breach of contract, and various claims in equity, including promissory estoppel and unjust

enrichment. Comp., pp. 22-26, [Doc. 1]. Plaintiff asserts all of his claims on behalf of himself and "all others similarly situated" pursuant to Fed. R. Civ. P. 23 and 29 U.S.C. § 216(b). *Id.* On May 27, 2016, Defendants filed an Answer to Plaintiff's Complaint. [Doc. 36].

On May 24, 2016, Plaintiff filed a Motion for Protective Order, to Provide Corrective Notice, to Strike Arbitration Requirement Transmitted to Putative Class Members, and for Attorney's Fees and Costs ("Motion"). [Doc. 27]. In the Motion, Plaintiff alleges Xclusive "attempted to force putative class members to enter into arbitration requirements" and that Xclusive engaged in "improper interactions with putative class members after Plaintiff filed claims on their behalf."[1] Motion, p. 2, [Doc. 27]. Plaintiff's Motion and the various requests made therein must be denied.

Plaintiff's Motion is supported by only a vague and inaccurate declaration of one of Xclusive's current employees, Maria Sonia M. Simon. [Doc. 27-1]. In her Declaration, Ms. Simon claims an unnamed woman at an unknown time "some point during the week beginning Monday, May 9, 2016" told Ms. Simon she "needed" to sign a "form." *See* Declaration of Maria Sonia M. Simon, paras. 6-7, [Doc. 27-1]. Ms. Simon admits she does not "remember exactly what the woman asking [her] to sign the form told [her]." *Id.* at para. 9. Ms. Simon asserts that the "form" was the Arbitration Agreement attached to her Declaration. *Id.* at para. 11.

---

[1] Plaintiff's statement in the Motion that the Complaint was filed on "behalf" of putative class members seems to suggest there is an attorney-client relationship between Plaintiff's attorney and the putative class members. This suggestion is contrary to established law. No attorney-client relationship exists between pre-certification putative class members and the named plaintiff's attorney. *See e.g., Parks v. Eastwood Ins. Servs., Inc.*, 235 F. Supp. 2d 1082, 1083 (C.D. Cal. 2002) ("Until they 'opt-in,' prospective § 216(b) plaintiffs are not yet parties to the action, they have no attorney, and no attorney-client relation is yet in issue."); *Babbitt v. Albertson's Inc.*, 1993 WL 128089 (N.D. Cal. 1993) (finding putative class members were not represented by class counsel).

2

Ms. Simon does not claim she felt threatened, harassed, intimidated, or coerced in any manner whatsoever with regard to Xclusive's alleged request that she sign an Arbitration Agreement and there is no evidence to support such a claim.[2]  Rather, Ms. Simon only states she was told she "needed to sign" the Arbitration Agreement, that she "didn't want to sign" the Arbitration Agreement because she "didn't know what it meant," and that she told the unnamed woman that she "would not sign the" Arbitration Agreement.  *See* Declaration of Maria Sonia M. Simon, paras. 7-10, [Doc. 27-1].  Ms. Simon also states she "did not sign the" Arbitration Agreement.  *Id.*  Importantly, neither Plaintiff's Motion nor Ms. Simon's declaration allege Ms. Simon was denied her paycheck or suffered any other adverse action.[3]

Ultimately, Plaintiff's Motion is an improper attempt to keep Xclusive from having lawful communications with its employees and to keep employees from executing valid and permissible Arbitration Agreements.  Plaintiff's Motion must be denied.

---

[2] Although Plaintiff attempts to characterize Xclusive's alleged statements to Ms. Simon as "explicit lies," Motion, p. 5, Ms. Simon's Declaration is not so clear.  Moreover, Xclusive vehemently denies making any misrepresentations regarding the nature of the Arbitration Agreement to Ms. Simon and, for the reasons described below, Ms. Simon's declaration should be rejected.  *See* Declaration of Selene Hockenberger, attached hereto as ***Exhibit B***.

[3] Ms. Simon also makes several allegations in her Declaration relating to the merits of this matter, as well as her opinion that Xclusive "employees are low-wage, immigrant workers, who live from paycheck to paycheck" and "fear that they will lose their job or face immigration consequences if they do not do what Xclusive wants them to do."  Declaration of Maria Sonia M. Simon, paras. 3-5 and 12-13, [Doc. 27-1].  It is unclear how these allegations are relevant to Plaintiff's Motion or how Ms. Simon has personal knowledge of how other employees may or may not live, and what they may or may not fear.  Such baseless and unsupported accusations are irrelevant and must be disregarded.

