# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Case No. 16-cv-00671-MSK-MJW

ISABEL VALVERDE;
MARIA SONIA MICOL SIMON; and those similarly situated

      Plaintiffs,

v.

XCLUSIVE STAFFING, INC.;
XCLUSIVE MANAGEMENT, LLC D.B.A. XCLUSIVE STAFFING;
XCLUSIVE STAFFING OF COLORADO, LLC;
DIANE ASTLEY;
OMNI INTERLOCKEN COMPANY, L.L.C.;
OMNI HOTELS MANAGEMENT CORPORATION;
JMIR DTC OPERATOR LLC;
MARRIOTT INTERNATIONAL, INC.; and
HCA-HEALTHONE LLC D.B.A. SKY RIDGE MEDICAL CENTER

      Defendants.

---

## FIRST AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT

---

Plaintiffs amend as a matter of course pursuant to Fed. R. Civ. P. 15(a)(1).[1]

## INTRODUCTORY STATEMENT

Xclusive Staffing is a Colorado-based staffing agency composed of a conglomerate of

entities in at least 10 states. In large part, Xclusive provides low paid hourly employees to its

clients, like Defendants Omni, Hyatt, Marriott, and HealthONE. Xclusive's entire operation is

---

[1] Pursuant to Fed. R. Civ .P. 15(a)(1), Plaintiffs may amend by right "21 days after service of a motion under Rule 12(b)." Though Defendants style their motion as a motion for judgment on the pleadings, which falls under Rule 12(c), Defendants state in their motion that a "portion is brought pursuant to Fed. R. Civ. P. 12(b)(1)." ECF # 43 at 1 n. 1.

100% owned and operated by Defendant Diane Astley from Xclusive's Westminster, Colorado corporate office.

Xclusive is a serial violator of federal and state wage and hour laws. Since 2011, the United States Department of Labor has found Xclusive in violation of federal minimum wage and overtime laws on at least five occasions. After these investigations, Xclusive promised to conform. But its blatant violations continue.

Among other things, Xclusive forces its employees to pay to get paid: deducting $3.00 from each pay check for the cost of issuing the check. Xclusive also systematically fails to appropriately track its employees' time, automatically deducting 30 minutes each day for lunches while often not permitting a lunch break and failing to provide the 10 minute breaks required by Colorado law. Xclusive does all of this while advertising on its website that it "exceed[s] industry standards" in complying with "federal, state and local laws."

Meanwhile, clients of Xclusive (including Defendants Omni, Hyatt, Marriott, and HealthONE) hope to relieve themselves of their legal obligations to their employees by hiring Xclusive to act as an intermediary between them and their workers. The law does not sanction these efforts.

Xclusive accepts the incidental cost of occasional wage and hour compliance actions by government agencies as a cost of doing business, while persisting with wage-and-hour violations in its sprawling operation. Here, Plaintiffs Valverde and Simon, victims of these policies, seek to hold Xclusive, Defendant Astley, and some of Xclusive's clients accountable to them and their fellow workers.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question), and supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's related claim under state law.

2.      Venue is proper pursuant to 28 U.S.C. § 1391 because all of the defendants reside, or are registered to do business in, Colorado.

## PARTIES

3.      At all times material to the allegations of the complaint, Plaintiffs Valverde and Simon were domiciled in the District of Colorado.

4.      Plaintiffs Valverde and Simon shall hereinafter be collectively referred to as the "Workers" or the "Plaintiffs."

5.      The Workers each signed written consents to be a named Plaintiffs in a Fair Labor Standards Act collective action and the signed consents are attached to this Complaint as Exhibit 1.

6.      At all times material to the allegations of the complaint, Defendant XCLUSIVE STAFFING, INC. (hereinafter "Xclusive") was a Colorado corporation with its principal place of business in the District of Colorado.

7.      At all times material to the allegations of the complaint, Defendant XCLUSIVE MANAGEMENT, LLC D.B.A. XCLUSIVE STAFFING (hereinafter "Xclusive Management") was a Colorado limited liability company with its principal place of business in the District of Colorado.

3

8.      At all times material to the allegations of the complaint, Defendant XCLUSIVE

STAFFING OF COLORADO, LLC (hereinafter "Xclusive Colorado") was a Colorado limited

liability company with its principal place of business in the District of Colorado.

9.      At all times material to the allegations of the complaint, Defendant OMNI

INTERLOCKEN COMPANY, L.L.C was a Delaware limited liability company registered to do

business in Colorado.

10.     At all times material to the allegations of the complaint, Defendant OMNI HOTELS

MANAGEMENT CORPORATION was a Delaware corporation registered to do business in

Colorado.

11.     Defendants OMNI INTERLOCKEN COMPANY, L.L.C and OMNI HOTELS

MANAGEMENT CORPORATION shall hereinafter collectively be referred to as the "Omni

Defendants."

12.     Upon information and belief, based on the hotel's website and a search of the Colorado

Secretary of State's records, the Omni Defendants own and operate the Omni hotel located at 7

500 Interlocken Blvd, Broomfield, CO 80021 (hereinafter, the "Omni Interlocken").

13.     At all times material to the allegations of the complaint, Defendant JMIR DTC

OPERATOR LLC (hereinafter "Hyatt") was a Delaware limited liability company registered to

do business in Colorado.

14.     Defendant Hyatt owns and operates the Hyatt hotel located at 7800 E Tufts Ave, Denver,

CO 80237 (hereinafter, the "Hyatt Denver Tech Center").

15.     At all times material to the allegations of the complaint, Defendant MARRIOTT

INTERNATIONAL, INC. (hereinafter "Marriott") was a Delaware corporation registered to do

business in Colorado.

16.     Upon information and belief, based on the hotel's website and a search of the Colorado

Secretary of State's records, Defendant Marriott owns and operates the Marriott hotel located at

4900 S. Syracuse Street  Denver  Colorado  80237 (hereinafter, the "Marriott Denver Tech

Center").

