**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case No. 16-cv-00671-RM-MJW

ISABEL VALVERDE *ET AL.,*
        Plaintiffs,
v.

XCLUSIVE STAFFING, INC. *ET AL.*,
        Defendants.

---

**PLAINTIFF SIMON'S RESPONSE TO DEFENDANTS' MOTION TO COMPEL
ARBITRATION**

---

**INTRODUCTION**

In January 2015, a group of Xclusive employees brought class and collective action claims against Xclusive Management LLC and Xclusive Staffing, Inc. (together "Xclusive") for violations of federal and state wage-and-hour laws. *See* Compl., *Cota Martinez v. Xclusive*, 15-cv-00047, ECF Doc. No. 1 (D. Colo. Jan. 7, 2015). That case was voluntarily dismissed before class certification. *Id.*, ECF Doc. No. 70 (D. Colo. Jan. 6, 2016).

Plaintiffs allege that Xclusive's wage-and-hour violations have persisted throughout the past year. But, according to Xclusive, one thing that ***has*** changed since that prior litigation is Xclusive's adoption of an "employment policy of providing arbitration procedures and agreements to all of its employees." ECF Doc. No. 38-1 at ¶ 3. Among other things, those "agreements" prohibit Xclusive employees from "seek[ing] to bring [any] dispute on behalf of other employees as a class or collective action or other representative proceeding." *Id.*, Ex. 1.

Although Xclusive apparently rushed to issue the arbitration policy in the summer of 2015,

it did not begin to aggressively distribute the policy until sometime after the filing of *this* litigation.

Plaintiff Isabel Valverde worked for Xclusive through most of 2015. ECF Doc. No. 1 at ¶ 34. And

yet, Xclusive never provided him with the arbitration policy. Similarly, Plaintiff Maria Simon

began working at Xclusive in 2015. Simon Decl. at ¶ 1, Ex. A ("Simon Decl."). But Xclusive did

not attempt to obtain an arbitration agreement from her until May 2016, *Id.* at ¶ 3, months after

Plaintiff Valverde filed a putative class action on her behalf. Xclusive now hopes to force Ms.

Simon out of this litigation.

Xclusive's efforts to avoid resolution of the substantive issues underlying this litigation

fail. To be sure, the Federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, embodies "a liberal federal policy

favoring arbitration agreements." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 346 (2011).

That principle is the law of the land, and Plaintiffs do not attempt to refute it here. But that "liberal

federal policy" does not require the enforcement of every arbitration requirement promulgated by

an employer. For the following reasons, the Court should deny Defendants' Motion to Compel

Arbitration.

*First*, "while [e]veryone knows the Federal Arbitration Act favors arbitration. . . . [b]efore

the Act's heavy hand in favor of arbitration swings into play, the parties themselves must agree to

have their disputes arbitrated." *Howard v. Ferrellgas Partners*, 748 F.3d 975, 977 (10th Cir. 2014);

*see also BG Grp., PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1222 (2014) (Roberts, C.J.,

dissenting) ("The majority acknowledges—but fails to heed—the first principle that underscores

all of our arbitration decisions: Arbitration is strictly a matter of consent." (internal quotation marks

omitted)). Because Ms. Simon has, at the very least, established genuine issues of material fact

regarding whether she entered into the arbitration requirement, the Court must either deny

Defendants' Motion or hold a trial on the matter. 9 U.S.C. § 4 ("If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.").

*Second*, even if the parties have entered into an arbitration agreement, that agreement is only enforceable if consistent with "such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. In recent months, both the Seventh and Ninth Circuits have concluded that agreements that force employees to waive their right to participate in collective litigation— whether or not situated within arbitration clauses—are unenforceable under the National Labor Relations Act, 29 U.S.C. §§ 151, *et seq. Morris v. Ernst & Young, LLP*, --- F.3d ----, 2016 WL 4433080, at *2 (9th Cir. Aug. 22, 2016); *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147 (7th Cir. 2016). Because the arbitration agreement at issue here purports to effect such a waiver, it is unenforceable as a matter of law. And, thus, the Court can also deny Defendants' motion to compel arbitration without having to hold a trial on contract formation issues.

