**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 16-cv-00671-RM-MJW

ISABEL VALVERDE, *ET AL.,*
        Plaintiffs,
v.

XCLUSIVE STAFFING, INC. *ET AL.*,
        Defendants.

---

**RESPONSE TO DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED
COMPLAINT**

---

**Table of Contents**

I.   Introduction ................................................................................................................. 2

II.   Plaintiffs Plausibly Pled Their Claims ................................................................... 4

   A.   RICO ................................................................................................................. 4

      1.   Defendants' Novel RICO "Standing" Argument Should be Rejected ........................ 4

      2.   The FLSA Does Not "Preempt" Plaintiffs' Civil RICO Claims ................................ 10

      3.   Plaintiffs Adequately Allege Their RICO Claim Against Defendant Astley ............. 13

   B.   Federal and State Wage Claims ....................................................................... 23

      1.   The Plaintiffs Adequately Allege Federal and State Overtime Claims ..................... 23

      2.   The Deductions ................................................................................................ 25

      3.   Colorado State Law Joint Employment .................................................................. 30

   C.   Plaintiffs Have Standing to Bring their Multi-State State Law Class Action Claims ...... 30

   D.   Contract and Unjust Enrichment ...................................................................... 33

   E.   Plaintiffs Can Pursue Their Rule 23 Action Alongside Their FLSA Collective Action .. 34

Conclusion ................................................................................................................... 35

# I.    INTRODUCTION

Defendants would have this Court believe that this is a run-of-the-mill wage-and-hour case on top of which Plaintiffs' attorneys have alleged extravagant and novel claims. But it is the alleged facts, not Plaintiffs' claims, that are extraordinary.

The primary Defendants in this case are the entities composing Xclusive Staffing—a staffing agency based in Westminster, Colorado that has thousands of employees and sprawls over at least 10 states—and the person who 100% owns and controls all of these entities: Defendant Astley. The other Defendants are Xclusive's clients who, though perhaps also victims of Xclusive, are liable to Plaintiffs for some of their damages as joint employers.[1]

In their First Amended Complaint (ECF Doc. 52, "Complaint" or "Compl.") Plaintiffs allege a series of claims surrounding the following illegal pay policies: (1) deducting $3.00 from **every** employee pay check **every week** as a processing fee; (2) automatically deducting daily 30 minute breaks from employee work time even though employees in fact almost always work during these purported breaks; and (3) failing to give 10 minute breaks every 4 hours, as required under Colorado law. Compl. ¶¶ 50-82 (describing each of these policies in detail).

In a normal case, Plaintiffs might bring only federal and state wage-and-hour claims based on these policies. But this is no simple wage-and-hour case. Defendants' illegal business model is designed to mislead both workers and its clients in order to reap the profits of illegal wages while retaining business. In recent years, Xclusive's industry has boomed as "[s]ubcontracting, outsourcing, and the use of staffing agencies allows businesses to

---

[1] This response will often describe Defendants jointly because those filing the Motion—the Xclusive entities, Astley, and some of the clients—are defending this case jointly.

inexpensively scale up and scale down their labor needs, without the extra hassle and liability of adding payroll."[2] But these benefits also come with a substantial risk: when staffing agencies violate wage-and-hour laws, both the agencies and their clients can be held liable. This dynamic creates an incentive for staffing agencies to violate the wage and hour laws (to extract as much cheap labor from their workers as possible) while lying to their clients about their payroll practices (to maintain their customers and attract new ones).

Defendant Astley, through her wholly-owned corporation Xclusive, is doing exactly this. Focusing solely on the "electronic timekeeping scheme," Xclusive provides electronic time records of its employees' work hours and makes those records available, over the wires, to customers. Compl. ¶¶ 117-18. Among other things, these records help to reassure Xclusive's customers that Xclusive is paying its workers for all of the hours they work and overtime for all hours in excess of 40 hours per week. But the records are fraudulent.  They "consistently report 30 minute breaks that employees rarely take, notwithstanding that Xclusive and Defendant Astley know that this practice violates wage-and-hour laws." *Id.* ¶ 121. Similarly, the "Faxed Timesheet Scheme" allows Xclusive and Astley to "giv[e] clients the false impression that Xclusive's workers work less time than they actually."  *Id.* ¶ 130. The "Website Scheme" reassures Xclusive clients that Xclusive complies with wage-and-hour laws, even though Astley and Xclusive know this is false. *Id.* at ¶¶ 110-14. And the alleged "USDOL Scheme" involves

---

[2] Lydia DePillis, *Dep't of Labor Sends Warning Shot to Clients of Temp Staffing Agencies*, Wash. Post., Jan. 20, 2016, *available at* https://www.washingtonpost.com/news/wonk/wp/2016/01/20/department-of-labor-sends-warning-shot-to-clients-of-temp-staffing-agencies/.

serial misrepresentations to the USDOL that allow Xclusive and Astley to maintain their illegal

business practices notwithstanding mounting federal investigations. *Id.* ¶¶ 94-109.

In short, this case involves an explicit and knowing lie to the USDOL, workers, and

employers. That lie allows Astley to maintain a business model that would fail if exposed to

sunlight. It is a business model that harms Plaintiffs and the putative class and that profits Astley.

That is the basis for Plaintiffs' RICO claim.

## II.   PLAINTIFFS PLAUSIBLY PLED THEIR CLAIMS

### A.  RICO

#### 1.  Defendants' Novel RICO "Standing" Argument Should be Rejected

Defendants' RICO "standing" argument (better framed as a "ripeness" argument[3]) goes

like this: even if the wrongful conduct that serves as the basis for Plaintiffs' RICO claims is

distinct from the wrongful conduct supporting Plaintiffs' wage-and-hour claims, the monetary

harm giving rise to all of those claims is Plaintiffs' lost wages. But, according to Defendants,

because Plaintiffs may still recover some or all of those wages through their wage-and-hour

claims in this suit, we cannot yet be sure that Plaintiffs have suffered an injury to "business or

property," a prerequisite to an action under 18 U.S.C. § 1964(c). Under the principle Defendants

advance here, plaintiffs cannot assert a RICO claim if they have (or might be able to assert) a

different legal claim to remedy some of the monetary harm that supports their standing under

RICO. Every such claim will be "unripe" until the non-RICO claim is decided.

---

[3] "Although Renta labels his argument lack of standing and some cases use the same language, he is really arguing that the Commission's claims are unripe." *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1350 (11th Cir. 2008) (footnote omitted).

The error of Defendants' reasoning is illustrated most starkly by the absurd consequences that would follow from accepting it. Defendants approach would foreclose civil RICO liability in any case where the plaintiff also asserts a non-RICO claim seeking recovery of damages for the plaintiff's monetary harm—whether that other claim is for violating the FLSA, breach of contract, or any of the other causes of action that frequently arise alongside civil RICO claims. And Defendants' argument is even more extreme than that. It would also foreclose RICO liability where there might be another cause of action available. An extorted business owner, threatened with violence, would have no RICO claim against the mobster who breached his contract, as he could pursue that claim through a breach of contract action. The trafficking victim who seeks to deter a serial trafficker has no RICO claim, because she can obtain relief under a separate claim brought under the Trafficking Victims Protection Act. And of course, a serial violator of wage and hour laws, such as the Defendant here, cannot be attacked for fraudulently withholding wages because state and federal minimum wage laws provide a remedy.