3

**FACTUAL HISTORY**

A.        **Xclusive's Efforts To Enter Into Arbitration Agreements With Employees.**

During the Summer of 2015, well prior to this litigation, Xclusive developed and adopted an employment policy of providing arbitration procedures and agreements to all of its employees. Declaration of Cynthia Luevano, para. 3, attached hereto as ***Exhibit A***. These agreements were sought to mutually bind Xclusive and its employees to an arbitration forum for dispute resolution that is near to each employee's location and that obligates Xclusive to pay all arbitrator expenses in excess of $25.00. *Id.* The Arbitration Agreement also provides confidentiality to both the employee and Xclusive. *See* Declaration of Maria Sonia M. Simon, Exhibit A, para. 3, [Doc. 27-1]. The Arbitration Agreement is given to all employees. Declaration of Cynthia Luevano, para. 4, attached hereto as ***Exhibit A***. The Arbitration Agreement attached to Ms. Simon's Declaration is an accurate copy of the Arbitration Agreement Xclusive provides its employees. *Id.* at para. 5. Xclusive has presented existing employees with the Arbitration Agreement contemporaneously when they pick up their paycheck. *Id.* Since November, 2015, Xclusive has also given new employees the Arbitration Agreement at the time they are hired. *Id.*

Unfortunately, Xclusive managers are not always able to present existing employees with the Arbitration Agreement when they pick up their paychecks. *Id.* at para. 6. For example, there are alternative procedures for receiving paychecks that do not involve Xclusive managers interacting with employees. *Id.* Sometimes Xclusive managers take paychecks directly to the clients' locations for employees to pick up there. *Id.* Employees can also send a friend or family member to pick up their paycheck as long as they have identification and a letter of authority. *Id.*

4

For these reasons, Xclusive has, thus far, not spoken with every employee about the Arbitration Agreement. *Id.*

Contrary to Ms. Simon's assertion, Xclusive can find no evidence of managers describing the Arbitration Agreement as a release relating to on the job injuries. *Id.* at para. 7. Moreover, Xclusive does not require employees to sign the Arbitration Agreement and some employees simply refuse to do so. *Id.* at para. 8. No employment action of any kind is threatened or taken against any employee who decides not to execute the Arbitration Agreement. *Id.* Employees' paychecks are never withheld or threatened to be withheld if an employee does not sign the Arbitration Agreement. *Id.*

### B.   Xclusive's Effort To Enter Into An Arbitration Agreement With Simon.

Ms. Simon began her employment at Xclusive in October 2015, prior to implementation of the use of Arbitration Agreements during the hiring process. Declaration of Selene Hockenberger, para. 3, attached hereto as ***Exhibit B***. On or about May 9, 2016, Ms. Simon came to Xclusive's office to pick up her paycheck. *Id.* Consistent with Xclusive's ongoing attempts to enter into an Arbitration Agreement with employees, Selene Hockenberger presented Ms. Simon with a copy of the Arbitration Agreement. *Id.* at para. 4. As described in Ms. Hockenberger's Declaration, Ms. Hockenberger did not claim the Arbitration Agreement related to on the job injuries. *Id.* at para. 5. At no point did Ms. Hockenberger withhold or threaten to withhold Ms. Simon's paycheck if Ms. Simon did not execute the Arbitration Agreement. *Id.* Ms. Simon did

5

not ask Ms. Hockenberger about the Arbitration Agreement and she executed the Agreement.[4] *Id.* Ms. Simon was given her paycheck. *Id.*

## ARGUMENT

**A.  Xclusive's Communications With Its Employees Are Appropriate And The Court Should Not Enter A Protective Order.**

Plaintiff requests the Court enter a broad protective order "prohibiting Xclusive from communicating with putative class members about this case and from transmitting arbitration requirements or class waivers to them." Motion, p. 7, [Doc. 27]. There is no basis in law or fact upon which to enter such a broad sweeping protective order.

    i.    <u>Xclusive's communications with employees are appropriate.</u>

There is nothing inherently unlawful or improper about Xclusive's communication with employees regarding the Arbitration Agreement. It is well-established that "pre-certification communication[s] from the defense to prospective plaintiffs is generally permitted" and "a defendant employer may communicate with prospective plaintiff employees who have not yet 'opted in,' unless the communication undermines or contradicts the Court's own notice to prospective plaintiffs."[5] *Parks v. Eastwood Ins. Servs., Inc.*, 235 F. Supp. 2d 1082, 1083-84