17.     At all times material to the allegations of the complaint, Defendant HCA-HEALTHONE

LLC D.B.A. SKY RIDGE MEDICAL CENTER (hereinafter "HealthONE") was a Colorado

limited liability company registered to do business in Colorado.

18.     Upon information and belief, based on the Sky Ridge Medical Center website and a

search of the Colorado Secretary of State's records, HealthONE owns and operates the Sky

Ridge Medical Center located at 10101 Ridgegate Pkwy, Lone Tree, CO 80124 (hereinafter, the

"Sky Ridge Medical Center").

19.     At all times material to the allegations of the complaint, Defendant Astley was a natural

person domiciled in the District of Colorado.

## STATEMENT OF FACTS

### I.    Xclusive

20.     Xclusive is a staffing agency based in Colorado that is 100% owned by Defendant

Astley.

21.     Xclusive's corporate headquarters is in Westminster, Colorado.

22.     Xclusive operates in at least 10 other states using subsidiary entities in each state.

23.     Xclusive operates subsidiaries in Colorado, New Mexico, Texas, Kansas, Louisiana, Indiana, Tennessee, Kentucky, Ohio, and Florida.

24.     Xclusive uses Xclusive Management to manage these state subsidiaries and their employees.

25.     Xclusive Colorado is a Colorado subsidiary of Xclusive.

26.     All of these entities are under common control because they are all 100 percent owned and operated by Defendant Astley.

27.     All of these entities are also a unified operation because they are all are advertised as a single operation at www.xclusivestaffing.com, and they all do business as Xclusive Staffing.

28.     All of the entities provide clients low-wage workers for their clients. Most of Xclusive's clients are hotels, like Defendants Omni, Hyatt and Marriott. But Xclusive also provides its services to other types of clients, like Defendant HealthONE, including convention centers, timeshares, warehouses, stadiums, hospitals, office buildings, catering companies, amusement parks, and schools.

29.     Xclusive describes itself as follows on its website:

> In 2002, Xclusive Staffing began as a small Denver-based firm specializing in housekeeping services for local hotels. Xclusive Staffing was born out of our experience as "the user" of temporary staffing agencies. With many years of hotel experience among us, our executives and managers understood the challenges of working with outside staffing firsthand. Based on our past struggles we collectively created a unique model of providing quality employees centered on the client's needs.
>
> The past 13 years have proved that our vision of creating a new model of staffing was sorely needed. Xclusive Staffing has expanded from one location to 25 regional offices in 11 states largely on our reputation of doing things differently than the "typical staffing agency." We are a 100% female-owned

company and remain committed to the highest levels of integrity in
our business. We treat our employees with respect and in turn they
deliver top-notch customer service.

We are trailblazers in our industry because we share the same
values as our clients when it comes to staffing. Our focus on
quality, consistency, and reliability has allowed us to build long-
term partnerships. We understand the pressure that hoteliers face
every day and we want to be that partner you can count on. We
speak and understand the same "language" that hoteliers speak
regarding standards, guest expectations, and competition.

Now, Xclusive Staffing is the industry leader and trusted partner of
hundreds of clients across the country. As the preferred partner of
multiple national hotel brands, facilities management companies
and hotel management companies, we are excited to share our
passion with you. We care about your challenges like they are our
own because we have been in your shoes.

30.     Xclusive's operations throughout the country are controlled centrally out of its

Westminster, Colorado headquarters. The branch offices fax and email timesheets and employee

paperwork to the corporate office, and the corporate office sends payroll checks by FedEx to the

branch offices weekly.

31.     In an enforcement action ending in January of 2014, the United States Department of

Labor's Wage and Hour Division found that Ms. Astley creates policies affecting all of the

branches.

32.     All pay stubs issued to every employee out of every branch are issued by "XCLUSIVE

STAFFING."

33.     Pay checks issued by Xclusive are signed by Defendant Astley.

34.     Xclusive's clients also rely on and help control the work of the workers provided by

Xclusive. The USDOL has found that Xclusive employees are an integral part of the clients'

business activities, providing large numbers of housekeeping, cooking, room attendant, and other

operational staff. Moreover, client supervisors take part in training, controlling, and inspecting the work of Xclusive's employees.

35.     While Xclusive is responsible for compensating its employees, its employees' work directly benefits Xclusive's clients, and Xclusive's clients compensate Xclusive for providing the employees.

**II.     Mr. Valverde was Employed by Xclusive**

36.     Mr. Valverde first worked for Xclusive from the fall of 2010 to late winter or spring of 2011. During that time, Mr. Valverde worked at the following hotels that were clients of Xclusive or one of its subsidiaries:

     i.     Ameristar Blackhawk

     ii.     Crowne Plaza Denver Airport Convention Center

     iii.     Hyatt Regency Denver at Denver Convention Center

     iv.     Hyatt Denver Tech Center

     v.     Omni Interlocken

     vi.     The Denver Convention Center

37.     Mr. Valverde then worked again for Xclusive from the fall of 2014 to the winter of 2015. During that time, Mr. Valverde worked at the following hotels that were clients of Xclusive or one of its subsidiaries:

     i.     Ritz Carelton, Denver

     ii.     Marriott Denver Tech Center

     iii.     Omni Interlocken

     iv.     Hyatt Denver Tech Center

38.     At every hotel, Mr. Valverde worked as a cook or prep cook. Sometimes, when things were busy, he would also help serve. At the Colorado Convention Center, he also sometimes worked as a cleaner.

39.     During his second stint with Xclusive – from the Fall of 2014 to the Winter of 2015 – Mr. Valverde frequently worked overtime. In particular, he remembers working considerable overtime during November and December of 2014 because he helped to cater many holiday parties.

40.     Attached as Exhibit 2 is one weekly paystub from this period dated 12/7/2014 and reporting that Mr. Valverde worked 11.5 hours of overtime and that he worked at the Omni Interlocken, the Marriott Denver Tech Center, and the Hyatt Denver Tech Center during that week.

**III.     Ms. Simon was Employed by Xclusive**

41.     Ms. Simon first worked for Xclusive for approximately two months starting in late 2015. During that time, Ms. Simon worked at the Sky Ridge Medical Center, which was a client of Xclusive's.