*Third*, if the Court concludes that the arbitration agreement is enforceable notwithstanding the NLRA, it should deny Defendants' Motion because Xclusive presented the arbitration agreement to Ms. Simon after a Rule 23 action was filed on her behalf. Rule 23 provides the exclusive mechanism for opting out of an already-filed class action—the presentation of this agreement contravened that procedure.

*Fourth*, even if the agreement is enforceable by Xclusive and Astley, by its plain terms, it is not enforceable by any of the other Defendants.

## ARGUMENT

### A.  Ms. Simon Never Entered into the "Mutual Arbitration Agreement."

#### 1.  Ms. Simon did not sign the agreement attached to Defendants' Motion to compel arbitration.

A court should not compel arbitration unless it (not an arbitrator) has first determined that an agreement to arbitrate exists under the generally applicable contract law of the state thats law governs the question. The FAA was not enacted to force parties into arbitration, but to enforce parties' voluntary agreements to arbitrate certain specified disputes. "Arbitration is simply a matter of contract between parties; it is a way to resolve disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995). And "[w]hat happens when it's just not clear whether the parties opted for or against arbitration? The FAA tells district courts to 'proceed summarily to the trial' of the relevant facts." *Howard*, 748 F.3d at 977 (10th Cir. 2014) (quoting 9 U.S.C. § 4). To determine whether such a trial is necessary, the Court should evaluate the facts under the standard normally applicable to a motion for summary judgment. *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012). It may not make credibility determinations on the papers.

In this case, there are—at the very least—genuine issues of material fact about whether Ms. Simon signed the arbitration agreement that Defendants attach to their Motion to Compel Arbitration. She acknowledges that the signature on the "form" "looks kind of like my signature." Simon Decl. at ¶ 13. But she insists that "she didn't sign that form." *Id.* She says that the form Xclusive presented to her was written in English and, although she "understand[s] English," she "didn't understand that form." *Id.* at ¶ 7. The arbitration agreement that Defendants have submitted here (and that appears to include a signature that "looks kind of like [Ms. Simon's] signature") is

in Spanish. Ms. Simon, however, does not speak Spanish, and she "would never sign anything in Spanish." *Id.* ¶ 15.

### 2. Even if Ms. Simon did sign the arbitration agreement, she did so under duress.

Even if Ms. Simon did sign the arbitration agreement, she did so under duress and can therefore void the agreement as a matter of state law. The Tenth Circuit has explained that "the existence (or nonexistence) of an agreement to arbitrate is judged by normal state law contract formation principles." *Howard*, 748 F.3d at 979. Under Colorado law, a "contract is voidable on the grounds of duress if a party's manifestation of assent is induced by an improper threat that leaves no reasonable alternative." *Vail/Arrowhead, Inc. v. Dist. Court for the Fifth Judicial Dist.*, 954 P.2d 608, 612 (Colo. 1998). And in determining whether a threat is "improper" Colorado courts look to the Restatements, which provide among other things that a threat is improper if "what is threatened is a crime or a tort, or the threat itself would be a crime or a tort if it resulted in obtaining property." Restatement (Second) of Contracts § 176(1)(a).

Even if Ms. Simon did sign the agreement here, she did so under the threat that Xclusive would withhold her paycheck if she did not sign it. Simon Decl. at ¶ 4. Withholding lawfully earned wages violates state law. *See, e.g.*, Colo. Rev. Stat. § 8-4-103. Any threat to withhold lawful wages from an employee is therefore presumptively "improper" for the purposes of determining whether an agreement entered into under that threat was entered into under duress. An employer may not deprive an employee of property that is rightfully hers in order to extract an agreement that would require her to waive her right to a public forum. In line with this reasoning, courts around the country have concluded that arbitration agreements entered into by employees under the threat of their wages being withheld are unenforceable. *In re RLS Legal Sols., L.L.C.*, 156 S.W.3d 160, 165

(Tex. App. 2005); *Canales v. Performance Team Triangle W.*, 2003 WL 361242, at *7 (Cal. Ct.

App. Feb. 20, 2003) ("While the evidence on the point was conflicting, the version credited by the

trial court, and binding here, established that an agent of the employer told Ms. Canales that she

would receive her paycheck only when she signed the arbitration agreement. She signed it under

compulsion of not being paid unless she did. That amounts to duress, rendering the agreement

unenforceable.").