This is not the law. Courts around the country have long held that RICO claims premised on alleged violations of non-RICO laws can proceed in tandem with claims brought under same non-RICO laws.[4] Indeed, there is a developing body of law that specifically allows for plaintiffs

---

[4] *See, e.g.*, *Sedima v. Imrex Co.*, 473 U.S. 479, 484 (1985) (reversing dismissal of a RICO claim based in mail and wire fraud that arouse out of a contract dispute in which the plaintiffs also alleged overlapping "claims of unjust enrichment, conversion, and breach of contract, fiduciary duty, and a constructive trust"); *Arabian American Oil Co v Scarfone*, 939 F 2d 1472, 1478 (11th Cir 1991) (reasoning that "no federal case or statute prohibit[s] a plaintiff from bringing a RICO action where a breach of contract claim also exists" and holding that a plaintiff is not precluded from bringing federal RICO action merely because a breach of contract claim exists for same conduct); *Battlefield Builders, Inc v Swango*, 743 F 2d 1060, 1062-64 (4th Cir 1984) (reversing dismissal of RICO claims by real estate developer alleging that condominium unit purchasers exacted money through threats of economic harm, and rejecting district court's determination that the complaint stated "at best a garden-variety commercial breach of contract"); *All World Prof'l Travel Servs. v. Am. Airlines, Inc.*, 282 F. Supp. 2d 1161, 1174 (C.D. Cal. 2003) (holding

to pursue FLSA claims alongside RICO founded in part on alleged violations of the FLSA.[5]  In

other words, when wrongful conduct violates both the RICO Act and other provisions of law

which themselves include private causes of action, plaintiffs can pursue both RICO claims and

claims under those other laws at the same time. There is no requirement that plaintiffs pursue the

non-RICO claims first.

Defendants' "ripeness" argument appears to derive from a line of cases rooted in the

Second Circuit's oft-rejected "clear and definite" standard, under which "a RICO plaintiff's

damages must be 'clear and definite' before a claim accrues." *See, e.g., Denney v. Deutsche*

*Bank AG*, 443 F.3d 253, 267 (2d Cir. 2006). Based on this principle, the Second Circuit has held

that "a plaintiff who claims that a debt is uncollectible because of the defendant's conduct can

only pursue the RICO treble damages remedy after his contractual rights to payment have been

frustrated"—before that point, his claims are unripe. *Motorola Credit Corp. v. Uzan*, 322 F.3d

130, 136 (2d Cir. 2003). Here, Defendants rely mainly on an unreported Eastern District of

Pennsylvania case, *FL Receivables Trust 2002-A v. Bagga*, 2005 WL 563535, at *4 (E.D. Pa.

Mar. 8, 2005), that itself relies on Second Circuit cases like *First Nationwide Bank v. Gelt*

*Funding Corp.*, 27 F.3d 763 (2d Cir. 1994) and *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096,

1106 (2d Cir. 1988). *See* Motion at 6-7.

---

in the context of a denial of a motion to dismiss a claim raised by an extorted contract holder that "[i]t is
well established that RICO claims are considered ripe and proper even if the damage to property alleged
for purposes of RICO arises out of conduct that violates another law, such as a breach of contract.").
[5] *See, e.g., Kuznyetsov v. W. Penn Allegheny Health Sys., Inc.*, No. 09-379, 2009 WL 2175585, at 2-4
(W.D. Pa. July 20, 2009); *Taylor v. Pittsburgh Mercy Health Sys., Inc.*, No. 09-377, 2009 WL 2992606,
at 1 (W.D. Pa. Sept. 17, 2009) (citing *Kuznyetsov* approvingly on this issue); *Camesi v. Univ. of*
*Pittsburgh Med. Ctr.*, No. 09-85J, 2009 WL 2940067, at 1 (W.D. Pa. Sept. 11, 2009) (same).

The Second Circuit's reasoning, however, is inapplicable here. On this point, the Eleventh Circuit's opinion in *Renta*, 530 F.3d 1339 (11th Cir. 2008), which rejected an argument similar to the one that Defendants assert in this case, is instructive. In *Renta*, a Dominican commission that had taken over a failed Dominican bank asserted claims against a Dominican-American businessman who had allegedly received fraudulent transfers from the bank in the form of sham "loans." The defendant argued that the commission could not assert RICO claims before first attempting to recover under the promissory notes supporting these loans. Until then, the defendant argued, the commission's RICO claim was "unripe . . . because [the commission] might get some of its money back elsewhere." *Id.* at 1350.

But, as the *Renta* court explained, that application of the "clear and definite" standard has been rejected by most other courts to consider it. The possibility that another cause of action might mitigate RICO damages bears on the amount of such damages, but it does not bear on the availability of the RICO claim. *Renta*, 530 F.3d at 1350; *see also Isaak v. Trumbull Sav. & Loan Co.*, 169 F.3d 390, 397 (6th Cir. 1999); *Grimmett v. Brown*, 75 F.3d 506, 517 (9th Cir. 1996) ("[The plaintiff] knew the value of her injury. . . at the time she filed her bankruptcy complaint. That she might have been able to recoup some of those damages in the bankruptcy proceeding did not preclude her from bringing her RICO action."). Although the Tenth Circuit has not weighed in expressly, at least one district court in this Circuit has persuasively reasoned that the Tenth Circuit has implicitly rejected the rule that a plaintiff must pursue all available remedies for remedying RICO harm before pursuing a RICO claim. *Sussex Grp., LLC*, 2009 WL 2497326, at *3 (W.D. Okla. Aug. 17, 2009) (citing *Deck v. Engineered Laminates*, 349 F.3d 1253 (10th Cir. 2003)).

Moreover, even under the Second Circuit's case law, the RICO claim at issue here is ripe

now. As the Eleventh Circuit also explained in *Renta*:

> [T]here is no *per se* rule—in this Circuit, the Second Circuit, or elsewhere—that a
> plaintiff must pursue every other avenue of re-covery, such as realization on
> collateral or claims for fraud or breach of contract, before his RICO claim is ripe.
> Nor is there a per se rule to the contrary. Rather, whether a plaintiff must pursue
> oth-er remedies before a RICO claim depends on whether those other
> contingencies are sufficiently likely to mitigate the plaintiff's loss that damages in
> the RICO case cannot be ascertained, or may not have occurred at all. RICO need
> not necessarily be the claim of last resort, but neither can a plaintiff seek to treble
> damages that he did not actually incur.

*Id.* at 1351. Where courts have concluded that the availability of an alternative remedy renders a

RICO claim unripe, the facts relating to the plaintiff's financial injury remain in flux at the time

she files her RICO claim—for example, where her RICO claims arise from the defendant's

interference with her ability to recover on a different claim that she is then pursuing in a different

forum, *see, e.g., Sky Med. Supply Inc. v. SCS Support Claims Servs., Inc.*, 17 F. Supp. 3d 207,

231 (E.D.N.Y. 2014); *Bagga*, 2005 WL 563535, at *3 (E.D. Pa. Mar. 8, 2005), or where the

plaintiff is a secured creditor who has not yet taken steps to enforce a security interest that would

mitigate its financial injury, *see, e.g., Motorola Credit Corp. v. Uzan*, 322 F.3d 130, 135 (2d Cir.

2003).

In this case, however, the facts giving rise to Plaintiffs' RICO injury are no longer in

flux. There is a difference between cases where "the [RICO] injury is speculative because it is

not known whether it will occur at all" and cases where "the [RICO] injury has occurred and is

known, but it is speculative whether the damages might be reduced or even eliminated by

alternative recovery efforts." *Grimmett*, 75 F.3d at 517. In this case, Xclusive's and Astley's

ongoing fraud allows them to maintain their relationships with customers while denying

Plaintiffs their rightful pay. The harm flowing from that fraud may be mitigated in part, but it cannot be said that the harm has not already occurred.