---

[4] Ms. Simon's representation in her declaration that she did not sign the Arbitration Agreement is demonstrably false. Ms. Simon's executed Arbitration Agreement is attached to Ms. Hockenberger's declaration. In the Reply, Plaintiff may argue the signature on the executed Arbitration Agreement is not Ms. Simon's. This argument is incredible. Ms. Simon's signature on the declaration attached to Plaintiff's Motion is identical to the signature on the executed Arbitration Agreement. Ms. Simon's untruthful statement regarding her execution of the Arbitration Agreement undermines the veracity of her entire declaration.

[5] Communications between a defendant employer and employees pre-opt-in in a § 216(b) action are evaluated the same as pre-certification communications in a Rule 23 case. *See e.g., Bobryk v. Durand Glass Mfg. Co.*, 2013 WL 5574504, at *4 (D.N.J. Oct. 9, 2013) ("With respect to defense communication with § 216(b) prospective plaintiffs, the situation is analogous to a *pre-*

6

(C.D. Cal. 2002) (collecting cases); *see also Gulf Oil Co. v. Bernard*, 452 U.S. 89, 104 (1981) ("the mere possibility of abuses does not justify routine adoption of a communications ban . . . in the absence of a clear record and specific findings of need"). Communications are only improper if they are misleading, coercive, or threatening. *Id.*; *see also Parks*, 235 F. Supp. 2d at 1084 (pre-certification contacts by defense with potential class members permitted "except as needed to prevent serious misconduct"); *Gerlach v. Wells Fargo & Co.,* 2006 WL 824652, *7 (N.D. Cal. 2008) (denying motion for corrective notice where defense contacts "not sufficiently misleading or coercive to justify the relief sought"); *Bobryk v. Durand Glass Mfg. Co.*, 2013 WL 5574504, at *4 (D.N.J. Oct. 9, 2013) ("Federal courts have restricted communications in class actions, in both Rule 23 and § 216(b) settings, where a party has engaged in misleading or coercive behavior with respect to potential class members.") (internal quotations omitted). The moving party bears the burden of showing that the nonmovant has engaged in coercive, misleading, or other abusive communications with the putative class. *See Gulf Oil Co.,* 452 U.S. at 102.

As the Supreme Court recognized, "a district court has both the duty and the broad authority to exercise control over a class action and to enter appropriate orders governing the conduct of counsel and parties. But this discretion is not unlimited, and indeed is bounded by the relevant provisions of the Federal Rules."[6]  *Gulf Oil Co.*, 452 U.S. 89 at 100.  A court order

---

*certification* Rule 23 class action, when the prospective plaintiffs are still unrepresented parties.") (internal quotations omitted, emphasis in original); *Parks*, 235 F. Supp. 2d at 1083 ("the defense communication allowed in a § 216(b) representative action during the period before a prospective plaintiff 'opts in' should be the same as in a Rule 23 class action before certification and creation of a represented class.").

[6] Of course, the Court not only has authority to regulate Xclusive's communications with putative class members, but it can also regulate Plaintiff's attorney's communications. *See Jones v. Casey's Gen. Stores*, 517 F. Supp. 2d 1080, 1086, 1089 (S.D. Iowa 2007) (limiting the

7

restricting communication with putative class members must be grounded in "a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Id.* at 101. To determine when to restrict communication with putative class members, courts evaluate the evidence of actual or threatened abuse by the party sought to be restrained. *See Kleiner v. First Nat. Bank of Atlanta*, 751 F.2d 1193, 1205 (11th Cir. 1985). Xclusive's dissemination of Arbitration Agreements to employees, including the circumstances involving Ms. Simon, were not coercive, misleading, or otherwise abusive and involve no actual or threatened abuse.

Here, there were no misleading, coercive, or threatening communications with employees. The only facts provided in support of Plaintiff's Motion are those outlined in Ms. Simon's Declaration. Ms. Simon does not claim she felt threatened, harassed, intimidated, or coerced in any manner whatsoever with regard to Xclusive's request that she sign an Arbitration Agreement and there is no evidence to support such a finding. Ms. Simon only alleges she was told she "needed to sign" the Arbitration Agreement, she "didn't want to sign" the Arbitration Agreement because she "didn't know what it meant," and she told the unnamed woman that she "would not sign the" Arbitration Agreement. *See* Declaration of Maria Sonia M. Simon, paras. 7-10, [Doc. 27-1]. Absent evidence that employees were actually threatened or coerced, there is no basis to restrict Xclusive's communications.