42.     At Sky Ridge Medical Center, Ms. Simon worked as a cook in the cafeteria.

43.     After her stint at Sky Ridge Medical Center, Ms. Simon worked at several other Xclusive clients, including the following:

      i.      Courtyard Marriott Denver Downtown

      ii.     Hyatt Denver Tech Center

      iii.    Hyatt Place Denver

      iv.    Omni Interlocken

    v.  Westin Westminster

    vi.  Hyatt Place Denver

    vii.  Marriott Westminster

    viii.  Grand Hyatt Denver

    ix.  Ritz Carelton, Denver

    x.  Marriott Denver Tech Center

44. At these other Xclusive clients, Ms. Simon worked as a server, often at banquets.

45. Attached as Exhibit 3 are two weekly paystubs representing weeks where Ms. Simon worked overtime at the Sky Ridge Medical Center. One of the paystubs is dated 10/25/2015 and reports 1 hour of overtime. The second paystub is dated 11/15/2015 and reports 1.83 hours of overtime.

**IV. Xclusive's Pay Practices**

46. Xclusive's website advertises compliance "federal, state and local laws" and ensures its customers that it takes these laws "extremely seriously" and that "[w]e exceed the industry standards to ensure your protection."

47. In addition, the website claims that Xclusive has "[f]ull compliance with overtime laws."

48. Xclusive makes these promises knowing that its clients care about whether Xclsuive's pay practices violate state and federal law because Xclusive's illegal pay practices might subject Xclusive's clients to liability.

49. Despite these promises, Xclusive maintains policies that violate state and federal wage and hour laws.

 **A. The $3.00 Weekly Deduction and Other Deductions Primarily for the Benefit of the Employer**

50.     $3.00 was deducted from every paycheck the Workers received from Xclusive as an administrative charge.

51.     Mr. Valverde complained about the deduction, and an agent of Xclusive told him that it was necessary because Xclusive had to recoup the $3.00 cost of issuing his paychecks.

52.     Xclusive also deducts other expenses from wages that are primarily for the benefit of the employer, including clothing, name tags, criminal background checks, and tools or other equipment necessary for the employee's work.

53.     Mr. Valverde talked to various other Xclusive employees at the various hotels where he worked, and many of them complained of the same deductions.

54.     A 2011 enforcement action against Xclusive by the USDOL Wage & Hour Division in Texas found that Xclusive "deducted $3.00 per paycheck as a processing fee and made other deductions for things such as uniforms, name badges and background checks."

55.     The paystubs attached as Exhibits 2 and 3 reflect the $3.00 deduction (labeled "FEE") during the work weeks described by each paystub. The paystubs also reflect deductions for a criminal background check, a name tag, a kitchen uniform, and kitchen tools during the year to date.

56.     Neither of the Workers agreed to these deductions either implicitly or expressly.

57.     Plaintiff Valverde signed a contract, written in Spanish, that refers to a $3.00 deduction in each check without explaining the purposes of the $3.00 deduction.

58.     The $3.00 deduction provided a benefit to Xclusive, not to the Workers.

59.     Based on information and belief, the average cost to an employer of issuing a payroll check is less than $3.00 per check. Therefore, the amount of the deduction exceeds the cost of the administrative tasks involved in issuing checks to the workers.

**B. Automatic 30 Minute Meal Deductions**

60.     At every Xclusive client where the Workers worked, Xclusive automatically deducted 30 minutes from their work time each day irrespective of whether they actually took a 30 minute break.

61.     Sometimes the Workers would receive a 30 minute break.

62.     But most of the time they did not receive 30 minute breaks, and would instead would continue performing their normal work taks during the unpaid 30 minutes. This happened to Mr. Valverde during the workweek described by the paystub attached as Exhibit 2.

63.     On some occasions, Mr. Valverde was ordered to indicate the 30 minute break on his own time sheet, irrespective of whether he took that break.

64.     On other occasions, Mr. Valverde saw an agent of Xclusive indicate the 30 minute break on his timesheet, irrespective of whether he took that break.

65.     Mr. Valverde talked to his coworkers about this policy, and they complained about the same thing happening to them.

66.     Ms. Simon also rarely received 30 minute breaks during her time working for Xclusive.

67.     At Sky Ridge Medical Center – where Ms. Simon was supervised by a supervisor from the medical center, rather than Xclusive – Ms. Simon did regularly receive the breaks.

68.     However, for her work at all other Xclusive clients – where she was supervised by Xclusive supervisors – Ms. Simon only remembers receiving one 30 minute break *ever*.

Xclusive nevertheless deducted 30 minute breaks from her worktime, and did not pay her for this time, even  though she continued to work through lunch.

69.     Ms. Simon's Xclusive supervisors often entered these 30 minute breaks on time sheets for Ms. Simon and her coworkers.

70.     On one such occasion, Ms. Simon's supervisor wrote ".30" in the first row of the "Break" column on a time sheet, and then drew a squiggly line through the rest of the column to indicate *exactly* a 30 minute break for *every* worker. This time sheet is attached as Exhibit 4.

71.     Ms. Simon worked during the 30 minutes deducted in the time sheet attached as Exhibit 4 and was not paid and was not paid for the 30 minutes.

72.     A 2012 enforcement action against Xclusive by the USDOL Wage & Hour Division at the Grand Hyatt in Denver Colorado found that Xclusive "did not count missed lunch breaks" as work time.

73.     A 2014 enforcement action against Xclusive by the USDOL Wage & Hour Division at the Hampton Inn & Suites in Denver Colorado found that lunches were "auto-deducted even when the employee worked."

74.     The result of not deducting time for meal breaks that never actually occurred, and during which the Workers and those similarly situated actually worked, is that the paystubs for the Workers and those similarly situated did not reflect all the time worked. The paystub attached as Exhibit 2 is missing time for meal breaks that never occurred and during which Mr. Valverde in fact worked.