**B.** **The "Mutual Arbitration Agreement" Is Unenforceable as a Matter of Federal Law Because it Violates the National Labor Relations Act.**

    **1.** *D.R. Horton* **and its path through the courts**

The Court need not hold a trial in order to deny Defendants' Motion to Compel Arbitration.

It should conclude that even if Ms. Simon did enter into the agreement, the agreement is

unenforceable as a matter of law because it conflicts with Ms. Simon's rights under the National

Labor Relations Act ("NLRA") 29 U.S.C. §§ 151, *et seq.* That conclusion is consistent not only

with the language and purposes of the NLRA and FAA, but also with the trajectory of the case law.

The Court's analysis of this issue, as with any issue involving interpretation and application

of the NLRA, should begin with the NLRB's interpretation of the statue. *N.L.R.B. v. Kentucky*

*River Cmty. Care, Inc.*, 532 U.S. 706, 711 (2001). In *In Re D. R. Horton, Inc.*, 357 NLRB 2277

(2012), the Board concluded that a class waiver in an arbitration agreement violated § 7 of the

NLRA, which protects employees' right "to engage in . . . concerted activities for the purpose of

collective bargaining or other mutual aid or protection." 29 U.S.C. § 157. The Board also

concluded that that holding did not run afoul of the FAA because (1) the class wavier in an

employment contract "interferes with substantive statutory rights under the NLRA, and the intent

of the FAA was to leave substantive rights undisturbed"; and (2) § 2 of the FAA expressly "that

arbitration agreements may be invalidated in whole or in part upon any 'grounds as exist at law or in equity for the revocation of any contract.'" *In Re D. R. Horton, Inc.*, 357 NLRB 2277, 2286-87 (2012).

The principle announced in that case has followed a meandering path through the courts that has resulted in a stark circuit split. On immediate appeal of the Board's decision, the Fifth Circuit reversed. *D.R. Horton, Inc. v. N.L.R.B.*, 737 F.3d 344, 348 (5th Cir. 2013). While the court recognized that other "courts ha[d] held [§ 7 of the NLRA] protects collective-suit filings," *id.* at 356, it held nonetheless that the FAA trumped this protection because the NLRA does not include an explicit or implicit "congressional command" overriding the FAA. *Id.* at 361. The Eighth Circuit later sided with the Fifth Circuit. *Owen v. Bristol Care, Inc.*, 702 F.3d 1050 (8th Cir. 2013). And in *dicta* the Second Circuit cited the Fifth Circuit's reasoning with approval. *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 297 n.8 (2d Cir. 2013). Recently, however, both the Seventh Circuit and the Ninth Circuit have adopted the Board's position, concluding that class waivers in employment contracts are unenforceable because they violate the NLRA. *Morris v. Ernst & Young, LLP*, --- F.3d ----, 2016 WL 4433080 (9th Cir. Aug. 22, 2016); *Lewis v. Epic Sys. Corp.*, 823 F.3d 1147 (7th Cir. 2016).

The Tenth Circuit has not yet addressed this issue. At least one district court in this District has sided with the Fifth Circuit—concluding that any right under the NLRA to engage in collective litigation is trumped by the FAA. *Pollard v. ETS PC, Inc.*, 2016 WL 2983530 (D. Colo. May 12, 2016). But that decision was issued before either the Seventh Circuit's or the Ninth Circuit's opinions on this point. Moreover, for the reasons discussed here, *Pollard* makes a fundamental legal error that leads to its incorrect conclusion. With the recent Seventh and Ninth Circuit opinions

in hand and without any binding precedent on point, this Court should adopt the Board's position

and deny enforcement of the arbitration agreement because its class waiver violates the NLRA.[1]

    **2.  The *D.R. Horton* rule does not conflict with the FAA when applied to agreements to arbitrate.**

There should be no dispute that the NLRA provides employees with the right to participate

in class and collective litigation. Courts around the country have long held this to be the case,

*Lewis*, 823 F.3d at 1152 (7th Cir. 2016) (collecting cases) (collecting cases), and to the extent that

there is any ambiguity, the NLRB has now resolved the issue. *Tigges v. AM Pizza, Inc.*, 2016 WL

4076829, at *16 (D. Mass. July 29, 2016) ("The NLRA is not ambiguous with respect to this issue,

and even if it were, the NLRB's interpretation is eminently reasonable."). In that it forces

employees to waive their right to participate in any "class or collective action or other

representative proceeding," the arbitration agreement here violates the NLRA.[2]