Finally, even if this Court were to accept Defendants' argument that Plaintiffs have no RICO injury where that injury can be completely redressed through another claim, Defendants' argument fails because it incorrectly presumes that Plaintiffs' monetary harm would necessarily be redressed by a favorable resolution of their wage-and-hour claims. In *Imperial Capital Bank v. Sussex Grp., LLC*, 2009 WL 2497326 (W.D. Okla. Aug. 17, 2009), a district court in this Circuit rejected the argument that "standing does not exist with respect to the [plaintiff's] RICO claims because any injury [the plaintiff] suffered as a . . . creditor is wholly contingent on the outcome of . . . foreclosure and guaranty claims which [were] part of [that] action." *Id.* at *2. Among other things, the court took issue with the suggestion that a successful foreclosure would resolve the entirety of the plaintiff's harm. That suggestion failed to take account of the monetary harm that would not be remedied by recovery of lost funds (even with interest). The plaintiff could, for example, have experienced harm in the form of the "opportunity costs" of doing business with the defendant. *Id.*

Similarly, here, while the FLSA provides for liquidated damages as "compensation to the employee occasioned by the delay in receiving wages due caused by the employer's violation of the FLSA," *Evans v. Loveland Auto. Investments, Inc.*, 632 F. App'x 496, 498 (10th Cir. 2015), it does not purport to provide damages for all of the monetary harm that an employee might experience as a consequence of lost wages. RICO damages would allow for a more precise approximation of Plaintiffs' monetary harm—including any opportunity costs of Plaintiffs' employment with Xclusive. *See Deck v. Engineered Laminates*, 349 F.3d 1253, 1260 (10th Cir.

2003). Even more concretely, Plaintiffs and putative class members cannot recover any damages under the FLSA outside of FLSA's three-year statute of limitations. 29 U.S.C. § 255(a). RICO's four-year statute of limitations, [6] on the other hand, would allow these employees to recover monetary damages beyond lost wages for the period between four and three years before Plaintiffs filed this case.

### 2.  The FLSA Does Not "Preempt" Plaintiffs' Civil RICO Claims

Defendants also argue that Plaintiffs' RICO claim is "preempted" by their FLSA claim. *See* Motion at 8. This argument also fails. It is true that violations of the FLSA do not necessarily trigger civil RICO liability. But this does not mean that where a single course of conduct involving multiple illegal acts results in the failure to pay employees their lawful wages under the FLSA, the only cause of action available to those employees is under the FLSA. Rather, the question is whether the course of conduct involves an independent violation of another law. Where it does, the employees may assert claims under that law as well. Because Plaintiffs' RICO claims are based on alleged conduct that violates RICO independently of its violation of the FLSA, they may assert both claims here.[7]

Defendants would have the Court believe that the FLSA effectively "occupies the field" with respect to conduct resulting in the failure to pay lawful wages. But in fact, the Act has a relatively narrow preemptive scope. It provides a broad federal scheme to ensure basic, minimum wage-and-hour protections for workers, but it was carefully drawn to allow for the

---

[6] *Agency Holding Corp. v. Malley-Duff & Associates, Inc*., 483 U.S. 143, 151 (1987).
[7] *See generally* James W. Crooks, *Fair Labor Fraud: The Peculiar Interplay of Civil Rico and the Federal Minimum Wage Act,* 112 Colum. L. Rev. 2153, 2158 (2012).

simultaneous operation of more protective state and municipal law. 29 U.S.C § 218(a). Indeed, nothing in FLSA preempts states from incorporating FLSA's substantive requirements into their own laws, while providing additional and more robust remedies than would be available under the FLSA. *See, e.g., Knepper v. Rite Aid Corp.*, 675 F.3d 249, 263 (3d Cir. 2012); *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 759-60 (9th Cir. 2010), judgment vacated on other grounds, 132 S. Ct. 74 (2011); *Bouaphakeo v. Tyson Foods, Inc.*, 564 F. Supp. 2d at 883; cf. *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. at 1042 (2016) (observing that Iowa law creates heightened, state-level remedies for failure to pay wages owed under the FLSA without acknowledging any potential preemption concerns).  In other words, there is **nothing about the FLSA** that dictates that conduct that in one regard violates the FLSA cannot, in another regard, be said to violate another provision of law.

Defendants have pointed to cases where courts have said that FLSA "preempts" other causes of action available under state or federal law. In these cases, however, it is that other cause of action that precludes its simultaneous application with RICO. For example, in holding that violations of the FLSA do not give rise to § 1983 claims, the *Kendall* court relied on a line of § 1983 law examining whether § 1983 claims are available for violations of law that provide their own causes of action. *Kendall v. City of Chesapeake, Va.*, 174 F.3d 437, 442 (4th Cir. 1999) (citing *Blessing v. Freestone*, 520 U.S. 329, 341 (1997)). The *Roman* court held that the plaintiffs could not recover under Maine law for violations of the FLSA that would result in double recovery. *Roman v. Maietta Const., Inc.*, 147 F.3d 71, 76 (1st Cir. 1998) ("Since *Román* received compensation under the FLSA for his claims, he cannot recover again under Maine law.").  And *Conner* held that the plaintiff could not pursue state wrongful discharge claims alongside FLSA

retaliation claims because the state supreme court "would not allow a common law cause of action for retaliatory discharge when an adequate statutory remedy exists" elsewhere. *Connor v. Schnuck Markets, Inc.*, 121 F.3d 1390, 1399 (10th Cir. 1997).

By contrast, as explained above, there is **nothing about RICO** that precludes its application to a wrongful course of conduct that also involves violations of the FLSA. The Supreme Court has again and again concluded that RICO—notwithstanding its origins in the fight against organized, illegitimate criminal enterprises—includes no implicit requirement that the defendant be involved in criminal conduct[8] or conduct that falls outside of the protections of other laws.[9]

The question, then, is not whether RICO claims can be pursued alongside FLSA claims—they clearly can be. The question is whether the alleged conduct violates both FLSA and RICO. Understandably, courts have looked skeptically on RICO claims based on the simple "bootstrapping" of FLSA violations into RICO's framework. *See* James W. Crooks, *Fair Labor Fraud: The Peculiar Interplay of Civil Rico and the Federal Minimum Wage Act*, 112 Colum. L. Rev. 2153, 2168 (2012). Many of these cases, including *DeSilva v. N. Shore-Long Island Jewish Health Sys., Inc.*, 770 F. Supp. 2d 497 (E.D.N.Y. 2011), cited by Defendants, "stem largely from a recent spate of lawsuits by hospital workers against their employers. These lawsuits use a 'boilerplate' RICO complaint that states the hospitals committed mail fraud when they sent paychecks to their employees that did not adequately compensate them for overtime." Crooks, *supra*, at 2168. It is contrary to RICO to allow RICO claims based on misrepresentations

---

[8] *See, e.g.*, *United States v. Turkette*, 452 U.S. 576, 580-81 (1981).
[9] *Sedima v. Imrex Co.*, 473 U.S. 479, 484 (1985).

transmitted through the mail or over the wires where those misrepresentations are merely the collateral and incidental consequences of an underlying FLSA violation. *See, e.g., Cavallaro v. UMass Mem'l Health Care Inc.*, 2010 WL 3609535, at *3 (D. Mass. July 2, 2010).

But Plaintiffs' RICO claims here do not involve such bootstrapping. The alleged fraud is not Xclusive's and Astley's ongoing transmission of illegally low wage payments. Rather, it is an explicit and public lie about Xclusive's employment practices. That lie is not mere puffery, and it is not a necessary and logical outgrowth of the failure to pay overtime wages in violation of federal and state law. Rather, it is designed to allow Xclusive and Astley to maintain and profit off of their business practices.