---

plaintiffs' counsel from affirmatively soliciting potential opt-in plaintiffs to join the FLSA action and requiring counsel to modify their website to provide "only a factual, accurate, and balanced outline of the proceedings"); *see also Gulf Oil Co. v. Bernard*, 452 U.S. 89. At least one employee has already complained that they have been "harassed" by Plaintiff's counsel and/or one of his representatives regarding this case and their employment at Xclusive. A Spanish and English translated version of a written statement from one of these employees is attached hereto as ***Exhibit C***. If Plaintiff's attorney's harassing communications with employees continues, Xclusive will file the appropriate motions to protect its employees from such conduct.

8

Ms. Simon also does not allege she was denied her paycheck. Nor could she; Xclusive has never withheld, or threatened to withhold an employee's paycheck in exchange for the employee signing the Arbitration Agreement. Declaration of Cynthia Luevano, para. 8, attached hereto as *Exhibit A*; Declaration of Selene Hockenberger, para. 6, attached hereto as *Exhibit B*. The Arbitration Agreement also conspicuously states it is a voluntary agreement right above the signature block. *Id.* at para. 10. As such, there can be no argument that employees were required to sign the Agreement.

Plaintiff also argues that Xclusive's communications with Ms. Simon were misleading because Ms. Hockenberger allegedly "said something about how the form meant that if there was an accident on the job, [she would] have to talk to [her] boss about it."[7] Declaration of Maria Sonia M. Simon, para. 9, [Doc. 27-1]. Xclusive adamantly denies any such statement was made to Ms. Simon or any other employees. Declaration of Cynthia Luevano, para. 7, attached hereto as *Exhibit A*; Declaration of Selene Hockenberger, para. 4, attached hereto as *Exhibit B*. The Arbitration Agreement itself also undermines such a conclusion; the Agreement expressly states, "[c]laims for workers compensation benefits are not covered by this Agreement." *See* Declaration of Maria Sonia M. Simon, Exhibit A, para. 2, [Doc. 27-1]. Thus, the Arbitration Agreement, on its face, is entirely unrelated to on the job injuries.

---

[7] In her Declaration, Ms. Simon admits she does not "remember exactly what the woman asking [her] to sign the form told [her]." Declaration of Maria Sonia M. Simon, para. 9, [Doc. 27-1]. Ms. Simon also does not remember who the "woman" was or when the conversation allegedly took place. *Id.* at paras. 7-9. Moreover, as noted above, Ms. Simon's claim that she did not sign the Agreement is untruthful on its face. In light of Ms. Simon's admission that she has trouble remembering the encounter and her vague statements about when the encounter occurred, as well as her false statements regarding her execution of the Arbitration Agreement, Ms. Simon's declaration should be afforded no weight.

9

Plaintiff has provided absolutely no evidence that employees were threatened, coerced, or forced to sign an Arbitration Agreement and Plaintiff has not shown that employees have been misled regarding this case. Thus, Plaintiff has failed to present even "the mere possibility of abuse" and cannot establish a "clear record" to support a finding that there is a need for a protective order limiting Xclusive's ability to communicate with its employees. *See Gulf Oil*, 452 U.S. at 104.

      ii.    <u>Plaintiff's arguments are unavailing.</u>

Plaintiff makes several arguments and cites a variety of cases to support his position that the Court should enter a protective order. Plaintiff's arguments are unavailing. Xclusive's communication with Ms. Simon was not improper simply by virtue of the employment relationship, as Plaintiff suggests. "In tracing out the fault line between conduct which warrants restrictions and conduct which does not, it bears emphasis that mere inherent coerciveness in the employment relationship is insufficient, in and of itself, to warrant imposition of limitations on employers' ability to speak with potential class members prior to certification." *Bobryk v. Durand Glass Mfg. Co.*, 2013 WL 5574504, at *4 (D.N.J. Oct. 9, 2013). Courts from around the country have similarly held that the mere existence of an employment relationship is not sufficient to justify restricting a defendant's communications with putative plaintiffs. *See e.g., Agerbrink v. Model Serv. LLC*, 2015 WL 6473005, at *5 (S.D.N.Y. Oct. 27, 2015) ("Yet the mere existence of such a relationship is not enough to justify restricting the defendants' communications."); *Jackson v. Papa John's USA, Inc.*, 2009 WL 650181, at *1–2 (N.D. Ohio March 10, 2009) (declining to limit defendant's communications on basis of employment relationship in absence of evidence of "coercive, misleading or improper communications" by