**C.  Failure to Provide 10 Minute Breaks**

75.    The Colorado Wage Order provides that "[a] compensated ten (10) minute rest period for each four (4) hours or major fractions thereof shall be permitted for all employees."

76.    During his time working for Xclusive, Mr. Valverde did not receive *any* 10 minute rest breaks, except for when he worked at the Hyatt Regency Denver and at the Denver Convention Center.

77.    At those two hotels, managers that worked for the hotel and convention center, rather than an Xclusive supervisor, required the breaks.

78.    Mr. Valverde did not receive 10 minute breaks during his workweek described by the paystub attached as Exhibit 2.

79.    During her time working for Xclusive, Ms. Simon did not receive *any* 10 minute rest breaks, except at the Sky Ridge Medical Center.

80.    At that Xclusive client, managers that worked for the client, rather than an Xclusive supervisor, required the breaks.

81.    No other person who managed Mr. Valverde or Ms. Simon during their time at Xclusive permitted the 10 minute breaks.

82.    As a result of not being provided the 10 minute breaks, the Workers and those similarly situated were not paid for 10 minutes of time that they should have been paid for during each 4 hours they worked without a break.

**V.    The USDOL Wage & Hour Division Investigations**

83.    Xclusive has been investigated several times by the USDOL Wage & Hour Division for minimum wage and overtime violations.

84.     Below is a table summarizing USDOL Wage & Hour Division's recent history with

Xclusive:

| Year | Location | Finding |
|------|----------|---------|
| 2011 | Albuquerque, NM | Minimum Wage and Overtime Violations |
| 2011 | Grapevine, TX | Minimum Wage, Overtime, and Recordkeeping Violations |
| 2012 | Tampa, FL | Minimum Wage Violation |
| 2012 | Denver, CO | Minimum Wage, Overtime, and Recordkeeping Violations |
| 2014 | Denver, CO | Overtime and Recordkeeping Violations |

## VI.    Xclusive's Pattern of Racketeering

### A.  The Astley Enterprise

85.     As the Owner of Xclusive, Defendant Astley formed an association-in-fact with Xclusive

and all of its associated entities and subsidiaries, which shall be referred to as the "Astley

Enterprise."

86.     In the alternative, Xclusive and all of its associated entities and subsidiaries formed and

association-in-fact called the "Astley Enterprise."

87.     The USDOL Wage and Hour Division found that Ms. Astley is "involved in the daily

operations of [Xclusive]."

88.     Ms. Astley owns and operates 100% of Xclusive and all of its associated entities and

subsidiaries.

89.     In conducting their illegal racketeering scheme, the enterprise acted with the common

purpose of maintaining their business and attracting clients with the promise that Xclusive paid

its workers in compliance with federal and state wage-and-hour law, even though Xclusive knew that its pay practices violated federal and state wage-and-hour law.

90.     Defendant Astley used enterprise to effect this scheme.

91.     Because of her sole ownership of Xclusive, Defendant Astley has personally profited from the fraudulent scheme through Xclusive's increased profits resulting from the racketeering.

   **B. Wire And Mail Fraud Schemes And Their Resulting Harm To Plaintiffs And The Class**

92.     The Astley Enterprise engaged in three interrelated wire fraud schemes: (1) the USDOL scheme, (2) the website scheme, (3) the electronic timekeeping scheme, and (4) the faxed timesheet scheme.

93.     Both on their own and together, these schemes comprise patterns of racketeering activity.

   **i.     The USDOL Scheme**

94.     In a 2012 investigation by the USDOL Wage and Hour Divisions Denver District Office of Xclusive's operations at the Grand Hyatt, Denver, the USDOL found an illegal policy of automatic 30 minute deductions for lunch. As part of that investigation, Ms. Astley met with the USDOL Investigator on June 27, 2012 and was told that Xclusive had "failed to count missed lunch breaks" as work time.

95.     According to the USDOL, at this meeting, Ms. Astley "agreed to comply by making sure that all employees are paid at time and one-half the employee's regular-rate of pay after 40 hours in a workweek and by making sure that the Grand Hyatt and Xclusive compensate employees for all their hours worked." Ms. Astley blamed Xclusive's client – Grand Hyatt – for the practice.

96.     Despite Ms. Astley's attempt to blame Grand Hyatt, a DOL investigator found that Xclusive "employees have missed lunch breaks that Grand Hyatt employees did not have." That

is, at the Grand Hyatt non-Xclusive employees only recorded unpaid lunch breaks when they actually took breaks, whereas Xclusive recorded unpaid lunch breaks for Xclusive workers whether or not those workers took their lunch breaks.

97.     In 2014, the USDOL found that Xclusive was automatically deducting lunch breaks at another hotel. At the close of the investigation, the DOL held a 2/24/14 meeting with Ms. Astley at the Denver District Office of the USDOL Wage and Hour Division. According to the USDOL, "Ms. Astley stated that Xclusive never automatically deducted lunches." After the investigator showed Ms. Astley records showing that every employee was off the clock from exactly 12:00pm to 12:30pm, Ms. Astley again blamed Xclusive's client – this time Hampton Inn & Suites – for the practice.

98.     The automatic lunch break deductions, and the resulting underpayment of Xclusive employees, were the consequence of an intentional pay practice of the Astley Enterprise. Particularly in light of the number of investigations by the USDOL, Ms. Astley's representations to the USDOL were fraudulent, and she knew or should have known that they were fraudulent.

99.     Moreover, despite Ms. Astley's promises to the USDOL, these illegal pay practice practices continued after the USDOL investigations.

100.    For example, Mr. Valverde experienced automatic lunch deductions at each hotel where he worked for Xclusive, including the workweek encompassed by the paystub attached as Exhibit 2.

101.    Ms. Simon experienced the automatic lunch break deductions, including on the timesheet attached as Exhibit 4.

102.     The USDOL relied on Ms. Astley's fraudulent promises regarding the meal deductions in

deciding its dispositions, and the Plaintiffs and those similarly situated were harmed because, as

a result of the fraud, Xclusive was able to continue its illegal pay policies.