The question, then, is whether the arbitration agreement is somehow insulated from

application of the NLRA because of the FAA. Opponents of the *D.R. Horton* rule argue that

---

[1] Alternatively, the Court may deny enforcement of the arbitration agreement based on the Norris-Laguardia Act. Section 2 of Norris-LaGuardia declares it to be the "public policy of the United States" that the individual employee be free of "interference" or "restraint" by employers when they engage in "concerted activities for the purpose of . . . mutual aid or protection." 29 U.S.C. § 102. Section 3 of the Act provides that, "*[a]ny* undertaking or promise" that is contrary to the policy declared in section 2 "shall not be enforceable in any court of the United States." 29 U.S.C. § 103 (emphasis added).

[2] This is not to say that the NLRA provides a right to a ***certain kind*** of collective litigation. The NLRA does not, for example, require class certification under Rule 23 even where the putative class does not meet the requirements for class certification. *See, e.g.*, *Bekele v. Lyft, Inc.*, 2016 WL 4203412, at *20 (D. Mass. Aug. 9, 2016) (expressing a concern about this possibility). Rather it requires that employees have access to whatever class or collective procedures are available to them under the law. Indeed, although "Rule 23 may have been yet to come at the time of the NLRA's passage, [the NLRA] was not written on a clean slate. Other class and collective procedures had existed for a long time on the equity side of the court: permissive joinder of parties, for instance, had long been part of Anglo-American civil procedure and was encouraged in 19th-century federal courts." *Lewis*, 823 F.3d at 1154 (7th Cir. 2016).

requiring the availability of class and collective proceedings "interferes with fundamental attributes of arbitration and thus creates a scheme inconsistent with the FAA." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011). To justify this inconsistency, they argue, the NLRA would need to include a "contrary congressional command." *Am. Exp. Co. v. Italian Colors Rest.,* 133 S. Ct. 2304, 2309 (2013). Because no such command exists, the NLRA protection recognized in *D.R. Horton* does not apply to class waivers situated within agreements to arbitrate.

For at least two reasons, however, this argument is incorrect. *First*, it ignores that the FAA is not a "super statute" that presumptively thwarts every other federal protection in its path. To be sure, the Supreme Court has instructed courts to not lightly conclude that a federal statute provides a right to a public forum or to procedures that conflict with the "fundamental attributes" of arbitration. *See, e.g.*, *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 26 (1991); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 227 (1987). For example, a federal statute does not provide plaintiffs with a right to bring claims in a public forum merely because it appears to provide a "right to sue." *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665 (2012). Nor does it provide access to class procedures merely because those procedures might present the only viable path to the vindication of claims under the statute. *Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304, 2309 (2013).

But this case presents a fundamentally different question than all of those other Supreme Court cases. In those other cases, the question confronting the Court was whether a non-FAA statute should be read to provide a right that is inconsistent with the FAA. In this case, on the other hand, "the shoe is on the other foot." *Lewis*, 823 F.3d at 1159. We *know* the NLRA provides a right to class and collective procedures, and the question is whether the FAA can be harmonized with

that right.[3] Consistent with normal rules of statutory construction, "[i]mplied repeal [of the NLRA's § 7 rights] should be found" only if there is an "irreconcilable conflict between the [NLRA and FAA]." *Matsushita Elec. Indus. Co. v. Epstein*, 516 U.S. 367, 381 (1996) (internal quotation marks omitted). The conflict here is not irreconcilable: the FAA provides a "savings clause" to deal with precisely this situation. Where an arbitration agreement is invalid on grounds that exist "at law or in equity" for the revocation of any contract, the FAA gives way. 9 U.S.C. § 2.  An agreement that forces employees to waive their non-waivable § 7 rights is therefore unenforceable, whether or not it is part of an arbitration agreement.