### 3. Plaintiffs Adequately Allege Their RICO Claim Against Defendant Astley

#### a. *The Alleged RICO Person and Enterprises are Distinct*

Defendants ignore binding Supreme Court case law in arguing that Defendant Astley is not sufficiently distinct from Xclusive and its various subsidiaries for RICO purposes. *See* Motion at 10-12. RICO provides that: "It shall be unlawful for **any person [*i.e.,* the RICO defendant]** employed by or associated with **any enterprise** engaged … to conduct or participate … in the conduct of such enterprise's affairs through a pattern of racketeering activity." 29 U.S.C. § 1962(c) (emphasis added). The RICO person and the RICO enterprise must be distinct:

> We do not quarrel with the basic principle that to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: **(1) a "person"**; and **(2) an "enterprise"** that is not simply the same "person" referred to by a different name.

*See Cedric Kushner Promotions v. King*, 533 U.S. 158, 161-62 (2001) (emphasis added) (citations omitted).

The Complaint alleges that Defendant Astley is the RICO person and then describes two enterprises:

> (1) an enterprise composed of Defendant Astley, Xclusive, and all of Xclusive's associated entities and subsidiaries; and
>
> (2) an enterprise composed of only Xclusive and all of Xclusive's associated entities and subsidiaries **without Defendant Astley**.

Compl. ¶¶ 86-87. This Court's analysis of whether there is sufficient distinctiveness between the alleged RICO person (Defendant Astley) and the alleged enterprises should be grounded in the Supreme Court's analysis **of this exact issue** in *Cedric Kushner*. It is no surprise that the Defendants entirely ignore *Cedric Kushner*, as it found "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." *Cedric Kushner,* 533 U.S. at 163.

*Cedric Kushner* considered whether a natural person named as a RICO defendant (Don King) was sufficiently distinct from the corporation named as the RICO enterprise (Don King Productions). *Id.* at 164. There, "[p]etitioner sued Don King, the president and sole shareholder of Don King Productions, a corporation, claiming that King had conducted the boxing-related affairs of Don King Productions in part through a RICO 'pattern,' *i.e.*, through the alleged commission of at least two instances of fraud and other RICO predicate crimes." *Id.* at 160-161. It was undisputed that the alleged fraud was committed while King was "acting within the scope of his authority" as an agent of the enterprise. *Id.* at 161. Plaintiffs' allegations are directly analogous to the facts at issue in *Cedric Kushner*. Like King, Ms. Astley is alleged to 100% own and control the entities composing the alleged enterprises and to have conducted the affairs of

14

the enterprise through a pattern of racketeering. *See* Compl. ¶¶ 85-131. Thus, just like in *Cedric Kushner*, Plaintiffs have alleged sufficient distinctiveness to withstand a motion to dismiss.

The cases Defendants cite are inapposite. For example, one district court case upon which Defendants rely acknowledges that the *Cedric Kushner* formulation as legally sufficient to make out an enterprise, but finds that the opposite formulation—when the **corporation** is the RICO person and the corporation and its employees are the RICO enterprise—is not sufficient:

> Plaintiffs rely on *Cedric Kushner Promotions v. King*, 533 U.S. 158 (2001), in support of their argument that BOA is distinct from the alleged enterprise, but such reliance is misplaced. *King* held that, in certain circumstances, RICO liability can attach to a corporate employee when the employee unlawfully conducts the affairs of the corporation. However, the Supreme Court specifically limited its discussion to cases where "a corporate employee is the 'person' and the corporation is the 'enterprise.'" Here, unlike King, the RICO "person" is BOA, the corporation itself, and plaintiffs claim that BOA the corporation is separate from the enterprise — a scenario that King explicitly declined to address.

*George v. Urban Settlement Servs.,* 2014 WL 4854576 (D. Colo. Sep. 30, 2014). Defendants blatantly misinterpret this authority, confusing the person-enterprise formulation in *George* with Plaintiffs' alleged formulation here. Moreover, *George* has recently been reversed with the RICO claim being permitted to proceed. *See George v. Urban Settlement Services,* --- F.3d ---, 2016 WL 4272377 (10th Cir. Aug. 15, 2016).

Furthermore, Defendants' reliance on Magistrate Shaffer's un-adopted report and recommendation in *LLacua v. Western Range Association*, Civil Action No. 15-1889-RED-CBS is also misplaced. There, Magistrate Shaffer addressed three separate RICO formulations, only one of which was marginally analogous to the one at issue here.[10] As to the RICO allegation

---

[10] Plaintiffs' counsel here is also Plaintiffs' counsel in *Llacua* and are intimately familiar with the case.

containing a similar RICO person-enterprise formulation as this one, Magistrate Shaffer largely relied on purported technical pleading errors to recommend dismissal.

Plaintiffs do not contend that there is a colorable RICO claim against **every owner or employee** of a corporation that engages in a pattern of racketeering. There likely is some yet-unclear limiting principle to the *Cedric Kushner* framework. *Cedric Kushner* states that "[a] corporate employee who conducts the corporation's affairs through an unlawful RICO 'pattern . . . of activity,' § 1962(c), uses that corporation as a 'vehicle' [through which unlawful activity is committed] whether he is, or is not, its sole owner." 533 U.S. at 164-65. Here, Defendant Astley is alleged to control all of Xclusive's activities, including its racketeering activities. *See, e.g.,* Compl. ¶ 20 ("Xclusive is a staffing agency based in Colorado that is 100% owned by Defendant Astley."); ¶ 26 ("All of these entities are under common control because they are all 100 percent owned and operated by Defendant Astley."); ¶ 30 ("Xclusive's operations throughout the country are controlled centrally out of its Westminster, Colorado headquarters."). Thus, regardless of where this limiting principle may fall, what is clear is that the enterprise alleged in *Cedric Kushner* was legally sufficient and the facts alleged here are **directly analogous** to those.

Finally, Defendants attempt to dispose of Plaintiffs' second enterprise formulation by claiming that the RICO person must also be part of the enterprise. Motion at 12-13 ("Defendant Astley is a required component of the RICO claim and, therefore, must be part of the underlying enterprise."). Defendants are likely incorrect—it does not appear that Don King was part of the alleged enterprise in *Cedric Kushner,* 533 U.S. at 164 ("This case concerns a claim that a corporate employee is the 'person' and the corporation is the 'enterprise.'"). And yet, it is true that some courts allow (or in some cases demand) that the RICO "person" be named as part of

the enterprise. *See River City Markets v. Fleming Foods West*, 960 F. 2d 1458, 1461 (9th Cir. 1992).  Whatever approach is correct, Plaintiffs allege both enterprise formulations—one including the RICO person in the enterprise and one not—to avoid dismissal on exactly this technical question. There is no difference between one or both of the enterprises proceeding past a motion to dismiss. Defendant Astley remains the Defendant, and the alleged racketeering activity and damages stemming from that activity are the same.

      **b.**  ***Plaintiffs Allege Racketeering Activity***

        **i.**  ***The Alleged Fraudulent Payroll Records are More than Checks***

      Defendants also misstate the law by claiming that "[p]ayroll records cannot constitute misrepresentations as a matter of law." Motion at 16 (citing *Williams v. U.S.*, 458 U.S. 279, 284-85 (1982)). Of course they can. What *Williams* says—as Defendants ultimately acknowledge—is that a payroll **check** cannot, on its own, constitute a fraudulent misrepresentation. Plaintiffs, however, do not argue that the transmission of checks alone constitutes a fraudulent misrepresentation. Instead, they claim that fraudulent timekeeping records were transmitted by mail and wired to Xclusive's Colorado corporate offices, and then checks based on those records were mailed to Xclusive's branches. *See, e.g.,* Complaint at ¶¶ 30, 105. Moreover, these fraudulent payroll records were provided to Xclusive clients, as employee work hours were the basis for Xclusive's client billing. Compl. ¶¶ 120, 129.