defendant); *Basco v. Wal-Mart Stores, Inc.*, 2002 WL 272384, at *3–4 (E.D. La. Feb. 25, 2002) ("[W]hile it is evident that there is an ongoing business relationship between employee and employer, it is not enough that a potentially coercive situation exists."). Thus, the mere existence of a relationship between Xclusive and its employees does not make Xclusive's communications improper or coercive.

Plaintiff's argument that Xclusive's Arbitration Agreement is improper under Rule 23 is similarly unpersuasive. Plaintiff's argument appears to be that by disseminating the Arbitration Agreements Xclusive transformed Rule 23's opt-out class process into an opt-in class. Motion, p. 7, [Doc. 27]. Plaintiff cites no cases in support of this proposition. Although Xclusive agrees opt-in procedures are inherently in conflict with Rule 23's opt-out process, no such conflict exists here. Employees are not required to "affirmatively reject the arbitration requirement" as Plaintiff suggests. Motion, p. 7, [Doc. 27]. Xclusive's Arbitration Agreement is not self-effectuating and only becomes effective if an employee voluntarily agrees to the terms and executes the Agreement. Thus, an employee's inaction by not entering into the Arbitration Agreement is all that is required for the Arbitration Agreement *not* to be effective. Because the Arbitration Agreement does not create a conflict with Rule 23's opt-out process, Plaintiff's argument must be rejected.

The cases cited by Plaintiff in support of his request for a protective order are also inapposite. First, the defendant-employers in the cases cited by Plaintiff did not begin distributing arbitration agreements to employees until *after* plaintiff initiated the action. *See e.g., Billingsley v. Citi Trends, Inc.*, 560 F. App'x 914, 916 (11th Cir. 2014) (defendant obtained the "arbitration agreements after the district court set forth the schedule and procedures for

11

[plaintiff's] motion for conditional certification and notice."); *Espinoza v. Galardi S. Enterprises, Inc.*, 2015 WL 9592535, at *1 (S.D. Fla. Dec. 31, 2015) ("After this action was filed (April 8, 2014), Defendants began requiring all dancers to sign arbitration agreements."); *Jimenez v. Menzies Aviation Inc.*, 2015 WL 4914727, at *1 (N.D. Cal. Aug. 17, 2015) ("while the complaint was pending, Menzies adopted a *new* ADR Policy for its U.S. locations.") (emphasis added); *Piekarski v. Amedisys Illinois, LLC*, 4 F. Supp. 3d 952, 954 (N.D. Ill. 2013) (after the complaint was filed and a stay in discovery was entered, "Defendants implemented a company-wide policy called the 'Amedisys Arbitration Program,' which mandated arbitration for nearly all employment disputes and barred employees from pursuing litigation, unless the employee affirmatively opted-out within 30 days.").

In contrast to the cases cited by Plaintiff, here, Xclusive has been working with employees to enter into Arbitration Agreements for more than seven months and Xclusive's continuing efforts to do so were not motivated by Plaintiff's Complaint. Declaration of Cynthia Luevano, para. 3, attached hereto as **Exhibit A**. Xclusive's dissemination of the Arbitration Agreement was neither in response to the Complaint nor an attempt to interfere with the interests of putative class members. Accordingly, Xclusive's efforts to enter into an Arbitration Agreement with employees is not subject to the same scrutiny and inference of impropriety as that in the cases cited by Plaintiff.

The cases cited by Plaintiff are further unlike this matter for other reasons. For example, in *Billingsley*, 560 F. App'x 914, the defendant executed arbitration agreements with potential plaintiffs after the action was filed. *Id.* at 918. The court found that those arbitration agreements were "unconscionable as a matter of law" and "confusing, misleading, coercive, and clearly

12

designed to thwart unfairly the right of managers to make informed choice as to whether to participate in collective action." *Id.* at 919, 922. In contrast, here, there is no evidence Xclusive's Arbitration Agreement is "unconscionable as a matter of law" and it is not "confusing, misleading, coercive, and clearly designed to thwart unfairly the right of [employees] to make informed choice as to whether to participate in collective action." Rather, employees were presented the Arbitration Agreement, given the opportunity to review the Agreement, and sign or not sign the Agreement in their discretion and with impunity.