103.     The Astley Enterprise used the mail and wires in furtherance of the fraudulent scheme

directed toward the DOL by transmitting fraudulent pay records and checks between Xclusive

branches, and  Xclusive employees and clients. These fraudulent pay records indicated, among

other things, that Xclusive workers had taken 30 minute unpaid breaks when, in fact, the workers

generally worked during these unpaid periods.

104.     The Astley Enterprise used the mail and wires each week, including the week

encompassed by the paystub attached as Exhibit 2  and timesheet attached as Exhibit 4, to send

time records to its corporate office in Westminster, Colorado and to send the resulting pay

checks back to its branch offices.

105.     In the 2012 USDOL investigation of Xclusive in Denver, the USDOL found that

Xclusive "routinely faxes/emails timesheets and new-hire paperwork from branch offices

(located in other states) to the corporate office and the corporate office sends payroll checks by

FedEx to the branch offices weekly." One such timesheet is attached as Exhibit 4.

106.     The Astley Enterprise communicated with the USDOL Wage and Hour Division by wire

and or mail during the course of investigations by the USDOL into Xclusive's wage-payment

practices. Ms. Astley is listed as a contact by the USDOL for Xclusive in the documents related

to these investigations, along with her phone number, cell phone number, fax number, and email

address.

107.    Specifically, the Astley Enterprise continually and repeatedly made material and false representations to the USDOL Wage and Hour Division after investigations by that agency found violations of wage and hour laws.

108.    One such communication to the USDOL is attached as Exhibit 5. There, Ms. Atsley responds to a letter from the USDOL referencing a "history of prior violations" by Xclusive, noting previous assurances by Ms. Astley "of full future compliance with the [FLSA]," and assigning penalties. In her response, Ms. Astley disavows any knowledge the facts found by USDOL, blames Xclusive's employees and clients for the violation, and against promises that "it is out Company's [sic] intent and policy to comply with all applicable laws."

109.    The Astley Enterprise made these fraudulent statements despite knowingly and intentionally implementing policies that violated state and federal wage and hour laws.

### ii.    The Website Scheme

110.    The Astley Enterprise uses the internet to fraudulently advertise its compliance with state and federal minimum wage laws.

111.    Specifically, Xclusive's website currently advertises that Xclusive "exceed[s] industry standards" in complying with "federal, state and local laws."

112.    From at least 8/2/2010 to 3/6/2015, Xclusive's website claimed "[c]ompliance with all federal, state and local labor laws" in advertising "Why Xclusive Staffing?" to potential clients.

113.    Not only does this knowingly and intentionally false assurance allow Xclusive to recruit employees, it also serves to reassure current and potential clients who confront the risk of being held jointly and severally liable for Xclusive's wage-and-hour violations.

114.    Because of the false assurances made by the Astley Enterprise over Xclusive's website, clients are more likely to contract with Xclusive, allowing Xclusive to maintain its illegal pay policies, which have harmed the Workers.

### iii.    The Electronic Timekeeping Scheme

115.    Xclusive maintains records of employee work hours for its various clients on online electronic time keeping systems, including its proprietary platform, StaffTraxs.com, and a third party platform, WorkRecords.com.

116.    Xclusive has advertised for Property Managers on its website that will manage their employees at client locations. The Property Managers must be able to "[m]anage all timekeeping systems including but not limited to manual timesheets, StafftraXS and WorkRecords."

117.    On its online "Client Center," Xclusive provides a link to its StaffTraxs.com system where a client can go if it is "[l]ooking to view [its] employees [sic] hours." StraffTraxs.com provides Justin Astley's name and phone number as a technical support contact. Justin Astley is a vice president at Xclusive.

118.    Until at least March 2, 2015, the Xclusive website advertised StaffTraXS to its clients as follows: "Xclusive Staffing is pleased to offer our clients the easiest and most user-friendly timekeeping solution in the industry.  Designed in house, StafftraXS is built specifically for the needs of the hospitality industry making it far superior to other options available. StafftraXS is indicative of Xclusive's commitment to leading the industry and making our client's jobs easier everyday."

119.    In a different wage-and-hour action against Xclusive in the District of Colorado different Plaintiffs, who were former Xclusive employees, filed an amended complaint with

WorkRecords.com time sheets for Xclusive Workers at the Omni Interlocken attached as Exhibits. *See Cota Martinez et al v. Xclusive Management LLC et al.*, 15-cv-00047 (D. Colo.), ECF Docs. 39-6, 39-8, & 39-10. The WorkRecords time sheets reflect automatic 30 minute breaks.

120.     Both Xclusive and its clients have access to and use these platforms, and therefore the Astley Enterprise uses these online platforms to make repeated, intentionally-false statements over the wires regarding employee work hours.

121.     In particular, as alleged elsewhere, Xclusive's records for employee work hours consistently report 30 minute breaks that employees rarely take, notwithstanding that Xclusive and Defendant Astley know that this practice violates wage-and-hour laws.

122.     By underreporting employee work hours to clients over the wires, the Astley Enterprise engages in repeated acts of wire fraud that harm the Workers and putative class members by giving clients the false impression that Xclusive's workers work less time than they actually work.  This enables Xclusive to either (1) charge clients less than it would if it truthfully recorded and reported work hours or (2) retain profits that would otherwise flow to employees Xclusive it truthfully recorded and reported work hours.

123.     An example of repeated wire fraud injuring Mr. Valverde is the use of WorkRecords.com to fraudulently report Mr. Valverde's time while he worked at the Omni Interlocken, including during the workweek described by Exhibit 2.

> **iv.     The Faxed Timesheet Scheme**

124.     Xclusive also sometimes uses handwritten time sheets to record employee time at client locations.

125.    An example of these timesheets is attached as Exhibit 4.

126.    Both Xclusive and its clients have access to, and use, these timesheets and therefore the Astley Enterprise uses these timesheets to make repeated, intentionally-false statements over the wires regarding employee work hours.

127.    The onsite Xclusive supervisor typically enters the time information on the timesheets and then, per the instructions on the timesheets, the client signs the timesheets and returns them by fax to Xclusive.