*Second*, the right under the NLRA to engage in class and collective litigation is a fundamental *substantive* right under the Act—not a procedural one. The difference between procedural and substantive rights is of paramount importance to the question of how and whether the FAA should be harmonized with the NLRA's protections. In general, "the Supreme Court has described rights that are the essential, operative protections of a statute as 'substantive' rights." *Morris v. Ernst & Young, LLP*, 2016 WL 4433080, at *7 (9th Cir. Aug. 22, 2016). Procedural rights, on the other hand, "are the ancillary, remedial tools that help secure the substantive right." *Id.* The right to bring a substantive claim under federal law does not impliedly amount to a right to a certain set of procedures to assert that substantive claim. *Sutherland v. Ernst & Young LLP*, 726 F.3d 290, 297 n.6 (2d Cir. 2013) (regarding the FLSA collective action mechanism, noting that "[w]e have previously explained that the procedural 'right' to proceed collectively presupposes, and does not create, a non-waivable, substantive right to bring such a claim."). However, "[t]he FAA does *not*

---

[3] Courts should harmonize overlapping statutes "so long as each reaches some distinct cases." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 144 (2001).

mandate the enforcement of contract terms that waive substantive federal rights. Thus, when an arbitration contract professes the waiver of a substantive federal right, the FAA's saving clause prevents a conflict between the statutes by causing the FAA's enforcement mandate to yield." *Morris*, 2016 WL 4433080, at \*7 (9th Cir. Aug. 22, 2016) (emphasis added).

This is where the district court in *Pollard* went astray. The court there suggested that the substantive-procedural divide in this context turns on whether the "right[] [is] established by the statute [under] which the plaintiff [is] suing"—in which case the right is substantive. 2016 WL 2983530, at \*14 (D. Colo. May 12, 2016). The distinction, however, has nothing to do with the claims alleged by a plaintiff in a particular case—after all, an arbitration agreement prohibiting a consumer or employee from bringing claims under state laws would be unenforceable even in a case involving only federal claims. Rather, the substantive-procedural divide turns on whether the right in question is designed merely to enable a plaintiff to vindicate in a public forum another underlying right—in which case the right is "procedural"—or whether the right is part of the "the central, fundamental protections" of a statute—in which case it is substantive. *Morris v. Ernst & Young, LLP*, 2016 WL 4433080, at \*8 (9th Cir. Aug. 22, 2016).

Ms. Simon's right under the NLRA to participate in class and collective proceedings does not involve merely the procedures available to her to vindicate another right. It is a freestanding right at the core of one of her most central protections as an employee. "Collective, representative, and class legal remedies"—just like labor unions themselves—"allow employees to band together and thereby equalize bargaining power." *Lewis*, 823 F.3d at 1153 (7th Cir. 2016). The FAA does not license drafters to craft arbitration requirements that force consumers and employees to waive substantive rights, like the right to certain remedies or claims, *Hayes v. Delbert Servs. Corp.*, 811

11

F.3d 666, 675 (4th Cir. 2016), and it likewise does not permit arbitration requirements that waive

their substantive rights under the NLRA. In other words, the *Pollard* court is surely right that "the

Supreme Court has already established that there is no such thing as a non-waivable opportunity

to vindicate federal policies through an attempt at a class action." *Pollard*, 2016 WL 2983530, at

*15 (D. Colo. May 12, 2016). But *D.R. Horton* does not recognize a non-waivable ***opportunity*** to

vindicate a federal policy. It recognizes a non-waivable federal policy. The distinction is critical.

For these reasons, the FAA must give way to the NLRB in at least one context. Employees

protected by the NLRA may choose whether or not to arbitrate, but they may not be forced to

waive their right to bring collective or class claims.

**C.** **Even if the Arbitration Agreement Does Not Violate the NLRA, It is Unenforceable with Respect to *This* Class Action Because Xclusive Presented it to Ms. Simon *after* this Action Was Filed.**

The arbitration agreement is additionally unenforceable with respect to ***this*** action because

Xclusive presented the arbitration agreement to Ms. Simon after a Rule 23 class action had already

been filed on her behalf. Rule 23 precisely sets out the procedure for individual class members to

decide whether they want to be bound by the outcome of a class action. For Rule 23(b)(3) classes—

like this one—the court must direct notice to the class members explaining, among other things,

"that the court will exclude from the class any member who requests exclusion." Fed. R. Civ. P.