      Plaintiffs' attach one such timesheet to their complaint:

Ex. 4 to Compl. That timesheet exactly aligns with Plaintiffs' allegations regarding the 30-

minute breaks—*i.e.*, that 30-minute breaks were automatically inserted into employees' work

days—and includes the instruction to "Please Fax by Following day to: 303-430-0700 [identified

as Xclusive's fax number elsewhere on the page]." *Id.*; Compl. ¶¶ 30-74 ("On one such occasion,

Ms. Simon's supervisor wrote '.30' in the first row of the 'Break' column on a time sheet, and

then drew a squiggly line through the rest of the column to indicate **exactly** a 30 minute break for

**every** worker." (emphasis in original)). Plaintiffs also incorporate copies of Xclusive's electronic

time records:

| Time Card Submission Information | | | | |
|---|---|---|---|---|
| WorkDate | Shift | Times | Hours | Notes |
| Sat 5/24/14 | 1 | 3:00 PM- 6:46 PM | 3.77 | |
| Sat 5/24/14 | 1 | 7:16 PM- 11:02 PM | 3.77 | |
| Sun 5/25/14 | 1 | 8:00 AM- 11:30 AM | 3.50 | |
| Sun 5/25/14 | 1 | 12:00 PM- 3:30 PM | 3.50 | |
| Sun 5/25/14 | 2 | 4:00 PM- 7:17 PM | 3.28 | |
| Sun 5/25/14 | 2 | 7:47 PM- 11:03 PM | 3.27 | |
| Mon 5/26/14 | 1 | 9:07 AM- 1:19 PM | 4.20 | |
| Mon 5/26/14 | 1 | 1:49 PM- 6:00 PM | 4.18 | |
| Tue 5/27/14 | 1 | 8:06 AM- 12:26 PM | 4.33 | |
| Tue 5/27/14 | 1 | 12:56 PM- 5:15 PM | 4.32 | |
| Fri 5/30/14 | 1 | 8:00 AM- 12:23 PM | 4.38 | |
| Fri 5/30/14 | 1 | 12:53 PM- 5:15 PM | 4.37 | |
| Fri 5/30/14 | 2 | 5:16 PM- 8:22 PM | 3.10 | |
| | | Totals:  Billable | 49.97 | |
| | | Non Billable | 0.00 | |

*Cota Martinez et al v. Xclusive Management LLC et al.*, 15-cv-00047 (D. Colo.),

ECF Doc. 39-6 at 9; Compl. ¶ 119 (incorporating the exhibits by reference).  Incredibly, and

implausibly, this employee's[11] days are split **exactly in half**, with 30 minutes of uncompensated

time unceremoniously wedged in the middle. For example, on 5/24/2014, Xclusive would have

us believe that this employee worked **exactly** 3.77 hours in the afternoon and **exactly** 3.77 hours

in the evening, with **exactly** 30 minutes in between. For this to happen, one day could be an

incredible coincidence. For it to happen five days in a row is impossible.

---

[11] Reviewing the whole timesheet reveals it is for an Xclusive employee at the Omni Defendants' hotel in 2014.

### ii.  *Plaintiffs Allege that Agents of the Astley Enterprise Enter Time*

Defendants next audaciously contend that any fraudulent timekeeping records are the employees' fault because employees enter time into the system. Motion at 17. But plaintiffs allege the opposite: that Xclusive has supervisors at client locations that maintain time records for transmission to Xclusive's headquarters. Plaintiffs make this allegation with respect to both electronic timekeeping and paper timekeeping. Compl. ¶¶ 116, 127. But even if it were not, as it is, crystal clear that the Complaint alleges Xclusive supervisors maintained timekeeping records for transmission to Xclusive's home office, the Complaint should be read in a light most favorable to the Plaintiffs and all inferences should be in Plaintiffs' favor.

### iii.  *Xclusive's Claims on its Website Are Fraudulent*

Defendants next misstate the law in attempting to argue that Xclusive's statements on its website cannot be fraudulent because they are statements of law. Motion at 17-18. This argument is based on a faulty legal premise. The question is not whether the alleged fraudulent statement characterizes the law; it is instead whether the statement purports to be one of fact or opinion. Restatements (Second) of Torts § 545. And even if the statement is a mere opinion regarding the law, "it may, as in the case of any other statement of opinion, carry with it by implication **the assertion that the facts known to the maker are not incompatible with his opinion** or that he does know facts that justify him in forming it." *Id.* cmt. c (emphasis added). In other words, claiming to follow the law when you know you are not or claiming the law is something that you know it is not, is **fraud.**

In *Miller*, upon which Defendants principally rely, the plaintiff attempted to claim that that paychecks and W2s that did not contain statutorily required overtime were fraudulent. That

is wholly different from the alleged fraud here. Compl. ¶¶ 46-49, 111-112. Xclusive **knew** it was violating wage and hour laws, and yet still told its clients on its website that it took these laws "extremely seriously," that it "exceed[s] industry standards to ensure [its clients'] protection]," and claimed "[f]ull compliance with overtime laws." Compl. ¶¶ 46-49.

First, claims to take laws seriously and to exceed industry standards to ensure client protection have **nothing** to do with the law. They are simply fraudulent statements of fact. Claims that Xclusive is following the law when it knows it is not, are also fraud. In particular with respect to the illegal 30-minute deduction scheme, the Complaint alleges that Defendants have been caught red-handed and sanctioned over and over again by the USDOL due to this policy and its **violation** of the FLSA. Compl. ¶¶ 72, 73. Despite this, "Xclusive's website currently advertises that Xclusive 'exceed[s] industry standards' in complying with 'federal, state and local laws' and, until recently, touted '[c]ompliance with all federal, state and local labor laws' in advertising 'Why Xclusive Staffing?'" *Id.* 110-14. This is also a fraud.

c. ***Defendant Astley used the Mail and Wires to Make Fraudulent Statements to the DOL that Harmed the Plaintiffs***

Defendants next claim that Plaintiffs' allegations regarding fraudulent misrepresentations should not proceed because fraudulent misstatements to the USDOL were not "in furtherance" of the alleged schemes and because, as they erroneously perceive the law, any employee harmed by the fraud must also have been the target of the fraud. Motion at 20-21.

The first argument is easily dismissed. Defendants are continually under investigation by the USDOL. *See* Compl. ¶¶ 83-84. And, particularly with respect to the 30-minute scheme, Defendants are continually caught, sanctioned, and proceed with this illegal activity. In order for this pattern to continue, the Complaint alleges Defendants repeatedly lie to the USDOL, blaming

the violations on everyone but themselves. *See* Compl. ¶¶ 94-109 (detailing the USDOL

Scheme).   For example, Plaintiffs allege:

> After a 2012 investigation by the USDOL finding that Xclusive had "failed to count missed lunch breaks," Defendant Astley blamed Xclusive's client, Grand Hyatt for the practive. Id. Ms. Astley's statement was clearly fraudulent because the investigator found that "employees have missed lunch breaks that Grand Hyatt employees did not have," i.e., the Grand Hyatt's non-Xclusive employees only recorded unpaid lunch breaks when they actually took breaks, whereas Xclusive recorded unpaid lunch breaks for Xclusive workers whether or not those workers took their lunch breaks.

*Id.* ¶¶ 94-96.

> In 2014, the USDOL found that Xclusive was automatically deducting lunch breaks at another hotel. At the close of the investigation, the DOL held a 2/24/14 meeting with Ms. Astley at the Denver District Office of the USDOL Wage and Hour Division. According to the USDOL, "Ms. Astley stated that Xclusive never automatically deducted lunches." After the investigator showed Ms. Astley records showing that every employee was off the clock from exactly 12:00pm to 12:30pm, Ms. Astley again blamed Xclusive's client – this time Hampton Inn & Suites – for the practice.

*Id.* ¶ 97.