Moreover, the Arbitration Agreements involved here are not only fair in that they bind both the employee and the employer, but they also provide a local forum for employees to confidentially present their issues for resolution, and the Agreement requires Xclusive to pay all of the arbitrator's expenses in excess of $25.00. *See* Declaration of Maria Sonia M. Simon, Exhibit A, para. 5, [Doc. 27-1]. Also, the Arbitration Agreement cannot be unilaterally modified by Xclusive and, instead, requires a signed written agreement by the parties. *Id.* at para. 6. Thus, not only are the circumstances involving Xclusive's distribution of the Arbitration Agreement significantly different here than in the cases cited by Plaintiff, but the Arbitration Agreement itself is significantly different and employee-friendly.

The court's analysis in *Czopek v. TBC Retail Grp., Inc.*, 2014 WL 5782794 (M.D. Fla. Nov. 6, 2014) is instructive in this matter. There, as part of defendant's response to plaintiff's collective action, defendant sought to enforce arbitration agreements signed by putative plaintiffs. Plaintiff cited *Billingsley* in support of its argument that the arbitration agreements were not enforceable because defendants engaged in "a concerted campaign of confusing, misleading, and coercive communications that were clearly and expressly designed to unfairly

13

thwart the right of potential class members to make an informed choice as to whether to participate in this lawsuit." *Id.* at 5. In rejecting this argument, the *Czyopek* court stated,

> Defendant has established that the Arbitration Agreement had been drafted and its distribution planned well in advance of Czopek's demand letter. Furthermore, the Arbitration Agreement was presented to all employees—not just putative collective action participants. In fact, the demand letter and draft complaint sent to Defendant on March 13, 2014 only contemplated a collective action of employees similarly situated to Czopek, who was a service manager. *See* Doc. 24–1. Sharpe and McClelland were not service managers and, thus, were not putative class members on the day the Arbitration Agreement was issued. Finally, the Arbitration Agreement was distributed before any lawsuit was filed. Thus, this case is not controlled by *Billingsley* and does not require the Court to intervene or correct any communications between Defendant and its employees regarding the Arbitration Agreement.

*Id.* at 5. Ultimately, the court enforced the arbitration agreements and compelled arbitration for those plaintiffs who entered the agreement. *Id.* Similarly, here, it is undisputed that Xclusive drafted and began disseminating the Arbitration Agreement to employees prior to Plaintiff's initiation of this lawsuit. Xclusive's continued efforts to enter into Arbitration Agreements with employees after the Complaint was filed were entirely appropriate and consistent with the law.

Plaintiff's request for a broad protective order "prohibiting Xclusive from communicating with putative class members about this case and from transmitting arbitration requirements or class waivers to them" is unfounded. Motion, p. 7, [Doc. 27]. Not only were Xclusive's communications with Ms. Simon appropriate, but Plaintiff has made no allegations and provided no evidence that Xclusive has made misleading, improper, or inaccurate representations to putative class members *regarding this case*. Applicable case law is clear regarding the boundaries of an employer's pre-certification communications and compliance with such case law is sufficient to protect employees without a protective order. Thus, the Court should deny Plaintiff's request that it enter a protective order.

14

B.     **The Court Should Not Issue A Corrective Notice.**

Plaintiff also requests that the Court "issue notice to putative class members describing this case and clarifying that Xclusive cannot force its employees to waive their right to participate in this litigation notwithstanding any forms that Xclusive forced putative class members to sign." Motion, p. 8, [Doc. 27]. Plaintiff's request for a corrective notice is baseless.

First, there is absolutely no evidence any employee or putative class member was "forced" to sign an Arbitration Agreement. Indeed, Ms. Simon's Declaration undermines any such finding because Ms. Simon does not state she was coerced in any manner whatsoever. *See* Declaration of Maria Sonia M. Simon, para. 10, [Doc. 27-1].