128.    In particular, as alleged elsewhere and shown in Exhibit 4, Xclusive's records for employee work hours consistently report 30 minute breaks that employees rarely take, notwithstanding that Xclusive and Defendant Astley know that this practice violates wage-and-hour laws.

129.    These timesheets are for single days and must be returned within a day of the time recorded on the sheets. Thus, each client using the timesheets has to transmit a separate fax for each day it used Xclusive workers.

130.    By using the wires to transmit underreported employee work hours, the Astley Enterprise engages in repeated acts of wire fraud that harm the Workers and putative class members by giving clients the false impression that Xclusive's workers work less time than they actually work.  This enables Xclusive to either (1) charge clients less than it would if it truthfully recorded and reported work hours or (2) retain profits that would otherwise flow to employees Xclusive it truthfully recorded and reported work hours.

131.    An example of repeated wire fraud injuring Ms. Simon is the timesheet attached as

Exhibit 4, which shows the uniform deduction of 30 minute breaks which were never taken and

which calls for the client to sign the timesheet and return it by fax.

## RULE 23 CLASS ALLEGATIONS

132.    The Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if

fully re-written herein.

133.    The Plaintiffs all counts other than the FLSA count as a Fed R. Civ P. 23 class action on

their own behalf and on behalf of classes for which he seeks certification.

134.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define

the "Rule 23 RICO Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT A CLIENT LOCATION

135.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define

the "Rule 23 Wage Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES
> THAT WORKED AT A CLIENT LOCATION

136.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define

the "Rule 23 Colorado Subclass" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES
> THAT WORKED AT A CLIENT LOCATION IN COLORADO

137.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define a

sub-class to the Rule 23 Wage Class (the "Rule 23 Omni Subclass") as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE OMNI INTERLOCKEN HOTEL (500
> INTERLOCKEN BLVD, BROOMFIELD, CO 80021)

138.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define a

sub-class to the Rule 23 Wage Class (the "Rule 23 Hyatt Subclass") as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE HYATT DENVER TECH CENTER
> HOTEL (7800 E TUFTS AVE, DENVER, CO 80237)

139.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define a

sub-class to the Rule 23 Wage Class (the "Rule 23 Marriott Subclass") as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE MARRIOTT DENVER TECH
> CENTER HOTEL (4900 S. SYRACUSE STREET DENVER,
> COLORADO 80237)

140.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define a

sub-class to the Rule 23 Wage Class (the "Rule 23 HealthONE Subclass") as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT SKY RIDGE MEDICAL CENTER (10101
> RIDGEGATE PKWY LONE TREE, CO 80124)

141.    The classes are so numerous that joinder of all potential class members is impracticable.

The Plaintiffs do not know the exact size of the classes since that information is within the

control of Defendants. However the Plaintiffs estimate that, based on the size of Xclusive's

operations, the classes are composed of well over 1000 persons and each sub-class is composed

of over 50 persons. The exact size of the classes will be easily ascertainable from Defendants'

records.

142.     There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions of law and fact include: the Defendants' pay practices; the Defendants' failure to pay employees all they are legally owed; the nature and extent of Defendant Astley's fraud; the nature and extent of the antitrust agreements.

143.     The class claims asserted by the Plaintiffs are typical of the claims of all of the potential class members because they experienced the same or similar working conditions and pay practices as the Defendants' other employees. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy. This is especially true in the case of low-wage, hourly, temporary workers, like the class members here, who are un-sophisticated, are unlikely to seek legal representation, cannot realistically navigate the legal system pro se, and whose small claims make it difficult to retain legal representation if they do seek it.

144.     The Plaintiffs will fairly and adequately protect and represent the interests of the class. They were Defendants' employees and were victims of the same violations of law as the other class members, including numerous violations of federal and state wage and hour laws.

145.     The Plaintiffs are represented by counsel experienced in litigation on behalf of low-wage workers and in wage and hour class actions.

146.     The prosecution of separate actions by the individual potential class members would create a risk of inconsistent or varying adjudications with respect to individual potential class members that would establish incompatible standards of conduct for Defendants.

147.    Each class member's claim is relatively small. Thus, the interest of potential class members in individually controlling the prosecution or defense of separate actions is slight. In addition, public policy supports the broad remedial purposes of class actions in general and that the pertinent federal and state laws are appropriate vehicles to vindicate the rights of those employees with small claims as part of the larger class.

148.    The Plaintiffs are unaware of any members of the putative classes who are interested in presenting their claims in a separate action.

149.    The Plaintiffs are unaware of any pending litigation commenced by members of the classes concerning the instant controversy.

150.    It is desirable to concentrate this litigation in this forum because all parties are domiciled in this jurisdiction, or are registered to do business in this jurisdiction.

151.    This class action will not be difficult to manage due to the uniformity of claims among the class members and the susceptibility of wage claims to both class litigation and the use of representative testimony and representative documentary evidence.

152.    The contours of the class will be easily defined by reference to the payroll documents Defendants were legally required to create and maintain. *See* 29 C.F.R. § 516 *et seq.*

## 29 U.S.C. § 216(B) COLLECTIVE ACTION ALLEGATIONS

153.    The Plaintiffs bring their FLSA claim as a collective action, pursuant to 29 U.S.C. § 216(b), on behalf of themselves and on behalf of all other similarly situated current and former employees of the Defendants.