23(c)(2)(B)(v). Consistent with the opt-out scheme prescribed by Rule 23, the law recognizes that

the mere filing of a Rule 23(b)(3) class claim must necessarily absolve putative class members of

the responsibility to take affirmative conduct to preserve their rights. *See, e.g., American Pipe &*

*Const. Co. v. Utah*, 414 U.S. 538, 550 (1974). This procedure—notice and an opportunity to opt

out—is fundamental to the Rule 23 scheme.[4]

In this case, however, Xclusive unilaterally placed Ms. Simon in the position of having to affirmatively reject the arbitration requirement in order to retain her class member status. Put simply, the unilateral transmission of the arbitration requirement transformed Ms. Simon from a Rule 23 opt-out class member into an opt-in class member. That conduct is antithetical to the Rule 23 scheme and therefore improper. Although this reasoning does not preclude enforcement of the agreement with respect to any of Ms. Simon's *future* litigation, it precludes enforcement of the agreement with respect to the case that Mr. Valverde filed on Ms. Simon's behalf before she ever saw the arbitration agreement.

Importantly, this holding would be consistent with the FAA. Rule 23 prohibits defendants from effecting a unilateral transformation of the mechanism available to putative class members for deciding whether to remain part of a class: putative class members remain in the class until they affirmatively opt out of it. Unilateral *pre-*agreement conduct conflicts with this scheme if it places a putative class member in the position of having to affirmatively opt-*in* to the class. But arbitration agreements between defendants and putative class members are enforceable with respect to the already-filed class action as long as the plaintiff was provided a meaningful opportunity to maintain the status quo while retaining her putative class member status—as long as she genuinely decided to opt-*out* of the class as opposed to merely declining to opt-*in* to it. In other words, it is the transmission of the arbitration agreement under circumstances suggesting that

---

[4] One of the members of the Advisory Committee that crafted the 1966 amendments to Rule 23 explained that Rule 23(c)(2) was "evidently patterned after the highly successful procedures of the Book-of-the-Month Club. It is . . . the provision for giving 'the best notice practicable' to all members of the class, allowing the reluctant to opt out, but binding those who fail to respond." Marvin E. Frankel, *Some Preliminary Observations Concerning Civil Rule 23*, 43 F.R.D. 39, 44 (1968).

a putative class member must opt-*in* to an already-filed class action that transforms the Rule 23 scheme, not any resulting agreement. Because this violation of Rule 23 occurs before any arbitration agreement between the parties has formed, this analysis does not implicate the FAA. *Howard v. Ferrellgas Partners*, 748 F.3d 975, 977 (10th Cir. 2014) ("Before the Act's heavy hand in favor of arbitration swings into play, the parties themselves must agree to have their disputes arbitrated.").

**D.** **Even if Ms. Simon Entered into the "Mutual Arbitration Agreement," and Even if that Agreement is Enforceable with Respect to Her Claims against Xclusive and Astley, It Does Not Bear on Her Claims against Other Defendants.**

Finally, even if Ms. Simon entered into the arbitration agreement, and even if that agreement is enforceable with respect to her claims against Xclusive and Ms. Astley, it is not enforceable with respect to her claims against other Defendants. It is the general rule that a non-party to an arbitration agreement is neither bound by the arbitration agreement nor has the right to enforce the arbitration agreement. With respect to the former, "[i]t goes without saying that a contract cannot bind a non-party." *Equal Employment Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 294, 122 S. Ct. 754, 151 L. Ed. 2d 755 (2002). Similarly, a non-party to the arbitration agreement generally lacks the authority to enforce the arbitration agreement against a signatory to the contract. *See Britton v. Co-op Banking Group*, 4 F.3d 742, 744 (9th Cir. 1993).

In this case, the arbitration agreement purports to bind the employee and the Xclusive, and it purports to cover all claims brought by the employee against the Xclusive or "against its directors, employees, or agents." That language clearly covers Xclusive and Astley. But it does not cover any of the other Defendants. Those Defendants are not Xclusive's *agents*; rather, they are Xclusive's clients. The plain language of the agreement does not provide them with protection

14

from Ms. Simon's claims.

## CONCLUSION

For all of these reasons, the Court should deny Defendants' Motion to Compel Arbitration.

Respectfully Submitted,

/s/ David H. Seligman
David H. Seligman
Alexander Hood
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-248-8426
Fax: 303-957-2289
Email: david@towardsjustice.org

Attorneys for Plaintiffs

**Certificate of Service**

I hereby certify that on September 1, 2016, I served a true and correct copy of the forgoing on all parties that have appeared pursuant to F.R.C.P. 5.


 s/David H. Seligman__

David H. Seligman