> Specifically, the Astley Enterprise continually and repeatedly made material and false representations to the USDOL Wage and Hour Division after investigations by that agency found violations of wage and hour laws.  One such communication to the USDOL is attached as Exhibit 5. There, Ms. Atsley responds to a letter from the USDOL referencing a "history of prior violations" by Xclusive, noting previous assurances by Ms. Astley "of full future compliance with the [FLSA]," and assigning penalties. In her response, Ms. Astley disavows any knowledge the facts found by USDOL, blames Xclusive's employees and clients for the violation, and against promises that "it is our Company's [sic] intent and policy to comply with all applicable laws."

*Id.* ¶¶ 107-108.  Defendants made these statements to the USDOL despite **knowing** they were

persisting with its illegal scheme. *See* Compl. ¶¶ 99-101, 109.

Finally, Defendants' argument that Plaintiffs "cannot ground their racketeering activity in

Astley's communications with the DOL" again blatantly ignores clear Supreme Court precedent

to the contrary. In *Bridge v. Phoenix Bond & Indem. Co*., the Supreme Court held that the object of RICO fraud does not have to be the same as the victim of RICO fraud. *See generally* 553 US 639 (2008). There, the RICO defendants were participants in a county lien auction and made fraudulent statements to the county in advance of the auction. Other auction participants sued under RICO claiming the Defendants' statements to the county proximately caused their harm— the "lost … opportunity to acquire valuable liens." The Court found that this was sufficient for proximate cause: the "alleged injury-the loss of valuable liens-is the direct result of petitioners' fraud." *Id.* at 655-57.

Here, like in *Bridge,* the alleged fraud was directed at a government agency, but it harmed third parties—Defendants' employees. *Id.* at 658. The Complaint alleges that Defendants lied to the USDOL in order continue their illegal pay policies, which, in turn, allowed Defendants to continue to pay Plaintiffs illegally low amounts. This is sufficient.

## B. Federal and State Wage Claims

### 1. The Plaintiffs Adequately Allege Federal and State Overtime Claims

Defendants cherry-pick from, and otherwise ignore, Plaintiffs' Complaint to argue that for both the federal and state overtime claim, Plaintiffs "never assert they were not paid at a rate of 1.5 times their normal hourly rate for hours they worked over 40 in a particular week." Motion at 22-24 (federal claims), 26-27 (state claims). Defendants' apparent argument is that because the paystubs attached to the Complaint include hours worked in excess of 40 in a week and because these hours were compensated with overtime premiums on the paystubs, they have not sufficiently alleged their wage-and-hour claims.

However, Plaintiffs plainly do not claim that they were **never** paid for **any** overtime by Defendants. Rather, they claim that Defendants illegal timekeeping policies systematically led to work time going unrecorded and uncompensated. Specifically, Plaintiffs claim that Defendants systematically did not compensate Plaintiffs for purported 30 minute breaks, during which Plaintiffs in fact worked. *See* Compl. ¶¶ 60-74. Similarly, for the employees in Colorado, Xclusive failed to provide the legally required 10-minute rest breaks, which results in 10 minutes of uncompensated work time as a matter of law. *See id.* ¶¶ 74-82 (detailing failure to give breaks); 7 CCR 1103-1 (Colorado Wage Order requiring that "[a] compensated ten (10) minute rest period for each four (4) hours or major fractions thereof shall be permitted for all employees."); *Lozoya v. AllPhase Landscape Constr.,* Inc., No. 12-CV-1048-JLK, 2015 WL 1757080, at *2 (D. Colo. Apr. 15, 2015) ("[a]lthough there do not appear to be any state or federal Colorado decisions on point, the idea that missed rest periods can constitute 'wages or compensation' has been accepted by other courts….I find that **Plaintiffs may prevail on their claim for lost wages because of unused rest breaks…."**).

What Defendants ignore, and what is common sense and plain from the face of the Complaint, is that Xclusive's records for every workweek that already reports overtime hours worked necessarily underreports the number of overtime hours **actually** worked. Therefore, all of those weeks contain uncompensated overtime under both federal and state law. Plaintiffs also point to specific work weeks where this occurred. *See* Exs. 1-3 to Compl.  Because the timesheet exhibits for these workweeks already report overtime, the effect of the uncompensated work time is additional unpaid overtime. Finally, the result of the deductions described below is also to fail to pay legally required state and federal overtime.

### 2.   The Deductions

In the Complaint, Plaintiffs allege that Defendants deducted $3.00 from each paycheck as a fee for receiving their pay, *i.e.*, Xclusive charged the Plaintiffs and those similarly situated to recoup the cost of issuing pay checks. *See* Compl. ¶¶ 50-59. Defendants do not attempt to refute this characterization. Instead, they provide a purported copy of Plaintiff Valverde's Spanish employment contract, a document entitled "Employment Policies" purportedly signed by Plaintiff Simon, and a purported English version of Mr. Valverde's Spanish contract. *See* Exs. C & D to Motion.[12] Mr. Valverde's purported contract, translated into English, describes the $3.00 fee as follows: "Every Monday the paycheck must include the days worked from Monday to Sunday of the previous week and a deduction of $ 3.00 on each check you receive per week."[13] This is exactly what Mr. Valverde described in the Complaint. Compl. ¶ 57 ("Plaintiff Valverde signed a contract, written in Spanish, that refers to a $3.00 deduction in each check without explaining the purposes of the $3.00 deduction.") The other two documents only add slightly more description: calling it a "$3.00 placement/process fee." *See* Ex. C at 4; Ex. D at 1.

Regardless, Plaintiffs' alleged description of the $3.00 fee remains, as it should on a motion to dismiss, unrebutted by the evidence brought forward by Defendants: a weekly administrative fee paid by Plaintiffs to receive their pay. Plaintiffs also allege a series of other deductions from Plaintiffs' pay: "The paystubs also reflect deductions for a criminal background check, a name tag, a kitchen uniform, and kitchen tools during the year to date." Compl. ¶ 55.

---

[12] Plaintiffs object to the authenticity of the documents provided by Defendants.
[13] In Spanish, it states: "Cada Lunes el cheque de pago deberá incluir los días trabajados de Lunes a Domingo de la semana anterior y una deducción de $3.00 en cada cheque que reciba por semana." Plaintiffs' note that the purported English translation provided by Defendants **is not** a correct translation.

Upon these allegations, the Plaintiffs make two claims: (1) the fee results in Plaintiffs not being

paid for all overtime in overtime weeks, and (2) the fee and other deductions constitute illegal

deductions under Colorado Revised Statutes § 8-4-105.

### a. *The $3.00 Fee Results in Unpaid FLSA Overtime in Overtime Workweeks*

In their attempt to argue that Plaintiffs failed to plead that they were denied overtime for

all hours worked in excess of 40 hours per week, Defendants also ignore the effect of the $3.00

weekly fee on Plaintiffs' overtime pay under the FLSA.[14] Because the $3.00 deductions is

principally for the benefit of the employer,[15] it is subject to FLSA's illegal kickback regulations

which bar such deductions from taking an employee's pay below minimum wage and set specific

requirements for taking such deductions in weeks in which an employee works overtime. *See* 29

C.F.R. §§ 531.36 ("Nonovertime workweeks"), 531.37 ("Overtime workweeks").