Further, there is no need for a corrective notice here. Plaintiff has presented no evidence that any employee has been misled or coerced into signing the Arbitration Agreement. There is similarly no evidence that any employee has been misled regarding this case. Indeed, Ms. Simon's Declaration specifically omits any reference to comments made about the Complaint, Xclusive's defense to the Complaint, or this matter generally. *See* Declaration of Maria Sonia M. Simon, [Doc. 27-1]. There is no basis for a corrective notice when, as here, there have been no misleading statements made about the case.

Finally, rather than clarify the effect of the Arbitration Agreement, the notice requested by Plaintiff may cause employees greater confusion. Plaintiff asks that the notice "clarify"[] that Xclusive cannot force its employees to waive their right to participate in this litigation notwithstanding any forms that Xclusive forced putative class members to sign." Motion, p. 8, [Doc. 27]. Although Xclusive could potentially be unable to enforce an Arbitration Agreement if it "forced" employees to sign the Agreement; where, as here, employees voluntarily entered into

15

the Agreement, they are bound by the Agreement and will have to bring their claims in arbitration. *See generally Hickey v. Brinker Int'l Payroll Co., L.P.*, 2014 WL 622883, at *5 (D. Colo. Feb. 18, 2014) (rejecting plaintiffs' argument that the arbitration agreements were unenforceable, dismissing plaintiffs' FLSA collective action, and compelling arbitration pursuant to the parties' arbitration agreement). The notice specifically requested by Plaintiff may lead employees to believe all Arbitration Agreements are without effect, regardless of when the employees entered into the Agreement and whether the Agreement is enforceable. Plaintiff's request for a corrective notice must be denied.

## C.     Xclusive's Arbitration Agreements Should Not Be Struck.

In the Motion, Plaintiff also seeks to have <u>all</u> Arbitration Agreements signed by employees struck as unenforceable. Motion, p. 8, [Doc. 27]. Plaintiff's request is premature and ignores the fact that many of the Arbitration Agreements were executed by employees prior to the initiation of this matter.

As described above, Xclusive began speaking with employees about the Arbitration Agreement seven months ago. Declaration of Cynthia Luevano, para. 5, attached hereto as ***Exhibit A***. Plaintiff has presented absolutely no basis to disregard the Arbitration Agreements that were executed by employees prior to the Complaint. Plaintiff has similarly failed to prove that Arbitration Agreements executed after the Complaint was filed should be struck. There is simply no evidence any Arbitration Agreements were executed by employees under duress, fraud, coercion, or because of misleading statements by Xclusive. In the cases cited by Plaintiff, the arbitration agreements were presented with misleading and/or coercive comments about the pending litigation. As Plaintiff and Ms. Simon admit, there were no such communications in this

16

case. *See generally* Declaration of Maria Sonia M. Simon, [Doc. 27-1]. Further, Plaintiff refers to nothing in the Arbitration Agreement itself that it claims is misleading or coercive. Accordingly, Plaintiff's request that all Arbitration Agreements be struck must be denied.

In *Stevenson v. Great Am. Dream, Inc.*, 2014 WL 3519184 (N.D. Ga. July 15, 2014), the court rejected plaintiffs' argument that an arbitration agreement executed by a putative class member after the complaint was filed but before the collective action was certified should be struck. *Id.* at 2. As the court described,

> Here, as Edwards herself acknowledges, the Defendant did not communicate with her about this case. The Defendant simply did what it was allowed to do: it "require[d] [its] employee[s] to arbitrate, rather than litigate, rights under various federal statutes." Although this may incidentally affect the litigation by reducing the total number of participants, that alone does not compel the Court to disregard an otherwise valid arbitration agreement.

*Id.* at 2. Here, too, Xclusive did not communicate with Ms. Simon about this case. Rather, it simply did what it was allowed to do: request that Ms. Simon agree to arbitrate, rather than litigate, her rights under various statutes. Thus, Xclusive's Arbitration Agreement should not be struck by the Court.

Among others, Plaintiff cites two cases in support of its position that the Arbitration Agreement should be struck: *Williams v. Securitas Sec. Serv. USA, Inc.*, 2011 WL 2713741, at *2 (E.D. Pa. July 13, 2011) and *Piekarski v. Amedisys Illinois*, LLC, 4 F. Supp. 3d 952, 956 (N.D. Ill. 2013). Those cases should be rejected. In *Williams*, the Eastern District of Pennsylvania invalidated the arbitration agreement because it "did not require an employee to sign the document before it [became] effective" and "[b]ecause of the label [on the agreement], [employees] may not read the document carefully or at all since they reasonably believe it will not affect them without their affirmative approval." *Williams*, 2011 WL 2713741, at *2. In

17

*Piekarski*, the Northern District of Illinois relied on *Williams* to invalidate an arbitration agreement, stating "it [was] likely that . . . [the] employees did not understand they would be bound by [the] agreement . . . unless they affirmatively opted-out."  4 F. Supp. 3d at 956. Plaintiff does not allege that similar circumstances are present here.  Nor could he; the Arbitration Agreement involved here is not effective unless employees execute it and, therefore, the *Williams* and *Piekarski* courts' reasoning is inapplicable to this matter.