154.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define the "216(b) National Class" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT ONE OF ITS CLIENTS' LOCATIONS

155.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define

the "216(b) Omni Subclass" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE OMNI INTERLOCKEN HOTEL (500
> INTERLOCKEN BLVD, BROOMFIELD, CO 80021)

156.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define

the "216(b) Hyatt Subclass" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE HYATT DENVER TECH CENTER
> HOTEL (7800 E TUFTS AVE, DENVER, CO 80237)

157.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define

the "216(b) Marriott Subclass" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT THE MARRIOTT DENVER TECH
> CENTER HOTEL (4900 S. SYRACUSE STREET DENVER,
> COLORADO  80237)

158.    Pending any modifications necessitated by discovery, the Plaintiffs preliminarily define

the "216(b) HealthONE Subclass" as follows:

> ALL CURRENT AND FORMER HOURLY EMPLOYEES OF
> XCLUSIVE STAFFING, INC., OR ONE OF ITS SUBSIDIARES,
> THAT WORKED AT SKY RIDGE MEDICAL CENTER (10101
> RIDGEGATE PKWY LONE TREE, CO 80124)

159.    All potential FLSA class members are similarly situated because, among other things,

they were all hourly employees of Defendants and the members of the sub-classes were

additionally all employed by Defendants. Moreover, all members of the class and sub-classes

suffered from the same policies of Defendants, including:

      a.      Deductions for costs that are primarily for the benefit of the employer

              (including the $3.00 weekly deduction for the cost of issuing a pay check);

              and

      b.      The automatic 30 minute meal break deduction, regardless of whether the

              employee worked during the 30 minutes.

### **COUNT I: CIVIL RICO, 18 U.S.C. 1964(C)**

- **The Named Plaintiffs and the Rule 23 RICO Class vs. Defendant Astley**

160.    The Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

161.    As set forth above, the Plaintiffs assert this count on their own behalf and on behalf of all

those similarly situated pursuant to Fed. R. Civ. P. 23.

162.    Defendant Astley violated RICO by violating 18 U.S.C. §§ 1962(c) and 1964(c).

163.    Defendant Astley and the Astley Enterprise engaged in the fraudulent schemes, acts, and

misrepresentations described above, which violate 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C.

§ 1343 (wire fraud), and which constitute patterns of racketeering.

164.    By conducting the Astley Enterprise through a pattern of racketeering, Defendant Astley

injured the Plaintiffs and those similarly situated.

165.    Among other things, each of these RICO violations caused the Plaintiffs and those

similarly situated to suffer loss of past, current, and prospective wages and to spend unpaid time

working as opposed to pursuing other interests.

166.    As a result, the Plaintiffs and those similarly situated suffered injuries and are entitled to

treble damages, fees, and costs as set forth by law.

### <u>COUNT II</u>: THE FAIR LABOR STANDARDS ACT, 29 U.S.C. §§ 201 *ET SEQ.*

- **The Named Plaintiffs and the 216(b) National Class against Xclusive, Xclusive Management, and Astley**
- **Plaintiff Valverde and the 216(b) Omni Subclass against Defendants Omni Defendants, Xclusive, Xclusive Management, Xclusive Colorado, and Astley**
- **Plaintiff Valverde and the 216(b) Marriott Subclass against Defendants Marriott, Xclusive, Xclusive Management, Xclusive Colorado, and Astley**
- **Plaintiff Valverde and the 216(b) Hyatt Subclass against Defendants Hyatt, Xclusive, Xclusive management, Xclusive Colorado, and Astley**
- **Plaintiff Simon and the 216(b) HealthONE Subclass against Defendants HealthONE, Xclusive, Xclusive Management, Xclusive Colorado, and Astley**

167.    The Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

168.    The Plaintiffs brings their FLSA claim as a collective action, pursuant to 29 U.S.C. §

216(b), on behalf of themselves and on behalf of all other similarly situated current and former

employees of the Defendants.

169.    Defendants Employed the Plaintiffs and those similarly situated pursuant to the Fair

Labor Standards Act.

170.    Each of the Defendants are, or were members of, of an enterprise that had annual

revenues in excess of $500,000 during the Plaintiffs' employment and had two or more

employees that handled goods or materials that had been moved in or produced for interstate

commerce. The Defendants were therefore part of an enterprise or enterprises engaged in

commerce pursuant to 29 U.S.C. § 203(s)(1).

171.    As employers of the Plaintiffs and those similarly situated, the Defendants named in this claim were required to pay the Plaintiffs and those similarly overtime pursuant to 29 U.S.C. § 207 and failed to do so.

172.    As employers of the Plaintiffs and those similarly situated, the Defendants named in this claim were required to pay the Plaintiffs and those similarly their regular rate for meal breaks that were deducted from compensated time, but never given or taken, and failed to do so.

173.    The failure to pay as required by the FLSA was willful pursuant to 29 U.S.C. § 255(a).

174.    The Plaintiffs and those similarly situated are therefore entitled to the following pursuant to 29 U.S.C. § 216:

      i.      unpaid overtime;

      ii.      gap time for any work week in which overtime is owed;

      iii.      their regular rate for unpaid breaks;

      iv.      statutory liquidated damages;

      v.      reasonable attorney's fees and costs.

175.    As joint employers, Defendants are joint and severally liable to the Plaintiffs and the 216(b) classes.

### COUNT III: FAILURE TO PAY STATUTORILY REQUIRED WAGES, INCLUDING OVERTIME UNDER, THE LAWS OF THE SEVERAL STATES

- **The Named Plaintiffs and the Rule 23 Wage Class vs. Defendant Xclusive**
- **Plaintiff Valverde and the Rule Omni Subclass against Defendants Omni Defendants, Xclusive and Xclusive Colorado**
- **Plaintiff Valverde and the Rule 23 Marriott Subclass against Defendants Marriott, Xclusive and Xclusive Colorado.**
- **Plaintiff Valverde and the Rule 23 Hyatt Subclass against Defendants Hyatt, Xclusive, and Xclusive Colorado**
- **Plaintiff Simon and the Rule 23 HealthONE Subclass against Defendants HealthONE, Xclusive, and Xclusive Colorado**

176.    The Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

177.    As set forth above, the Plaintiffs assert this count on their own behalf and on behalf of all

those similarly situated pursuant to Fed. R. Civ. P. 23.

178.    The Defendants employed the Plaintiffs and those similarly situated.

179.    The Plaintiffs and those similarly situated worked for the Defendants under an

employment contract and the Defendants failed to pay them overtime pursuant to the relevant

state statutes and regulations, including Colo. Rev. Stat. § 8-6-118 and the Colorado Wage

Order.