For a multitude of reasons Plaintiffs do not claim that the $3.00 deduction is illegal in

nonovertime workweeks. But Plaintiffs' **do** claim that the deductions are illegal in overtime

workweeks. The regulations allow deductions in overtime workweeks in the same fashion as

nonovertime weeks with important caveats: "their purpose and effect [cannot be] to evade the

overtime requirements of the Act or other law," and the deductions must be *"bona fide*

deductions . . . made for particular items in accordance with the agreement or understanding of

the parties." *Id.* § 531.37. These principles are further explained in a USDOL opinion letter:

_____

[14] Plaintiffs' assert first that Defendants have waived, by not raising, any argument that the allegations regarding the $3.00 fee do not constitute a FLSA overtime claim. However, if Defendants' vague assertions regarding Plaintiffs' overtime claim preserve their argument, Plaintiffs include the following.
[15] The USDOL found as much in finding that the $3.00 deduction cut into employees' minimum wage in a 2011 USDOL investigation of Xclusive in Texas. *See* Ex. A at 5-6 ("The Employer deducted $3.00 per paycheck as a processing fee…."[The Investigator] explained that deductions could not bring an employee's pay below the minimum wage.").

> Regulations, 29 CFR §531.37 contains our interpretations on deductions from wages for non-3(m) items in overtime workweeks. Briefly, deductions for articles that do not qualify as "board, lodging, or other facilities" under FLSA section 3(m) may be made in an overtime workweek to the same extent as in a non-overtime workweek, if their purpose and effect are not to evade the overtime requirements of the FLSA **or other law**, and provided the situation involves **bona fide** deductions that are made for **particular items** according to an **agreement or understanding** between the employer and the employee (29 CFR §531.37(a)). If all these conditions are met, the total amount that an employer may deduct from an employee subject to overtime pay in an overtime workweek may not exceed the amount that could be deducted if the employee had only worked a 40-hour week.

USDOL Opinion Letter, FLSA2001-7 (Feb. 16, 2001), *available at*

https://www.dol.gov/whd/opinion/FLSA/2001/2001_02_16_7_FLSA.htm (emphasis in original).

The deductions at issue here do not meet these requirements in overtime workweeks, and they thus constitute a failure to pay FLSA overtime in any overtime workweek. First, the deductions are not for "particular items." *Id.* ("The agreement must be specific concerning the particular items for which the deductions will be made, and the employee must know how the amount of the deductions will be determined that are included in the agreement.").  For the $3.00 fee, there can be no dispute: Mr. Valverde's purported agreement does not give a purpose for the $3.00 fee **at all** and the other two documents only describe the fee vaguely as a "$3.00 placement/process fee." That cannot be "specific" enough. In any event, "the burden of proof that an employee has agreed to the deduction policy rests on the employer." *Id.*

Moreover, the deductions must be *bona fide.* The USDOL explains that a deduction cannot be *bona fide* if it violates state law or if the deduction amount is more than the reasonable cost of the item. *Id.* ("Deductions which evade other laws (Federal, State or local) or which are otherwise prohibited by other authority are not bona fide.") ("Deductions for amounts above the reasonable cost to the employer of furnishing a particular item to an employee are also not bona

fide (e.g., furnishing items to employees 'at a profit').").  For the reasons articulated below, the

$3.00 deduction violates Colorado state law in **every workweek** and thus also violates the FLSA

in overtime workweeks.  Moreover, the fee is also not *bona fide* because Plaintiffs have alleged

that the $3.00 deduction **is not a reasonable fee** for the paying Plaintiffs.  *See* Compl. ¶ 59.

Indeed, both the alleged facts and common sense point toward Xclusive profiting off deductions

from employees for paying employees; that is explicitly barred.

Because Xclusive admits to the $3.00 deduction in every week, and because it is not a

"*bona fide*" deduction for "particular" items, Plaintiffs did not receive legal compensation for

their overtime in any week in which they worked overtime.  Plaintiffs thus have a FLSA overtime

claim for every week that they otherwise worked overtime, including the work weeks described

by the paystubs attached to the Complaint.  *See* Exs. 1-3 to Compl..

### b. <u>*Illegal Deductions Under Colorado Law*</u>

Defendants misconstrue Colorado law by apparently contending that all deduction are

permitted from wages where those deductions are subject to written authorization.  Motion 28-29.

That is not the law.  Even if Plaintiffs agreed to the deductions in writing, they had to be for a

"good or service." Colo. Rev. Stat. § 8-4-105 does not permit all deductions from wages with

written authorization:

> (1) No employer shall make a deduction from the wages or compensation of an
> employee except as follows: …
>
> (b) Deductions for loans, advances, **goods or services**, and equipment or property
> **provided by an employer to an employee pursuant to a written agreement**
> between such employer and employee, so long as it is enforceable and not in
> violation of law;

(emphasis added).

As to the $3.00 deduction, as described above for FLSA kickbacks, there is no written agreement specific enough to satisfy the Colorado statute. A written agreement to deduct $3.00 per pay check with no description of the purpose of the deduction cannot suffice as a written agreement for a "good or service." And a vague agreement to deduct $3.00 per pay check for "placement/process" should not either.

Further, if the fee is, as Plaintiffs allege, merely an administrative fee through which Xclusive recoups the cost of paying its employees, Xclusive is providing no "service" at all to Plaintiffs. Instead, Xclusive is providing only what it is legally required to do—pay wages by negotiable instrument, direct deposit, or pay card. *See* Colo. Rev. Stat. §§ 8-4-102, -103 (requiring payments of wages and method of pay). If no "service" is provided in exchange for the $3.00, the existence of a written agreement to deduct the $3.00 is irrelevant and the deduction is illegal under § 8-4-105.

Common law contract principles contain similar limitations. Under the preexisting duty rule, "[p]erformance of a legal duty owed to a promisor which is neither doubtful nor the subject of honest dispute is not consideration…." Restatements (Second) of Contracts § 73; *see Van Schaack Holdings, Ltd. v. Fulenwider*, 798 P. 2d 424, 431 (Colo. 1990) (recognizing preexisting duty rule). Just as Xclusive cannot enter into an enforceable contract requiring its employees to pay for the privilege of Xclusive complying with its legal obligation to pay wages, Xclusive cannot frame its legal obligation to pay its workers as a service to its employees under § 8-4-105.

Finally, as to the other deductions—*e.g.*, criminal background checks, name tags, kitchen uniforms, and kitchen tools—§ 8-4-105 also does not apply. First. other than for the uniforms and name tags, Defendants have provided no written agreement to avoid the general rule that

"**[n]o employer shall make a deduction from the wages** or compensation of an employee."

Colo. Rev. Stat. § 8-4-105(1). If an agreement does exist, that is Defendants' burden.

Second, even if there is a written agreement, the statute is not meant to permit a shift of

the cost of doing business from the employer to the employee. Rather the deductions must confer

some benefit to the employee. *Id.* ("goods or services, and equipment or property **provided by**

**an employer to an employee…**."). The statute is not meant to allow an employer to deduct, for

example, the cost of office air conditioning or the cost of the keyboard to an employee's office

computer. Similarly, here, requiring employees to pay for undergoing a background check, or to

use uniforms, name tags, and tools that the employer provides, should not be permitted.

### 3.   Colorado State Law Joint Employment

Defendants claim that Plaintiffs have failed to identify any reason why its clients, where

Plaintiffs Valverde and Simon worked, should be liable for Plaintiffs' state statutory wage claim.

Motion at 29. The obvious answer is that Plaintiffs allege that Xclusive and its clients jointly

employ the workers:

> Xclusive's clients also rely on and help control the work of the workers provided
> by Xclusive. The USDOL has found that Xclusive employees are an integral part
> of the clients' business activities, providing large numbers of housekeeping,
> cooking, room attendant, and other operational staff. Moreover, client supervisors
> take part in training, controlling, and inspecting the work of Xclusive's
> employees.

Compl. ¶ 34. And Colorado recognizes the joint employment doctrine. *Pinkstaff v. Black &*

*Decker (US) Inc.*, 211 P. 3d 698, 703 (Colo. 2009) ("Baldwin and Black & Decker will be unable

to contest the issues of liability, willful non-payment of wages, and Black & Decker's status as

an alleged joint employer.").