Aside from the existence of this action, Plaintiff makes no argument as to why the Arbitration Agreement is improper or unenforceable.  "Regardless of whether there is a pre-existing collective action, the effect of the arbitration agreement is the same: it prevents the signatory from litigating her FLSA claim in a judicial forum." *Stevenson*, 2014 WL 3519184, at *1.  Accordingly, Plaintiff's request that the Court strike the Arbitration Agreements is unfounded and should be rejected.

Plaintiff's request that the Court strike the executed Arbitration Agreements is also premature.  The cases cited by Plaintiff in support of his position that the Arbitration Agreements should be struck arise in response to an employer's request to *enforce* an arbitration agreement, not as part of a motion for protective order.  See e.g., *Billingsley*, 560 F. App'x at 919 (noting the district court "would not enforce the arbitration agreements against any opt-in plaintiffs who signed the agreement under [defendant's] coercive ADR rollout process . . . ."); *Espinoza v. Galardi S. Enterprises, Inc.*, 2015 WL 9592535, at *2 (S.D. Fla. Dec. 31, 2015) ("Defendant now moves to compel arbitration against four opt-in claimants who signed the agreement."); *Jimenez v. Menzies Aviation Inc*, 2015 WL 4914727, at *1 (N.D. Cal. Aug. 17, 2015) ("Menzies now argues that a new overtime claim has been alleged in this case after the ADR Policy went

18

into effect and that it must be arbitrated because the putative class members signed an agreement to arbitrate their claims."); *Balasanyan v. Nordstrom, Inc.*, 2012 WL 760566, at *1 (S.D. Cal. Mar. 8, 2012) (order regarding defendant's motion to compel arbitration).

In contrast, here, Xclusive has not yet sought to enforce the Arbitration Agreement against putative class members. Thus, Plaintiff's request that the Court strike the Arbitration Agreements is premature and an evaluation of the enforceability of the Agreements should wait until Xclusive seeks to enforce those Agreements, if it does so. If Plaintiff believes the Arbitration Agreements are unenforceable, then he should raise that argument if and when the enforceability of the Arbitration Agreements is at issue. *See Espinoza*, 2015 WL 9592535, at *2 (noting its previous order where it decided not to make "a blanket determination" and, "instead to 'examine the enforceability of the arbitration agreement on an individualized basis when, and if, defendants move to compel arbitration against an opt-in dancer who has signed such an agreement.'").

### D.   The Court Should Not Award Plaintiff Attorney Fees Or Costs.

Finally, Plaintiff asks that the Court award him "reasonable fees and costs incurred as a result of Xclusive's misconduct." Motion, p. 8, [Doc. 27]. Because Xclusive has not engaged in any inappropriate conduct, the Court should not award attorney fees or costs associated with Plaintiff's filing the Motion.

### CONCLUSION

Based on the foregoing, the Court should deny Plaintiff's Motion in its entirety.

Respectfully submitted this 17th day of June, 2016.

SHERMAN & HOWARD L.L.C.

*s/ W.V. Bernie Siebert*
W.V. Bernie Siebert
633 Seventeenth Street, Suite 3000
Denver, CO 80202
Telephone: (303) 297-2900
Email: bsiebert@shermanhoward.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on this 17th day of June, 2016, I electronically filed the foregoing **RESPONSE TO PLAINTIFF'S MOTION FOR PROTECTIVE ORDER, TO PROVIDE CORRECTIVE NOTICE, TO STRIKE ARBITRATION REQUIREMENT TRANSMITTED TO PUTATIVE CLASS MEMBERS, AND FOR ATTORNEY'S FEES AND COSTS** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Alexander Hood, Esq.
Towards Justice
1535 High Street, Suite 300
Denver, CO 80218
Email: alex@towardsjustice.org

*s/ Lynn Zola Howell*