180.    By failing to pay for all hours worked, the Defendants also failed to pay all wages due

under the law and therefore violated the state wage payment statutes, including Colo. Rev. Stat. §

8-4-101 *et seq.*

### COUNT IV: FAILURE TO PROVIDE 10 MINUTE BREAKS UNDER COLORADO LAW

- **The Named Plaintiffs and the Rule 23 Colorado Wage Sub-Class vs. Defendant Xclusive**
- **Plaintiff Valverde and the Rule Omni Subclass against Defendants Omni Defendants, Xclusive and Xclusive Colorado**
- **Plaintiff Valverde and the Rule 23 Marriott Subclass against Defendants Marriott, Xclusive and Xclusive Colorado.**
- **Plaintiff Valverde and the Rule 23 Hyatt Subclass against Defendants Hyatt, Xclusive, and Xclusive Colorado**

181.    The Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

182.    As set forth above, the Plaintiffs assert this count on their own behalf and on behalf of all

those similarly situated pursuant to Fed. R. Civ. P. 23.

183.    Xclusive's employees in Colorado are covered by The Colorado Wage Order, which

provides that "[a] compensated ten (10) minute rest period for each four (4) hours or major

fractions thereof shall be permitted for all employees." Defendants failed to provide these rest breaks.

184.    The Plaintiffs and the Rule 23 Colorado Wage Sub-Class are entitled to compensation for these lost breaks pursuant to Colo. Rev. Stat. §§  8-4-101 *et seq.*, 8-6-101 *et seq.*, and the Colorado Wage Order.

185.    The Plaintiffs and those similarly situated are entitled to damages and, if applicable, attorneys' fees.

<u>**COUNT V: ILLEGAL DEDUCUCTIONS UNDER COLORADO LAW**</u>

- **The Named Plaintiffs and the Rule 23 Colorado Wage Sub-Class vs. Defendant Xclusive**
- **Plaintiff Valverde and the Rule Omni Subclass against Defendants Omni Defendants, Xclusive and Xclusive Colorado**
- **Plaintiff Valverde and the Rule 23 Marriott Subclass against Defendants Marriott, Xclusive and Xclusive Colorado.**
- **Plaintiff Valverde and the Rule 23 Hyatt Subclass against Defendants Hyatt, Xclusive, and Xclusive Colorado**
- **Plaintiff Simon and the Rule 23 HealthONE Subclass against Defendants HealthONE, Xclusive, and Xclusive Colorado**

186.    The Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

187.    As set forth above, the Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

188.    The deductions taken from the Plaintiffs pay checks described above, including the $3 per pay check deduction, violated Colorado statute. Colo. Rev. Stat. § 8-4-105.

189.    These illegal deductions are recoverable under the Colorado Wage Claim Act. Colo. Rev. Stat. §§ 8-4-101 *et seq.*

190.    The Plaintiffs and those similarly situated are entitled to damages and, if applicable, attorneys' fees.

<u>**COUNT VI**</u>**: EQUITY UNDER THE LAWS OF THE SEVERAL STATES**

- **The Named Plaintiffs and the Rule 23 Wage Class vs. Defendant Xclusive**
- **Plaintiff Valverde and the Rule 23 Omni Subclass against Defendants Omni Defendants, Xclusive and Xclusive Colorado**
- **Plaintiff Valverde and the Rule 23 Marriott Subclass against Defendants Marriott, Xclusive and Xclusive Colorado.**
- **Plaintiff Valverde and the Rule 23 Hyatt Subclass against Defendants Hyatt, Xclusive, and Xclusive Colorado.**
- **Plaintiff Simon and the Rule 23 HealthONE Subclass against Defendants Health, Xclusive, and Xclusive Colorado.**

191.    The Plaintiffs incorporate by reference all previous paragraphs of this Complaint.

192.    As set forth above, the Plaintiffs assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

193.    Plaintiffs and those similarly situated entered into hourly, implied-in-fact employment contracts with the Defendants.

194.    The implied-in-fact contracts promised payment of a fixed amount per hour worked.

195.    The implied-in-fact contracts also incorporated state and federal wage and hour laws.

196.    The Defendants breached the contracts by, among other things, not compensating employees for all hours worked.

197.    Plaintiffs and those similarly situated suffered damages.

198.    In the alternative, if the contracts fail, the Defendants are liable to Plaintiffs and those similarly situated in quasi-contract, including promissory estoppel and unjust enrichment.

199.    In particular, as a result of accepting work without providing proper compensation, Defendants received a benefit at the expense of Plaintiffs and those similarly situated under circumstances that would make it unjust for Defendants to retain the benefit without

commensurate compensation. As a result, Plaintiffs and those similarly situated are entitled to damages.

## DEMAND FOR JURY TRIAL

200.    Plaintiffs demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

201.    The Plaintiffs respectfully request an Order from this Court:

    c.    Certifying an opt-in class and sub-class pursuant to the FLSA, 29 U.S.C. §§ 201 *et seq.*;

    d.    Certifying the Rule 23 class and sub-classes, naming the named Plaintiffs as class representatives of the respective classes they seek to represent, and naming Plaintiffs' counsel class counsel;

    e.    granting judgment in favor of Plaintiffs and against all Defendants;

    f.    awarding the Plaintiffs and the Rule 23 classes their actual damages and any applicable statutory damages;

    g.    awarding the Plaintiffs and those similarly situated damages and liquidated damages under the FLSA;

    h.    awarding the Plaintiffs and those similarly situated their costs;

    i.    awarding the Plaintiffs and those similarly situated their attorneys' fees;

    j.    awarding the Plaintiffs and those similarly situated prejudgment and post-judgment interest, when allowable by law; and

    k.    granting such other relief as this Court deems just and proper.

Respectfully Submitted,

<u>s/Alexander Hood</u>
Alexander Hood
David Seligman
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email:  alex@towardsjustice.org
        david@towardsjustice.org

Attorneys for the Plaintiffs

**Certificate of Service**

I hereby certify that on 7/22/2016, I served a true and correct copy of the forgoing on all parties that have appeared pursuant to F.R.C.P. 5.

 s/Alexander Hood
Alexander Hood