## C.  Plaintiffs Have Standing to Bring their Multi-State State Law Class Action Claims

Defendants also contend that Plaintiffs do not have standing to assert state-law claims on behalf of putative class members who worked in states other than Colorado (where Plaintiffs worked). They rely in part on *Smith v. Pizza Hut, Inc.*, No. 09-CV-01632-CMA-BNB, 2011 WL 2791331 (D. Colo. July 14, 2011), where the court concluded that a plaintiff who had worked for the defendant in Colorado did not have "standing" to represent a proposed class asserting claims under the laws of states where the plaintiff had not worked. *Id.* at *8.

The Court can allow these claims to go forward, however, without having to reject *Smith v. Pizza Hut*. In this case, it is enough for the Court to recognize that *Pizza Hut* was animated by **prudential** standing concerns, and that those concerns should not here. As another court recently explained, courts "ha[ve] the **discretion** to defer questions of standing until after class certification." *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051, 1074 (N.D. Cal. 2015) (Chen, *J.*) (emphasis added). The court ultimately decided to "require the Plaintiffs [in that case] to present a named class member who possesses individual standing to assert each state law's claims against Defendants." *Id.* But its reasoning supports Plaintiff's claims here. It explained that to have proceed to class certification, a putative class action must be (1) brought by plaintiffs who each have experienced an injury in fact that is concrete and particularized, actual and imminent, and likely redressable by a favorable decision, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); and (2) be brought against defendants each one of which is alleged to have caused the injury in fact of at least one named plaintiff. But, once a court is assured that a putative class meets these requirements, it "does no violence to Article III" to certify a class before considering whether the named plaintiffs could assert all of the proposed class members' claims if they were pursued in an individual action. *In re Carrier IQ, Inc.*, 78 F. Supp. 3d at 1073.  After all, if the

31

class includes at least one member who has a claim under each of the state laws asserted by the class a "case or controversy [will] . . . be assured" the moment the class is certified. *Id.*; *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999) (in settlement-approval context, courts may address certification before standing of individual class members); *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) (same).

Consistent with this approach, a number of federal courts have concluded that the standing question raised here can be resolved **after** class certification. As one federal district court in Florida explained, dismissing putative class claims for lack of standing in contexts like this "would . . . impose a requirement that, in a multistate class action involving state . . . law claims, [that] there be a named plaintiff from every state." *Wilson v. EverBank, N.A.*, 77 F. Supp. 3d 1202, 1231 (S.D. Fla. 2015). This result is inconsistent with "established practice," and "highly inefficient." *Id.*; *see also In re DDAVP Indirect Purchaser Antitrust Litig.*, 903 F. Supp. 2d 198, 213 (S.D.N.Y. 2012) (collecting cases and deciding to "join the courts in [the] growing consensus [to] find that class certification is logically antecedent to the issue of standing" in cases where the named plaintiff seeks to represent class members asserting claims under the laws of states where the named plaintiff does not reside or work).

In this case, the equitable concerns guiding the prudential standing analysis strongly counsel in favor of postponing the standing question until after certification. Unlike *In re Carrier IQ*, this is not a sprawling consumer class action involving sophisticated class members. The members of the proposed class are low-wage, mainly immigrant workers who likely do not have much experience with the American legal system and may fear that their employer will retaliate against them for participating as a named plaintiff in this dispute. These employees may be

deterred from serving as named plaintiffs, but they can effectively and efficiently achieve redress

as absent class members through the claims processing and distribution process.  In cases like

this, then, the requirement that there be a class representative who can individually assert each

state claim raised by the putative class is particularly inefficient and harsh, and is only likely to

insulate wrongdoers from liability for wrongful policies that stretch across state lines.

**D.  Contract and Unjust Enrichment**

Defendants also argue that Plaintiffs contract- and quasi-contract claims are preempted

by FLSA. They rely on old authority from the losing side of circuit split, *Anderson v. Sara Lee

Corp.*, 508 F.3d 181, 191-192 (4th Cir. 2007), which in turn relies in large part on *Kendall v.

City of Chesapeake*, 174 F.3d 437, 443 (4th Cir. 1999), a case where FLSA was found to

preempt the shoehorning of wage claims into an action under 42 U.S.C. § 1983.

Contrary to these authorities, numerous courts have determined that state law can

incorporate FLSA's substantive requirements while providing remedies and procedural

advantages that FLSA does not provide. *See Irigoyen-Morales v. Concreations of Colo.*, 2016

U.S. Dist. LEXIS 85837, at *4 (D. Colo. June 30, 2016) (holding that Colorado minimum wage

law "supports a claim for overtime pay owed under the FLSA"); *see also Knepper v. Rite Aid

Corp.*, 675 F.3d 249, 263 (3d Cir. 2012); *Wang v. Chinese Daily News, Inc.*, 623 F.3d 743, 759-

60 (9th Cir. 2010), *judgment vacated on other grounds*, 132 S. Ct. 74 (2011); *Bouaphakeo v.

Tyson Foods, Inc.*, 564 F. Supp. 2d at 883; *Avery v. City of Talladega*, 24 F.3d 1337, 1348 (11th

Cir. Ala. 1994) (rejecting Defendants' position and noting that "if violation of the FLSA has

occurred, then a violation of the contract, which incorporates the FLSA, will have occurred"); *cf.

Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. at 1042 (2016).

33

For similar reasons, Plaintiffs promissory estoppel claims can go forward if the parties never entered into an implied-in-fact contract to pay legal wages. Defendants attack Plaintiffs' promissory estoppel claim, by suggesting that any assurances that Xclusive follows wage-and-hour laws are "general policy" statements that are too equivocal to give rise to an estoppel claim. Plaintiffs allege, however, that Xclusive makes public and explicit communications about wage policies, and that plaintiffs justifiably relied on Xclusive's statements in deciding to work for Xclusive. In other words, this is not merely a "vague" assurance. *Vasey v. Martin Marietta Corp.*, 29 F.3d 1460, 1464 (10th Cir. 1994).

Finally, Defendants attempt to argue that the unjust enrichment claim is precluded by the existence of a contract. They fail to realize, however, that Plaintiffs' unjust enrichment claims are properly pled in the alternative. *See Robert W. Thomas & Anne McDonald Thomas Revocable Trust v. Inland Pac. Colorado, LLC*, No. 11-CV-03333-WYD-KLM, 2012 WL 2190852, at *4 (D. Colo. June 14, 2012) ("I find that the Trust may plead unjust enrichment in the alternative to the breach of contract claim at this stage of the litigation, but will have to choose which claim to pursue at a later date.").

**E.  Plaintiffs Can Pursue Their Rule 23 Action Alongside Their FLSA Collective Action**

Defendants also argue that Plaintiffs cannot pursue a "hybrid" class and collective action under Rule 23 and the FLSA. This argument should be rejected too. Courts in this District frequently exercise supplemental jurisdiction over state law claims asserted as Rule 23 class actions and federal FLSA claims asserted as collective actions. It "would [after all] not serve the interests of judicial economy, convenience, and fairness" to require two parallel proceedings.

*Bass v. PJCOMN Acquisition Corp.,* 2011 WL 2149602, \*5 (D. Colo. June 1, 2011); *see also*

*Lozoya v. AllPhase Landscape Constr., Inc.*, 2015 WL 1524639, at \*1 (D. Colo. Mar. 31, 2015).

## CONCLUSION

For the forgoing reasons, Defendants' motion should be denied.

Respectfully Submitted,

s/Alexander Hood
Alexander Hood
David Seligman
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

Attorneys for Plaintiffs

**Certificate of Service**

I hereby certify that on 9/1/2016, I served a true and correct copy of the forgoing on all parties that have appeared pursuant to F.R.C.P. 5.

 s/Alexander Hood
Alexander Hood